IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| QBE SPECIALTY INSURANCE COMPANY, | ) ) ) | CIVIL NO. 22-00450 SOM-KJM |
| Interpleader-Plaintiff, | ) ) | ORDER GRANTING IN PART AND DENYING IN PART CHRISTOPHER GOSSERT'S MOTION FOR SUMMARY |
| vs. | ) ) ) | JUDGMENT; ORDER DENYING PAUL MARINELLI'S AND JEFFERY AU'S |
| DAVID UCHIYAMA, CHRISTOPHER GOSSERT, PAUL MARINELLI, JEFFERY AU, and CATHERINE YANNONE, | ) ) ) ) ) | MOTIONS FOR PARTIAL SUMMARY JUDGMENT |
| Interpleader-Defendants. | ) ) ) | |

**ORDER GRANTING IN PART AND DENYING IN PART CHRISTOPHER GOSSERT'S MOTION FOR SUMMARY JUDGMENT; ORDER DENYING PAUL MARINELLI'S AND JEFFERY AU'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

**I.      INTRODUCTION.**

Before the court are dueling requests for partial summary judgment in an interpleader action arising from litigation associated with the bankruptcy of Hawaii Island Air, Inc. ("Island Air"), and a lawsuit against several of the company's former officers, directors, owners, and lenders.  The former officers and directors are covered by QBE insurance policy number QPLO192298 ("the Policy").  Rather than assume the risks associated with determining how to allocate finite Policy funds among the Interpleader-Defendants, QBE filed a Complaint for Interpleader.[1]  Not long after, QBE filed a motion for leave to

_____

[1] QBE first filed this interpleader action in the U.S. Bankruptcy Court for the District of Hawaii pursuant to a reference from the district court.  *See QBE Specialty Ins. Co. v. Kane*, Adv. No. 22-90006 ("Bankruptcy Proceeding"), ECF No. 1.

deposit the remaining Policy funds with the court and for discharge, injunctive relief, and dismissal.  *See* ECF No. 12. The court granted QBE's motion, concluding that QBE faced a real threat of multiple competing claims and had properly sought interpleader.  ECF No. 48.  Accordingly, the court enjoined any party to the action from seeking Policy funds in another state or federal court proceeding.  ECF No. 48.  Interpleader-Defendant Paul Marinelli's appeal of that order is pending before the Ninth Circuit.  *See* ECF No. 54.

Now, Interpleader-Defendants seek summary judgment as to the relative priority of their claims in the distribution of the interpleaded Policy funds.  The court disagrees with Interpleader-Defendants Paul Marinelli and Jeffery Au that the Policy clearly establishes a priority of payments.  *See* ECF Nos. 81, 82.  The court partially grants Interpleader-Defendant Christopher Gossert's motion for summary judgment, ECF No. 75, which Interpleader-Defendant David Uchiyama joined, ECF No. 79, on the issue of whether equitable principles control the distribution.  The court ultimately concludes that questions of fact preclude a grant of summary judgment on the exact allocation of funds under an equitable *pro rata* distribution scheme.

---

The district court later withdrew the referral, *see* ECF No. 11, and this interpleader action came before the district court.

II.        **BACKGROUND SUMMARY.**

The factual background for this case was set forth in the court's Order of January 27, 2023, granting QBE's motion for leave to deposit interpleader funds. *See* ECF No. 48, PageID # 462-67. That background is incorporated by reference and is summarized and supplemented only as necessary here.

Island Air filed for bankruptcy in 2017. *See* Adv. No. # 17-01078, ECF No. 1. Two years later, the bankruptcy trustee, joined by two labor unions, filed an adversary proceeding in the Bankruptcy Court for the District of Hawaii against several of Island Air's prior owners, executives, directors, and lenders, alleging that they had caused the company's bankruptcy. *See* Adv. No. 19-90027 ("the Trustee Proceeding" originally filed in the Bankruptcy Court for the District of Hawaii), ECF No. 1. Throughout the course of the Trustee Proceeding, a number of parties sought funds from QBE to cover defense costs related to the trustee's claims, as well as the related cross-claims, third-party complaints, and subpoenas. *See* ECF No. 14, PageID # 108-09.

Relevant here, Interpleader-Defendant Marinelli, as well as Interpleader-Defendant Au on behalf of himself and intervenor parties Malama Investments, LLC and PaCap Aviation Finance, LLC, submitted claims for their defense costs. ECF No. 81-2, PageID # 823-25; ECF No. 82-1, PageID # 1135-36.

Separately, Interpleader-Defendants Gossert and Uchiyama considered offers to settle with the Bankruptcy Trustee in the underlying litigation with the expectation (or at least hope) of being indemnified by QBE for settlement payments.  ECF No. 75-1, PageID # 709; ECF No. 79-1, PageID # 774.[2]  QBE acknowledged that the Trustee Proceeding and various claims deriving from it were covered claims.  *See* ECF No. 13, PageID # 97.

Facing multiple competing claims for Policy funds, QBE initiated this interpleader action in March 2022.  *See* ECF No. 1. In opposition to interpleader, Marinelli argued that QBE had no reasonable fear of multiple liability because the Policy language clearly established a priority of payments.  *See* ECF No. 38, PageID # 405.  According to Marinelli, "the Policy's 'Advancement' and 'Priority of Payments' provisions easily solve all the purported conflicts identified by QBE."  ECF No. 38, PageID # 404.  In its January 2023 Order, the court disagreed and granted QBE's motion for leave to deposit interpleader funds, discharge, and dismissal.  *See* ECF No. 48.  The court concluded that interpleader was justified because QBE's fear of multiple

---

[2] In March 2023, the court dispensed Policy funds to then Interpleader-Defendants David H. Pfleiger Jr. ($86,548.10) and Philip Wegescheide ($37,639.30) pursuant to a stipulation from the other Interpleader-Defendants.  ECF No. 61, PageID # 667. Three months later, Interpleader-Defendant Catherine Yannone passed away, ECF No. 71, and her estate relinquished any claims she may have had in this action, ECF No. 73, PageID # 694.

liability was "real and reasonable" in light of the relevant Policy language allowing for "considerable interpretation" and therefore not necessarily "foreclos[ing] all adverse claims."[3] ECF No. 48, PageID # 479-86.  The court noted, however, that while determining that QBE's fear of multiple liability was "real and reasonable[,]" the court was not "making a summary judgment ruling as to the import of any Policy provision."  ECF No. 48, PageID # 479.

Gossert, Uchiyama, Marinelli, and Au seek summary judgment on the priority of their claims in the distribution of Policy funs as among themselves.  *See* ECF Nos. 75, 79, 81, 82.

Gossert seeks summary judgment on his claim to a "significant pro-rata share" of the Policy proceeds.  ECF No. 75, PageID # 699.  Uchiyama joins Gossert's motion and asks the court to "order an equitable distribution" of the Policy proceeds. ECF No. 79, PageID # 771.  On the other hand, Marinelli seeks partial summary judgment to establish the priority of his claims over all others to the interpleaded funds.  ECF No. 81, PageID # 789.  However, at this time Marinelli "is not seeking a specific determination" of the amount to which each claimant is entitled.  ECF No. 81-1, PageID # 794.  Finally, Au also moves for partial summary judgment in his favor, submitting a

---

[3] The court noted that the multiple adverse claims already filed against QBE weighed in favor of allowing interpleader. ECF No. 48, PageID # 486-89.

declaration that he is owed defense costs from the interpleaded
funds, that his defense costs are "reasonable" and "necessary,"
and that the distribution of funds should follow priority rules
he sets forth.  ECF No. 82, PageID # 1118-19.

**III.      JURISDICTION.**

As discussed fully in the court's January 2023 Order,
QBE brought this action as an interpleader case under Federal
Rule of Civil Procedure 22.  ECF No. 48, PageID # 467.  In sum,
this court has diversity jurisdiction because the amount in
controversy exceeds $75,000 and Interpleader-Plaintiff's
citizenship is diverse from that of all Interpleader-Defendants.
The court also has jurisdiction because this matter relates to
bankruptcy.  *See* 28 U.S.C. § 1334.

**IV.      SUMMARY JUDGMENT STANDARD.**

Under Rule 56 of the Federal Rules of Civil Procedure,
summary judgment shall be granted when "the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R. Civ.
P. 56(a).  *See Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134
(9th Cir. 2000).  The movants must support their position
concerning whether a material fact is genuinely disputed by
either "citing to particular parts of materials in the record,
including depositions, documents, electronically stored
information, affidavits or declarations, stipulations (including

those made for the purposes of the motion only), admissions, interrogatory answers, or other materials"; or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56©. One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial.  *See id.* at 323.  A moving party without the ultimate burden of persuasion at trial——usually, but not always, the defendant——has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

The burden initially falls on the moving party to identify for the court those "portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact."  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp.*, 477 U.S. at 323).  "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote omitted).

The nonmoving party may not rely on the mere allegations in the pleadings and instead must set forth specific facts showing that there is a genuine issue for trial. *T.W. Elec. Serv.*, 809 F.2d at 630. At least some "'significant probative evidence tending to support the complaint'" must be produced. *Id.* (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)); *see also Addisu*, 198 F.3d at 1134 ("A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact."). "[I]f the factual context makes the non-moving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587).

In adjudicating a summary judgment motion, the court must view all evidence and inferences in the light most favorable to the nonmoving party. *T.W. Elec. Serv.*, 809 F.2d at 631. Inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party. *Id.*

8

V.        DISCUSSION.

        "Very little case law exists on the precise issue of
contemporaneous payment and the priority of defense costs claims
of the insured from interpleaded funds." *Gabarick v. Laurin Mar.
(Am.) Inc.*, 635 F. Supp. 2d 499, 509 (E.D. La. 2009).  Generally,
courts "first evaluate the policy to determine whether the policy
prioritized defense claims over other claims." *Id.*; *see Reliance
Nat. Ins. Co. v. Great Lakes Aviation, Ltd.*, 430 F.3d 412, 415
(9th Cir. 2005) ("The interpleader procedure is not intended to
alter substantive rights.").  When a policy does not prioritize
defense costs, courts "consider the equitable nature of
distribution from the interpleader fund." *Gabarick,* 635 F. Supp.
2d at 509; *see Liberty Mut. Ins. Co. v. Estrada*, 528 F.2d 319,
319 (9th Cir. 1975) (vacating a *pro rata* distribution plan
because it contravened "the express terms of the policy, as well
as [] the explicit provisions of the statute to which the policy
refers").  "To the extent that the priority of claims is not
controlled by policy language or controlling law, determination
of priority of claims 'is neither a conclusion of law nor a
factual finding, but is, instead, an equitable decision.'"
*Gabarick,* 635 F. Supp. 2d at 509 (quoting *Marine Indem. Ins. Co.
v. Kraft Gen. Foods, Inc.*, 115 F.3d 282, 287 (5th Cir. 1997)).

        To determine the parties' respective rights to the
Policy funds, the court analyzes the claims at the time the

interpleader fund was established. *Texaco, Inc. v. Ponsoldt*, 118 F.3d 1367, 1370 (9th Cir. 1997). Here, the fund was established by the court's January 2023 Order. *See* ECF No. 48.

A.   **Governing Law.**

Before evaluating the terms of the Policy, the court must determine the applicable source of law. State choice-of-law rules govern interpleader actions because the court derives jurisdiction from the parties' diversity of citizenship. *Federal Practice & Procedure* § 1713; *see Fed. Ins. Co. v. Areias*, 680 F.2d 962, 963 (3d Cir. 1982) ("Under *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938), state law determines the rights of the rival claimants to the interpleaded fund."); *Gray v. Travelers Indem. Co.*, 280 F.2d 549, 554, 554 n.2 (9th Cir. 1960) (Alaska law applied in statutory interpleader action to indemnity agreement pursuant to Washington conflicts rule). Under bankruptcy jurisdiction, however, federal choice-of-law rules apply. *In re Sterba*, 852 F.3d 1175, 1177 (9th Cir. 2017).

Fortunately, here, Hawai'i substantive law applies under both state and federal choice-of-law rules. Hawai'i's choice-of-law doctrine follows a "flexible approach looking to the state with the most significant relationship to the parties and subject matter." *Del Monte Fresh Produce (Haw.), Inc. v. Fireman's Fund Ins. Co.*, 117 Haw. 357, 364, 183 P.3d 734, 741 (2007). There is, however, always "a presumption that Hawai'i

10

law applies unless another state's law would best serve the interests of the states and persons involved." *Abramson v. Aetna Cas. & Sur. Co.*, 76 F.3d 304, 305 (9th Cir. 1996). Given that all the remaining Interpleader-Defendants are Hawai'i residents, ECF No. 1, BP 22-90006, as well as the strong nexus between Hawai'i and the conduct underlying this interpleader action, Hawai'i courts would likely apply Hawai'i substantive law to this case. *See Okada v. MGIC Indem. Corp.*, 823 F.2d 276, 280 (9th Cir. 1986) ("Hawai'i courts apply Hawai'i state law when the acts covered by the policy occur in Hawai'i, the insureds are Hawai'i citizens, and the insurance company is not a Hawai'i citizen."). This is especially true because Hawai'i courts would likely conclude that the state has a significant public policy interest in this case because it implicates important issues of insurance law and corporate conduct.

Federal choice-of-law rules also lead to the application of Hawai'i substantive law. The Ninth Circuit considers the principles stated in the Restatement (Second) of Conflicts of Laws section 188, to the extent such principles are persuasive. *Flores v. Am. Seafoods Co.*, 335 F.3d 904, 919 (9th Cir. 2003). Section 188 considers which state "has the most significant relationship to the transaction," including the place of negotiation, contracting, and performance; the location of the

11

subject matter of the contract; and the domicile, place of incorporation, and place of business of the parties.  Each of these factors weighs in favor of applying Hawai'i substantive law.  The Policy appears to have been negotiated in Hawai'i, ECF No. 81-20, the remaining Interpleader-Defendants are state residents, ECF No. 1, BP 22-90006, and the conduct covered by the Policy was primarily performed in Hawai'i.

Accordingly, under both state and federal choice-of-law approaches, Hawai'i substantive law governs the court's analysis.

### B.        Priority of Payments
###           Under the Policy's Terms.

Under Hawai'i law, "insurance policies are subject to the general rules of contract construction; the terms of the policy should be interpreted according to their plain, ordinary, and accepted sense in common speech unless it appears from the policy that a different meaning is intended." *Dairy Rd. Partners v. Island Ins. Co.*, 92 Hawai'i 398, 411, 992 P.2d 93, 106 (2000).

### 1.        Settlement Offers.

Gossert and Uchiyama argue that they had an indemnity interest in the Policy funds when the interpleader fund was established.  ECF No. 75-1, PageID # 709;  79-1, PageID # 774.  According to them, because the Policy indemnifies insureds for settlement obligations and they were both offered settlements by

the Bankruptcy Trustee,[4] they are entitled to some of the interpleaded funds.  *See* ECF Nos. 75-1, PageID # 713-15; 79-1, PageID # 775-76.  This argument runs up against the plain language of the Policy.

The Policy provides that funds are available to cover losses.  A "Loss" occurs when "an Insured becomes *legally obligated* to pay on account of any Claim."  ECF No. 76-2, PageID # 745.  Because Gossert's and Uchiyama's settlements were not finalized as of the date of the establishment of the interpleader fund, Gossert and Uchiyama never became legally obligated to pay any settlement amount.  Settlement offers not creating any legal obligation do not constitute a "Loss" for which Gossert and Uchiyama would have a right to indemnity from Policy funds as of January 2023, when the interpleader fund was established.

Nevertheless, the court addresses here Marinelli's contention that the Policy prioritizes defense payments over indemnity payments, such as settlements and judgments.  *See* ECF No. 81-1, PageID # 806-07 (citation omitted).  In support of his

---

[4] After this court established the interpleader fund in January 2023, Gossert signed a contingent settlement agreement in the underlying litigation, subject to the Bankruptcy Court's approval.  ECF No. 92-3, PageID # 1744-51.  The terms of this settlement agreement are irrelevant to whether Gossert has a *legal* right to interpleaded funds under the terms of the Policy because the court analyzes the Interpleader-Defendants' claims to the interpleaded funds at the time the interpleader fund was established in January 2023.  *See Texaco, Inc.*, 118 F.3d at 1370.

argument, Marinelli points to the defense-within-limits provision on the declarations page of QBE's Directors and Officers ("D&O") Policy.  ECF No. 81-1, PageID # 806-07.  The defense-within-limits provision states that "THE LIMIT OF LIABILITY TO PAY JUDGMENTS OR SETTLEMENT AMOUNTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY PAYMENT OF DEFENSE COSTS."  ECF No. 76-2, PageID # 741 (emphasis omitted).  He contends that this provision makes clear that the Policy "unambiguously prioritizes defense payments over indemnity payments."  *See* ECF No. 81-1, PageID # 806-07 (citation omitted).

He cites *Executive Risk Speciality Insurance Co. v. Rutter Hobbs & Davidoff, Inc.*, No. 2:11-cv-04828-SVW-FFM, 2019 WL 9358218, slip. op. at *2-3 (C.D. Cal. May 22, 2019), for support.  *See* ECF No. 81-1, PageID # 806-08.  In that case, the Central District of California examined an excess malpractice liability policy that provided an additional layer of coverage beyond the base layer of insurance provided under the primary policy.  *Exec. Risk Speciality Ins. Co.*, 2019 WL 9358218, at *1.  The primary policy provided that "[a]ll claim expenses shall first be subtracted from the applicable limit of liability with the remainder, if any, being the amount available to pay damages."  *Id.* at *2.  "Claim expenses" were defined as "(1) attorneys' fees incurred by lawyers designated by [the insurance company], and (2) 'all other fees, costs and expenses resulting from the

14

investigation, adjustment, defense and appeal of a claim'
incurred by [the insurance company]." *Id.*  Damages were "defined
broadly as 'a monetary judgment or settlement,' with certain
exceptions." *Id.*  The court concluded that a "plain reading" of
the policy "reveals that defense costs . . . are to be paid first
before any indemnity payments issue, and to the extent that
indemnity payments exceed the remaining liability limit after
defense costs are paid, then only a portion of the settlement or
judgment will be paid under the policy.  In other words, the
[primary] Policy unambiguously prioritizes defense payments over
indemnity payments." *Id.*

      The *Executive Risk* decision then examined the excess
policy, which stated that "[t]he limits of liability available to
pay damages or settlements shall be reduced, and may be
exhausted, by the payment of Defense Expenses." *Id.* at *3.  The
court concluded that "[t]he plain meaning of this sentence
implies that defense costs are prioritized over any 'damages or
settlements,' or, in other words, indemnity payments; to the
extent that the total defense and indemnity costs exceed the
policy limit, indemnity 'shall be reduced' by any defense costs,
which are to be paid in full." *Id.*  The court also noted that
the excess policy tied the interpretation of its terms to that of
the primary policy, so it reasoned that "the express terms of the
[excess] [p]olicy contemplate that the provisions in the

[primary] [p]olicy regarding the priority of payments between defense and indemnity were intended to apply with equal force to the [excess] [p]olicy as well." *Id.* The court thus concluded that the excess policy, viewed "either in isolation or in its full context alongside the [primary] [p]olicy," "unambiguously intended to prioritize the payment of defense costs over the payment of indemnity costs." *Id.*

This court is not persuaded that the Central District's interpretation should be applied here.

Historically, D&O policies did not contain a duty to defend; instead, the policies obligated insurers to reimburse insureds for defense costs. By the mid-1980s, however, most D&O contracts included a duty to defend. *See* Julie J. Bisceglia, *Practical Aspects of Directors' and Officers' Liability Insurance-Allocating and Advancing Legal Fees and the Duty to Defend*, 32 UCLA L. Rev. 690, 690 (1985). The inclusion of a duty to defend makes the insurer directly liable for payment of the insured's defense costs, but it gives the insurer more control to shape litigation strategy.

There are two principal types of duties to defend in D&O policies. In the first type, the costs spent on defense are independent from the limit of liability, meaning a dollar spent on defense will not deplete the proceeds available for other losses. The insurer's responsibility to defend the insured and

pay defense costs continues until judgment or settlement exhausts the company's liability.  In the other type, the terms of the policy include a "defense-within-limits" provision, which establishes that defense costs deplete the available limit of liability.  Put differently, each dollar spent on defense costs reduces the remaining proceeds for indemnity payments.  Among other benefits for the insurer, defense-within-limits provisions prevent the insurer from having to pay more funds than the insured purchased under the policy.  *See* Gregory S. Munro, *Defense Within Limits: The Conflicts of "Wasting" or "Cannibalizing" Insurance Policies*, 62 Mont. L. Rev. 131, 133, 139-44 (2001).  Contracts that contain such provisions have been referred to as "wasting," "self-consuming," "burning," "self liquidating," "defense-within-limits," or "cannibalizing" contracts.  *Id.*

Here, the Policy is a wasting contract.  A key feature of these contracts is that the terms make clear that defense costs are payable against the limits of liability, just like any other type of loss.[5]  Munro, *supra*, at 134.  The provision that

---

[5] Another key feature is that "the limit of liability clause is altered so that the 'aggregate' limit of the company's liability includes not only damages, but also 'claims expenses.'" Munro, *supra*, at 134.  In QBE's Policy, that is accomplished by adding "defense costs" to the definition of "Loss."  *See* ECF No. 76-2, PageID # 745.  The final key feature is that such policies often include "an additional definition for 'claims expenses' so the term will cover all legal defense costs."  Munro, *supra*, at 134.  This is done in the Policy by defining "Defense Costs" to

Marinelli champions here does just that—*and nothing more*.  *See* ECF No. 76-2, PageID # 741 ("THE LIMIT OF LIABILITY TO PAY JUDGMENTS OR SETTLEMENT AMOUNTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY PAYMENT OF DEFENSE COSTS.").  The sentence merely clarifies that the Policy can be exhausted by payment of judgments, settlements, or defense costs, without assigning any priority of payment to these different types of covered losses.

In addition to the historical context regarding the purpose and meaning of such provisions, the court's conclusion that the defense-within-limit provision is irrelevant to the issue of whether the Policy clearly establishes a priority of payment is bolstered by the Policy's separate "Priority of Payments" section.  That section, as discussed below, does not establish a priority of payment among settlements, judgments, and defense costs.  *See infra* Part 2(b).  QBE itself acknowledged as much before this court.  *See* ECF No. 35, PageID # 352-54.

## 2.        Defense Costs.

Marinelli and Au spill much ink attempting to convince the court that the "Advancement" and "Priority of Payments" provisions in the D&O Coverage Part clearly establish the priority of their individual defense costs over all other claims. *See, e.g.*, ECF Nos. 81-1, 82-1, 89, 96, 107, 108.  As the court

include all types of legal expenses.  *See* ECF No. 76-2, PageID # 745.

18

suggested in its January 2023 order, however, the "Advancement" and "Priority of Payments" provisions allow for considerable interpretation.  ECF No. 48, PageID # 485.  On the present summary judgment motions, this court is further assured that it cannot say that, as a matter of law, the Policy unambiguously establishes a priority of claims to the interpleaded funds.

**a)        Advancement Provision.**

The "Advancement" provision provides:

A.   . . . the Insurer shall advance Defense Costs on a current basis, but no later than 60 days after receipt of the legal bills and any supporting documentation.

B.   If it is determined by final adjudication that any advanced Defense Costs are not covered[,] the Insureds . . . shall repay such uncovered Defense Costs to the Insurer[.] . . .  If the Insurer recovers any portion of an amount paid under this Coverage Part, the Insurer shall reinstate the applicable limit of liability with any amounts recovered up to such amount paid, less any costs incurred by the Insurer in its recovery efforts.

ECF No. 76-2, PageID # 743 (emphasis omitted).

Marinelli argues that this provision "makes clear that claims for 'Loss' comprised of 'Defense Costs' becomes due and payable under the Policy 'as the bills are presented, and no later than 60 days after their receipts.'"  ECF No. 81-1, PageID # 810 (citation omitted).

However, as QBE pointed out in support of its motion for interpleader, although *advancements* must be made "on a

19

current basis," the plain meaning of the Policy does not conclusively resolve *substantive rights* to Policy funds on that basis.  *See* ECF No. 35, PageID # 354 ("The Advancement provision does not resolve any substantive right to coverage or address conflicting claims."); *see also Heine v. Bank of Oswego*, 144 F. Supp. 3d 1198, 1207 (D. Or. 2015) (addressing advancement and indemnification as separate matters and noting that "an individual ultimately determined to be ineligible for indemnification may still be entitled to advancement before that ultimate determination").  When read together, sections A and B of the Advancement provision plainly support QBE's assertion that the Policy treats advancements and entitlements differently; section B requires a party to return to QBE any money received as an advancement that is subsequently found not to be covered by the Policy.  *See* ECF No. 76-2. PageID # 743.  If an advancement and an entitlement were the same under the Policy, a party would have no obligation to return funds advanced for non-covered claims.

Although QBE conceded that the Trustee Proceeding is a covered matter and that it must cover defense costs associated with it, *see* ECF No. 14, (page 109), that does not amount to a concession that either Marinelli or Au is entitled to receive *and retain* all of the Policy funds they claim.  Under the Policy, they may still be required to return some of the advanced money

20

if it were determined, for example, that the fees for which an advancement was made were not "reasonable."  *See* ECF No. 76-2, PageID # 744 (establishing that, to qualify as "Defense Costs," such costs charges, fees, and expenses must be "reasonable").  Neither QBE nor this court has determined whether Marinelli's and Au's claims are "reasonable."  *See* ECF No. 104, PageID # 2593.

Among other scenarios, Marinelli and Au would also be required to return advancements if it were later determined that the advancement was for expenses unrelated to covered claims by insured persons.  Gossert and Uchiyama assert that precisely such a scenario exists here.  *See* ECF No. 88, PageID # 1530-31; ECF No. 104, PageID # 2593.  They point out that Marinelli's counsel also represents Marinelli's co-defendants——Lawrence Investments, LLC, Lawrence J. Ellison Revocable Trust, Ohana Airline Holdings, LLC, Carbonview Limited LLC, and Lawrence J. Ellison——in an action brought by the Bankruptcy Trustee currently before the District of Hawaii, Civ. No. 19-00574 JAO-RT.  ECF No. 88, PageID # 1530.  Ellison and the entities are not insureds under the Policy, and are therefore not entitled to interpleaded funds.  ECF No. 88, PageID # 1530.  Marinelli has not demonstrated that the defense costs he claims under the Policy were incurred only for his defense, or that separate billings were kept for noninsured parties.

Marinelli contends that "no such allocation is required

because any and all services that were performed on behalf or for the benefit of these related defendants were necessarily performed in connection with, and were reasonably related to, the defense of Mr. Marinelli." ECF No. 91, PageID # 1636-37. The Policy limits coverage, however, to "Insured Persons." ECF No. 76-2, PageID # 742. Nowhere in the Policy does it provide that defense costs "reasonably related" to the defense of both insured and uninsured persons are entirely covered. The language Marinelli relies on comes from *Safeway Stores, Inc. v. National Union Fire Insurance Co.,* 64 F.3d 1282, 1289 (9th Cir. 1995), which Marinelli cites for support. *See* ECF No. 91, PageID # 1636-37 (quoting *Safeway Stores*, 64 F.3d 1282).

But *Safeway Stores* is inapposite. That case involved shareholder class actions against Safeway alleging that its directors and officers had breached their fiduciary duty by approving a merger with another corporation. The claimants asserted that, under the merger, the corporation would receive the majority of the regular quarterly dividend that would have gone to the shareholders absent the directors' and officers' approval of the merger. *Safeway Stores*, 64 F.3d at 1284. Safeway settled the class action suits, ultimately agreeing to pay the dividend to shareholders and the class attorneys' fees and other costs. *Id.* at 1285.

Thereafter, Safeway sought reimbursement from National

Union Fire Insurance Company ("National Union") under a D&O liability insurance policy for costs incurred from the defense of itself, its officers, and directors, as well as from the settlement. *See id.* at 1284-85. The D&O policy contained a corporate reimbursement provision that covered Safeway for costs arising from the indemnification of its officers and directors for defense and settlement of the claims against them. *Id.* at 1284. National Union, however, refused to reimburse Safeway for the settlement. *Id.* at 1285. Safeway sued National Union in the Northern District of California, seeking, *inter alia*, the class attorneys' fees and costs,[6] and defense costs and attorneys' fees incurred on behalf of itself, its officers, and directors. *Id.* at 1283, 1285.

The district court determined that both Safeway's defense costs and the class attorneys' fees and costs were covered losses. *Id.* at 1285. The district court, however, allocated the reimbursement of Safeway's defense costs and class attorneys' fees and costs "three-quarters to the covered directors and officers (and thus paid for by National Union under the D&O policy) and one-quarter to Safeway and [the uninsured merger corporation.]" *Id.*

On appeal, Safeway argued that the district court's

---

[6] The Ninth Circuit referred to the class attorneys' fees and costs as "settlement costs." *Id.* at 1285.

allocation of defense costs was improper because it lumped together its defense costs and the class attorney's fees and costs in allocating only one-quarter of the reimbursement to Safeway and the uninsured merger corporation.  *Id.* at 1289.  The Ninth Circuit agreed, first explaining that "[i]n evaluating whether defense costs should be allocated between the corporation and the insured directors and officers, courts have adopted the 'reasonably related' test."  *Id.* (quoting *Raychem Corp. v. Fed. Ins. Co.*, 853 F. Supp. 1170, 1182 (N.D. Cal. 1994)).  The court then went on to state that "[d]efense costs are thus covered by a D&O policy if they are reasonably related to the defense of the insured directors even though they may also have been useful in defense of the uninsured corporation."  *Id.*  The court also noted that Safeway had "already reduced" its reimbursement claim "to exclude fees attributable to the defense of [the uninsured merger corporation]."  *Id.*  The court concluded that "Safeway's defense costs [were] reasonably related to the defense of its officers and directors in the class-action suits and are therefore fully covered by the D&O policy, subject to the deductible."  *Id.*

The factual situation in which the Ninth Circuit adopted the "reasonably related" test——the allocation of defense costs "between [a] corporation and the insured directors and officers," *id.* at 1289——is not the factual scenario here.  Unlike Safeway's costs incurred through the defense of itself and its

24

insured directors and officers, Marinelli's costs may have arisen through the defense of Marinelli, who is insured under the Policy, and his uninsured co-defendants in the underlying litigation. *Safeway Stores* is distinguishable on its facts.

Marinelli also points to *Lionbridge Technologies, LLC v. Valley Forge Insurance Co.*, No. 20-10014-WGY, 2023 WL 5985288, at *3 (D. Mass. Sept. 14, 2023), which interpreted *Safeway Stores* as establishing that "an insurer must pay all defense costs that reasonably relate to the insured, even if those costs involve a non-insured party." Even under the District of Massachusetts' interpretation of *Safeway Stores*, Marinelli still does not establish his priority as a matter of law. Marinelli has yet to show that his claims for defense were "reasonably related" to his defense. This court has only his counsel's assurances at the hearing on October 3, 2023. In fact, Marinelli's counsel acknowledged that the claimed defense costs included work for both "insured and uninsured clients" and "proper allocation was necessary" in related litigation before this court. *See* Dkt. 17 at 6, PageID # 506, 527-29, in *Marinelli v. QBE Specialty Ins. Co.*, No. 1:22-cv-00391-SOM-KJM.

Accordingly, it is not at all clear that, had Marinelli received the requested advancements for defense costs, QBE or this court would have deemed the defense costs covered by the Policy. If the costs were not covered under the Policy,

Marinelli would have had to return the portion of the advancement that was not covered.  In turn, the Policy requirement that portions of the advancements not covered by the Policy be returned indicates that the Policy distinguishes between advancements and substantive rights to Policy funds for covered losses.

In sum, the Policy's different treatment of advancements and substantive rights, acknowledged in QBE's statement that the Advancement provision "does not resolve any substantive right to coverage or address conflicting claims," ECF No. 35, PageID # 354, leads the court to conclude that the Advancement provision does not clearly establish a priority of distribution of the interpleaded funds.

b)        **Priority of Payments Provision.**

i.        **Section A.**

The Policy also contains a "Priority of Payments" provision, section A of which provides:

A.   In the event that Loss under Insuring Clause A and any other Loss are concurrently due under this Coverage Part, then the Loss under Insuring Clause A shall be paid first. In all other instances, the Insurer may pay Loss as it becomes due under this Coverage Part without regard to the potential for other future payment obligations under this Coverage Part.

ECF No. 76-2, PageID # 744 (emphasis omitted).

As the court's January 2023 Order explained, all

Interpleader-Defendants' "potentially adverse claims arise under 'Insuring Clause A,' so this provision does not clarify which claimant has priority to the funds in dispute."  ECF 48, PageID #485.

Marinelli and Au argue that the last sentence in section A establishes that defense costs are to be paid on a first-come, first-served basis.  ECF No. 81-1, PageID # 811; ECF No. 82, PageID # 1150.  As the court noted in the January 2023 order, however, "may pay" could be read as permissive, not mandatory.  That is, the insurer is allowed to pay loss as it becomes due, but it is not required to do so.  ECF No. 48, PageID # 485.

Marinelli responds that the word "may" is "industry standard language" that "(i) cannot reasonably be construed as 'permissive'; (ii) repeatedly has been construed as 'mandatory' by other courts; and (iii) was in fact intended and understood by Marinelli and the other Remaining Claimants as well as requiring the payment of Loss on a 'first-come, first-served' basis.'"  ECF No. 81-1, PageID # 812.  Marinelli is unpersuasive.

He proffers *SEC v. Morriss*, No. 12-CV-80, 2012 WL 1605225, at *1, *4 (E.D. Mo. May 8, 2012), for the proposition that other district courts have already held that language "identical" to the last sentence of the

27

Priority of Payments clause requires a first-come, first-served distribution of payments.  ECF No. 81-1, PageID # 813.  The *Morriss* court's decision regarding the priority of claims, however, was based on policy language mandating that the insurer pay claims under a designated insuring clause to insured individuals before claims under other insuring clauses.  *Morriss*, 2012 WL 1605225, at *4 ("[T]he policy includes a priority of payments provision requiring Federal to pay claims under Insuring Clause 1 (providing coverage to an insured individual) before claims under any other insuring clause, including those of the organization.").  For this reason, the court in *Morriss* held that "any claim [] the receiver may have for defense costs is subordinate to the coverage for [] insured persons" under the relevant insuring clause.  *Morriss*, 2012 WL 1605225, at *4.

This court has previously noted that every Interpleader-Defendant's claim in this case arises under the same insuring clause.  ECF No. 48, PageID #485.

Marinelli further argues that a "far more natural reading" of the term "may" is that it "was intended to signify each Insured Person's assent to the fact that QBE shall pay claims 'as they become due' and 'without regard to the potential for future payment obligations,' despite the

fact that doing so will erode the Policy limits."[7]   ECF No. 81-1, PageID # 812.   This reading of the term "may" contravenes ordinary understanding, not to mention the insurer's understanding, of the term.

A plain reading of the term "may" is that it is "used to indicate possibility or probability."   *See* Merriam Webster Dictionary, https://www.merriam-webster.com/dictionary/may (last visited Oct. 12, 2023).   This accords with QBE's understanding of the term "may."   ECF No. 35, PageID # 353-54 ("The only mandatory portion of the Policy's Priority of Payments provision states that Loss under Insuring Clause A 'shall be paid' ahead of Loss under any other insuring clause.  . . .   The provision goes on to state that, in other instances, QBE 'may' pay Loss as it becomes due, but it does not use the mandatory language of the preceding sentence.   Nor does it specify when such amounts 'become due.'   The provision does not provide instruction where Defense Costs are not submitted as they were incurred over the course of three years.   Nor does it state any priority as between such accumulated Defense Costs

---

[7] Marinelli points to *AvalonBay Communities, Inc. v. County of Los Angeles*, 197 Cal. App. 4th 890, 898 (Cal. Ct. App. 2011), in which the California Court of Appeal interpreted the word "may" in a statute as "establishing a mandatory duty[.]" However, the California Court of Appeal was interpreting the meaning of a state tax statute, not an insurance contract.

and settlement demands made before such time as the relevant Insureds decide to submit their claimed Defense Costs or supporting documentation for reimbursement under the Policy.").

This court concludes that section A of the priority of payments provision is permissive and not mandatory, and therefore does not unequivocally establish the priority of defense costs under the Policy.

### ii.        Section B.

In seeking to establish his priority, Au focuses on section B(2) of the priority of payments provision, which provides:

> B.   The coverage . . . is intended first and foremost for the benefit and protection of Insured Persons.   In the event a liquidation or reorganization proceeding is commenced by or against a Company pursuant to United States Bankruptcy law:
>
> 1.   the Insureds hereby agree not to oppose or object to any efforts by the Insurer, the Company, or an Insured to obtain relief from any stay or injunction issued in such proceeding; and
>
> 2.   the Insurer shall first pay Loss on account of a Claim for a Wrongful Act occurring prior to the date such liquidation or reorganization proceeding commences, and then pay Loss in connection with a Claim for a Wrongful Act occurring after the date such liquidation or reorganization proceeding commences.

ECF No. 76-2, PageID # 744 (emphasis omitted).  In his
briefs and at the hearing on October 3, 2023, Au has focused
on whether Interpleader-Defendants submitted claims to QBE
before or after the commencement of the Bankruptcy
Proceeding.  *See* ECF No. 96, PageID # 2062-68.  He argues
that section B(2) "is a specific priority provision" which
"direct[s] that, in the event of bankruptcy, Losses on
accounts of Claims for Wrongful Acts occurring prior to the
date when the bankruptcy proceeding commenced shall be paid
before Losses in connection with Claims for Wrongful Acts
occurring after the date the bankruptcy proceeding
commenced."  ECF No. 96, PageID # 2068; *see also* ECF No. 82-
1, PageID # 1150.

In response, Marinelli points out that Au's
interpretation of this section is at odds with the plain
language of the Policy.  ECF No. 107, PageID # 2645.  The
Policy defines "Claim" as, among other events, "a civil []
proceeding[], evidenced by: [] the service of a complaint of
similar pleading in a civil proceeding[.]"  ECF No. 76-2,
PageID # 744 (emphasis omitted).  Thus, according to him,
section B(2) does not "prioritize the payment of Loss
attributable to particular alleged 'Wrongful Acts'——or to
particular counts or causes of action——asserted within a
covered proceeding; rather it  prioritizes the payment of

31

Loss incurred on account of a covered proceeding."  ECF No. 107, PageID # 2645.

The court agrees with Marinelli's interpretation on this point.  Section B(2) does not determine the priority of payments as between Marinelli and Au because the "claim" from which both seek reimbursement for defense costs is the civil proceeding filed against both of them at the same time.

Accordingly, the court concludes that neither Marinelli nor Au shows that the Policy gives the payment of particular defense costs priority over payment of other claims to the Policy proceeds.  Thus, the court looks to equitable principles governing interpleader to determine how funds should be distributed.

### C.       Equitable Distribution.

Gossert asserts that the court should apply "a portion" of the Policy proceeds to pay his pending settlement offer, which would "benefit" the plaintiffs and bankruptcy trustee in the underlying litigation "by obtaining good faith compensation for their claims" against him.  ECF No. 75-1, PageID # 717.

Uchiyama asks the court to determine an equitable ratio "to distribute the remainder of proceeds to each qualified claim, provided that "it is equitably done, and

32

not calculated to the exclusion of one insured for the benefit of another." ECF No. 79-1, PageID # 775.

Au has not suggested an equitable distribution scheme. *See* ECF No. 82, 102.

Marinelli reprises his argument that the contract terms should guide any equitable analysis. In particular, he argues that "equity generally will 'follow the law,' and 'a court sitting in equity [should therefore generally] reference a[ny applicable] contract to give effect to equitable principles.'" ECF No. 91, PageID # 1641 (quoting *Fed. Ins. Co. v. Thompson*, No. 2:16-cv-00023-RJS-EJF, 2017 WL 11476225, at *9-10 (D. Utah Dec. 20, 2017) (alterations in original)). But Marinelli chops and splices case law to come up with a quotation to support his position. The *Thompson* language that Marinelli purports to cite to actually stated:

> A court sitting in equity may reference a contract to give effect to equitable principles. *See, e.g., Gen. Elec. Cap. Corp. v. Future Media Prods., Inc.*, 536 F.3d 969, 974 (9th Cir. 2008); *Kennedy Elec. Co., Inc. v. U.S. Postal Serv.*, 508 F.2d 954, 957 (10th Cir. 1974). Equitable considerations prevail, of course, when they favor a different outcome than a contract analysis. *Kennedy Elec. Co., Inc.*, 508 F.2d at 957 (altering the terms of a contract to subordinate one party's claim to give effect to equitable principles).

*Thompson*, 2017 WL 11476225, at *9.

Marinelli substitutes "should therefore generally"

in brackets in place of the word "may" used by the *Thompson* court. *Compare* ECF No. 91, PageID # 1641, *with Thompson*, 2017 WL 11476225, at *9. He omits the statement that "equitable considerations . . . prevail if they favor a different outcome than the contract analysis." *Compare* ECF No. 91, PageID # 1641, *with Thompson*, 2017 WL 11476225, at *9. Most notably, he amends the parenthetical quote to support his position by saying that the court should "'reference a[ny applicable] contract to give effect to equitable principles,'" when the actual quote stated that the court "alter[ed]" contractual terms "to subordinate one party's claim to give effect to equitable principles." *Compare* ECF No. 91, PageID # 1641, *with Thompson*, 2017 WL 11476225, at *9.

Courts appear to favor *pro rata* distributions under the circumstances presented here. *See Burchfield v. Bevans*, 242 F.2d 239, 242 (10th Cir. 1957) ("Whenever several persons are all entitled to participate in a common fund, or are all creditors of a common debtor, equity will award a distribution of the fund, or a satisfaction of the claims, in accordance with the maxim, Equality is equity; in other words, if the fund is not sufficient to discharge all claims upon it in full, or if the debtor is insolvent, equity will incline to regard all the demands as standing

upon equal footing and will decree a pro rata distribution or payment."); *see also Fed. Ins. Co. v. Areias*, 680 F.2d 962, 965 (3d Cir. 1982); *Hebel v. Ebersole*, 543 F.2d 14, 18 (7th Cir. 1976); *Ruddle v. Moore*, 411 F.2d 718, 719 (D.C. Cir. 1969); *Hudson Ins. Co. v. Klamath Superior Motor Co., Inc.*, No. 1:17-CV-00984-CL, 2018 WL 734669, at *2 (D. Or. Feb. 6, 2018); *Chi. Ins. Co. v. Abstract Title Guar. Co.*, Inc., No. 1:03-CV-00590-JDT-TA, 2004 WL 2750258, at *3 (S.D. Ind. Oct. 12, 2004); *Fid. Bank v. Commonwealth Marine & Gen. Assurance Co.*, 581 F. Supp. 999, 1019 (E.D. Pa. 1984); *State Farm Mut. Auto. Ins. Co. v. Hamilton*, 326 F. Supp. 931, 936-38 (D.S.C. 1971); *Gakiya v. Hallmark Props., Inc.*, 68 Haw. 550, 554, 722 P.2d 460, 463 (1986); *Territory v. Mellor*, 33 Haw. 523, 525 (1935); *Ariz. Pub. Serv. Co. v. Lamb*, 84 Ariz. 314, 318, 327 P.2d 998, 1001 (1958).

Thus, this court is faced with designing an equitable *pro rata* distribution of the remaining Policy funds.  In making this determination, the court must consider, *inter alia*, whether to provide Gossert and Uchiyama shares even though they had no legal right to the proceeds arising from their settlement offers as of the date the interpleader fund was established; whether to alter the distribution based on Marinelli's and the Au's decisions to retain expensive counsel and to not regularly report their

expenses to QBE; and whether to alter the distribution based on Marinelli's counsel's failure to provide an allocation of defense costs for Marinelli's noncovered co-defendants in the underlying litigation.  Within 14 days of the date of this order, the court ORDERS the parties to file briefs addressing the above questions and providing an explanation of their proposed *pro rata* distribution of Policy funds.

**VI.       CONCLUSION.**

The court GRANTS in part and denies in part Gossert's motion for summary judgment, ECF No. 75, in which Uchiyama joined, ECF No.79.  The court rules that the Policy terms do not clearly establish a priority of payments among Interpleader-Defendants' claims to the interpleaded funds. As such, equitable principles will guide the distribution of the interpleaded funds.  Accordingly, the court DENIES Marinelli's and Au's motions for partial summary judgment as to the supremacy of their claims over all others to the interpleaded funds.  ECF Nos. 81, 82.

The parties are ORDERED to file within 14 days of this order briefing as to the questions raised in section V.C of this ruling regarding equitable distribution of the interpleaded funds.

The parties are further ORDERED to contact the Magistrate Judge assigned to this case to schedule a

36

settlement conference at the earliest available date
occurring after the submission of the briefs ordered here.

        The Clerk of the Court is DIRECTED to terminate
Gossert's Motion for Summary Judgment, ECF No. 75,
Uchiyama's joinder in Gossert's motion, ECF No. 79,
Marinelli's Motion for Partial Summary Judgment, ECF No. 81,
and Au's Motion for Partial Summary Judgment, ECF No. 82.

        IT IS SO ORDERED.


        DATED: Honolulu, Hawaii, October 13, 2023.



                /s/ Susan Oki Mollway
                Susan Oki Mollway
       United States District Judge

37