IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| QBE SPECIALITY INSURANCE COMPANY, | ) ) | CIVIL NO. 22-00450 SOM-KJM |
| | ) | AMENDED POST-TRIAL |
| Interpleader-Plaintiff, | ) | FINDINGS OF FACT |
| | ) | AND CONCLUSIONS OF LAW |
| vs. | ) | AND EQUITY; ORDER |
| | ) | |
| DAVID UCHIYAMA, CHRISTOPHER GOSSERT, PAUL MARINELLI, JEFFREY AU, PHILLIP WEGESCHEIDE, DAVID PFLIEGER, PACAP AVIATION FINANCE, LLC, AND MALAMA INVESTMENTS, LLC, | ) ) ) ) ) ) ) | |
| | ) | |
| Interpleader-Defendants. | ) ) | |

**AMENDED POST-TRIAL FINGINGS OF FACT
AND CONCLUSIONS OF LAW AND EQUITY; ORDER**

On July 17, 2024, this court issued its Post-Trial Findings of Fact and Conclusions of Law and Equity and Order. ECF No. 226. The court gave the parties three working days to bring any mathematical, computational, or factual errors to the court's attention before the court entered judgment.

Interpleader-Defendant Paul Marinelli identified a mathematical error that caused him to receive less in interpleaded funds than he was entitled to under the distribution scheme set forth in the order. ECF No. 227.

This court, in these Amended Post-Trial Findings of Fact and Conclusions of Law and Equity and Order, corrects that mathematical error, which necessitated reordering the four

tranches of reductions to the Interpleader-Defendants' defense cost claims.  *See* COLs ¶¶ 30-71.  This amended Order also corrects a factual error regarding general excise tax raised by Marinelli, *see* COLs ¶¶ 20-21, and a few insignificant formatting and grammatical errors.  The court also added to FOF ¶ 157 n.49, noting that counsel for Interpleader-Defendants Christopher Gossert and David Uchiyama do not dispute the court's calculations of the fees QBE paid to them prior to this interpleader action.  *See* ECF No. 228.

Because the distribution of the finite interpleader fund is a zero-sum endeavor, rectifying the mathematical error identified by Marinelli (and thereby increasing his award), necessarily reduces the awards of the other Interpleader-Defendants.

**Table of Contents**

I.   **INTRODUCTION** ...............................................1
II.  **JURISDICTION** ..............................................2
III. **BACKGROUND FINDINGS OF FACT** ..............................3
     A. Island Air Case ..........................................3
        1.  Factual Background ...................................3
        2.  Parties ..............................................5
            a.  Ellison Parties ..................................6
            b.  Au Group and Co-Defendants .......................7
        3.  Attorneys ............................................8
            a.  Bankruptcy Trustee ...............................8
            b.  Au Group .........................................9
            c.  Gossert ..........................................9
            d.  Ellison Parties ..................................9
            e.  Uchiyama ........................................10
        4.  Trial ...............................................10
        5.  Claims Against the Policy ...........................12
        6.  Policy Terms ........................................13
     B. Interpleader Action .....................................14
        1.  QBE's Motion to Interplead Policy Funds .............14
            a.  Magistrate Judge's Ruling .......................14
            b.  District Court's Order ..........................15
            c.  Deposit and Stipulated Disbursement of Policy Funds...17
        2.  Motions for Partial Summary Judgment ................17
        3.  Bench Trial .........................................24
IV.  **POST-TRIAL FINDINGS OF FACT** .............................27
     A. Policy Insureds .........................................27
     B. Settlements .............................................28
        1.  Preliminary Discussions .............................30
        2.  July 2020 Offer .....................................31
        3.  April-May 2021 Discussions ..........................33
        4.  November 2021 Mediation .............................34
        5.  July 2022 Offer .....................................35
        6.  November-December 2022 Mediation and Proposal .......39
        7.  August 2023 Gossert Settlement ......................41
        8.  Allegations of Blocking .............................43
     C. Defense Costs ...........................................52
        1.  Au Group ............................................54
            a.  Interactions with QBE ...........................54
            b.  Policy Funds Sought .............................55
        2.  Gossert .............................................60
            a.  Interactions with QBE ...........................60
            b.  Policy Funds Sought .............................61
        3.  Marinelli ...........................................63
            a.  Interactions with QBE ...........................63
            b.  Policy Funds Sought .............................69

      4.  Uchiyama ................................................76
        a.  Interactions with QBE...............................76
        b.  Policy Funds Sought.................................77
    D. Total Amount Sought from Interpleaded Funds ..............79
**V.   CONCLUSIONS OF LAW AND EQUITY ...........................79**
    A. Governing Law ........................................79
    1.  Choice of Law ........................................79
    2.  Equitable Power in Interpleader ......................80
    B. Date Chosen for Evaluation
      of Claims to Interpleaded Funds ......................82
    C. Settlements ..........................................84
    D. General Excise Tax ...................................85
    E. Defense Costs ........................................86
    1.  Reduction No. 1: Interpleader Fees ...................89
    2.  Reduction No. 2: Hourly Rates ........................94
        a.  Senior-Level Attorneys.............................95
        b.  Associates.........................................98
        c.  Paralegals........................................101
        d.  Reasonable Hourly Rates...........................102
    3.  Reduction No. 3: Uninsured Co-Defendants .............107
    4.  Reduction No. 4: Rule 2004 Subpoenas .................109
    F. *Pro Rata* Distribution ..............................110
**VI.  COURT REGISTRY INVESTMENT SYSTEM .......................117**
**VII. CONCLUSION AND ORDER ...................................119**

## List of Tables

Table 1. Interpleader Fund Disbursement........................ 1
Table 2. Au Group Defense Costs................................ 55
Table 3. Ito Law Group Fees................................... 56
Table 4. Adams Krek Fees...................................... 57
Table 5. Ito Law Group Expenses............................... 58
Table 6. Adams Krek Expenses.................................. 59
Table 7. Gossert Defense Costs................................ 61
Table 8. Gossert Fees......................................... 62
Table 9. Gossert Expenses..................................... 63
Table 10. Marinelli Defense Costs............................. 69
Table 11. Morrison & Foerster Fees............................ 70
Table 12. TLM Fees............................................ 71
Table 13. Pillsbury Fees...................................... 71
Table 14. Morrison & Foerster Expenses........................ 72
Table 15. TLM Expenses........................................ 73
Table 16. Pillsbury Expenses.................................. 73
Table 17. Uchiyama Defense Costs.............................. 77
Table 18. Uchiyama Fees....................................... 78
Table 19. Total Interpleaded Policy Funds Sought.............. 79
Table 20. Total Defense Costs Sought.......................... 87
Table 21. Defense Costs After Reduction No. 1 (Interpleader).. 93
Table 22. Hourly Rates of Senior-Level Attorneys.............. 96
Table 23. Hourly Rates of Associates.......................... 99
Table 24. Hourly Rates of Paralegals......................... 101
Table 25. Reasonable Rates for Morrison & Foerster
          Professionals....................................... 105
Table 26. Reasonable Rates for Pillsbury Professionals....... 106
Table 27. Defense Costs After Reduction No. 2 (Hourly Rates). 107
Table 28. Defense Costs After Reduction No. 3 (Uninsureds)... 109
Table 29. Reasonable Defense Cost Claims up to
          February 3, 2023.................................... 110
Table 30. Total Reasonable Defense Costs..................... 115
Table 31. Remainder Percentage Calculation................... 115
Table 32. Remainder Allocation............................... 116
Table 33. Interpleader Fund Disbursement..................... 117
Table 34. Interest Percentage Calculation................... 118

I.        **INTRODUCTION.**

This interpleader action, commenced under Rule 22 of the Federal Rules of Civil Procedure, concerns the equitable distribution of insurance policy proceeds to competing claimants. The Interpleader-Defendants David Uchiyama, Christopher Gossert, Paul Marinelli, and the "Au Group" (Jeffrey Au, PaCap Aviation Finance, LLC (PAF), and Malama Investments, LLC) seek interpleaded funds to reimburse the amounts billed by numerous attorneys and several paralegals in an underlying dispute stemming from the bankruptcy of Hawaiʻi Island Air, Inc. ("Island Air"), an interisland airline.  (The court refers to these amounts as "defense costs" throughout this order, using the term "costs" to include fees and expenses.)  Gossert also seeks funds for a settlement reached with the bankruptcy trustee.  Collectively, the Interpleader-Defendants seek $9,263,503.68, but only $5,389,034.11 remains in the interpleader fund.

Following a three-day bench trial and pursuant to this court's equitable powers in interpleader, the court issues these findings of fact and conclusions of law and equity and orders that the interpleader fund be distributed follows:

| Table 1. Interpleader Fund Disbursement | |
| --- | --- |
| Name | Total Award |
| Au Group | **$3,188,289.84** |
| Gossert | **49,229.73** |
| Marinelli | **2,076,399.22** |
| Uchiyama | **75,115.32** |
| Total Disbursement | 5,389,034.11 |

1

**II.        JURISDICTION.**

The court has an independent duty to ascertain whether it has subject matter jurisdiction over this case. *See Bernhardt v. County of Los Angeles*, 279 F.3d 862, 868 (9th Cir. 2002). In this case, there are three independent bases of jurisdiction.

First, QBE brought this action as an interpleader case under Rule 22 of the Federal Rules of Civil Procedure. ECF No. 48, PageID # 467. In a rule interpleader case, subject-matter jurisdiction derives from the general grants of jurisdiction in federal law.

Second, this court has diversity jurisdiction because the amount in controversy exceeds $75,000 and the Interpleader-Plaintiff's citizenship is diverse from that of all the Interpleader-Defendants.

Finally, the court may also have jurisdiction because this matter relates to bankruptcy. *See* 28 U.S.C. § 1334.

III.     BACKGROUND FINDINGS OF FACT.

1.   If any Finding of Fact is more properly construed as a Conclusion of Law, or vice versa, it should be construed as such.

2.   This interpleader action concerns the equitable distribution of proceeds from QBE Policy No. QPLO192298 (the "Policy") to reimburse the Interpleader-Defendants for defense costs incurred, as well as a settlement, in an underlying dispute stemming from the bankruptcy of Island Air, a Delaware corporation that operated an airline with flights in and among the Hawaiian Islands.

A.   Island Air Case.

1.   Factual Background.

3.   Island Air filed for Chapter 11 bankruptcy protection in October 2017.  *See* Stipulated Facts for Trial ("Stip. Facts"), ECF No. 164, PageID # 3336 ¶ 1; *see* No. 17-01078 (Bankr. D. Haw.).

4.   The airline ceased operations on November 10, 2017.  Am. Trial Decl. of Nickolas A. Kacprowski ("Kacprowski Decl."), ECF No. 206, PageID # 4346.

5.   On November 12, 2017, Island Air moved to convert its case to a Chapter 7 liquidation.  *Id*.  Within a few days, Elizabeth Kane was appointed as the Chapter 7 bankruptcy trustee.  *Id*.

3

6.   In 2019, the bankruptcy trustee, joined by two labor unions, filed an adversary proceeding in the bankruptcy court for the District of Hawaiʻi against several of Island Air's prior owners, executives, directors, and lenders, alleging that they had caused the company's bankruptcy.  Stip. Facts, ECF No. 164, PageID # 3336 ¶ 2; *see* Ex. 2 (copy of ECF No. 1 (Complaint), *in* Adv. No. 19-90027 (Bankr. D. Haw.)).  The parties refer to this suit as the "First Adversary Proceeding" or the "27 Action."

7.   Sixty days after the filing of the First Adversary Proceeding, the bankruptcy trustee filed a second adversary proceeding against fifteen of the nineteen defendants named in the first suit.  *See* Ex. 3 (copy of ECF No. 1 (Complaint), *in* Adv. No. 19-90049 (Bankr. D. Haw.)).  The parties refer to this proceeding as the "Second Adversary Proceeding" or the "49 Action."

8.   The adversary proceedings were moved from the bankruptcy court to the district court.  In April 2021, another judge in this district consolidated the two adversary proceedings.  *See* Ex. 6 (copy of ECF No. 16 (Order Adopting Recommendation to Consolidate), *in* Civ. No. 19-00574 JAO-RT (D. Haw.)).

9.   The court collectively refers to the adversary proceedings and the consolidated case as the "Island Air case," "Island Air litigation," "Island Air dispute," or "underlying dispute."  *See* Stip. Facts, ECF No. 164, PageID #s 3336-37.

### 2.   Parties.

10.   The Interpleader-Defendants—Gossert, Marinelli, Uchiyama, and the Au Group—were either defendants, third-party defendants, and/or counterclaim defendants in the Island Air case.  *Id.* at PageID # 3337.

11.   Numerous other individuals and entities were also named as defendants in the Island Air case, including PaCap Management Holdings LLC; PaCap Investment Management, LLC; Snowbiz Ventures, LLC; PaCap Management Solutions, LLC; PaCap Advisors, LLC; Jack Tsui; the Jack Chuck She Tsui Trust ("Tsui Trust"); Lawrence Investments, LLC; the Lawrence J. Ellison Revocable Trust ("Ellison Trust"); Ohana Airline Holdings, LLC; Carbonview Limited, LLC; and Lawrence J. Ellison individually. *See, e.g.*, Ex. 2 (copy of ECF No. 1 (Complaint), *in* Adv. No. 19-90027 (Bankr. D. Haw.)); Ex. 5 (copy of ECF No. 211 (Second Amended Complaint), *in* Adv. No. 19-90049 (Bankr. D. Haw.)).

### a.   Ellison Parties.

12.   The following parties in the Island Air case are associated with Interpleader-Defendant Marinelli and were represented by the same attorneys:  Lawrence Investments, LLC; the Ellison Trust; Ohana Airline Holdings, LLC; Carbonview Limited, LLC; and Lawrence J. Ellison.  Am. Decl. of Paul T. Marinelli ("Marinelli Decl."), ECF No. 202-1, PageID # 4287; *see* Trial Decl. of Darryl P. Rains ("Rains Decl."), ECF No. 186, PageID # 3519; Amended Declaration of Christopher J. Muzzi ("Muzzi Decl."), ECF No. 203-1, PageID # 4296; Am. Decl. of Rahman Connelly ("Connelly Decl."), ECF No. 204-1, PageID # 4315.

13.   Marinelli is the president of Lawrence Investments, LLC.  Trial Transcript Day 2 ("Tr. Day 2"), ECF No. 195, PageID # 3902.  Lawrence Investments, LLC, according to Marinelli, is "basically the family office for Mr. [Lawrence] Ellison."  *Id.* at PageID # 3901.

14.   Numerous other parties associated with Marinelli are ultimately owned by Lawrence Ellison.[1]  *See* Civ. No. 19-574 JAO-RT (D. Haw.), ECF No. 732, PageID #s 29994-96.

15.   The court refers to Marinelli and the parties associated with him in the Island Air case collectively as the "Ellison Parties."  References to "Marinelli" refer simply to the individual.

### b.    Au Group and Co-Defendants.

16.   Interpleader-Defendants PAF and Malama Investments are associated with Au and were represented by the same attorneys in the underlying dispute.  Trial Decl. of Peter W. Ito ("Ito Decl."), ECF No. 181, PageID # 3490.

17.   Management Holdings, LLC; PaCap Investment Management, LLC; PaCap Management Solutions, LLC; PaCap Advisors, LLC; Snowbiz Ventures, LLC; Jack Tsui, and the Tsui

---

[1] Beyond noting the relationship between Marinelli and Ellison, and Ellison's ownership of the entities, this court will not dwell on the details of the related entities.  Nevertheless, the court briefly states its understanding of those relationships. Ellison and Marinelli are co-trustees of the Ellison Trust. Civ. No. 19-574 JAO-RT (D. Haw.), ECF No. 732, PageID # 29995. The Ellison Trust owns Ohana Airline Holdings.  *Id.*  Marinelli is the president and manager of Ohana Airline Holdings and the president of Lawrence Investments.  *Id.*  Through Ohana Airline Holdings, Ellison bought Island Air in 2013.  *Id.*  Marinelli managed the Island Air investment for Ellison and sat on Island Air's board until July 2017.  *Id.*  In February 2016, Ohana Airline Holdings sold a two-thirds ownership interest in Island Air to PAF and Malama Investments (which are ultimately controlled by Au and Jack Tsui).  *Id.* at PageID # 29996.

Trust—parties in the underlying dispute who are not among the Interpleader-Defendants in this interpleader case—are associated with the Au Group and were also represented by the same attorneys.[2]  Declaration of Christian K. Adams ("Adams Decl."), ECF No. 180, PageID # 3484.

### 3.   Attorneys.

18.  Because the funds sought in this interpleader action primarily relate to defense costs incurred in the Island Air dispute, an understanding of the attorneys representing the bankruptcy trustee and each of the Interpleader-Defendants in the Island Air case is necessary.

### a.   Bankruptcy Trustee.

19.  Nickolas Kacprowski of the Hawaiʻi office of Dentons US LLP was lead trial counsel for Elizabeth Kane, the bankruptcy trustee.  Kacprowski Decl., ECF No. 206, PageID # 4345.

---

[2] The relationships between these parties are not relevant to this interpleader case.  Nevertheless, the court includes a brief summary.  Au is an attorney and venture capitalist.  Civ. No. 19-574 JAO-RT, ECF No. 732, PageID # 29996.  He is the sole indirect owner of Malama Investments, LLC, and the managing director of the PacifiCap group, a venture capital fund.  *Id.* Jack Tsui, a businessman associated with a travel agency named Panda Travel, is the trustee of the Tsui Trust.  *Id.* at PageID #s 29994, 29996.  The Tsui Trust owned 99.5 percent of PAF.  *Id.* at PageID # 29996.  The other 0.5 percent was indirectly owned by Au through PaCap Management Holdings.  *Id.* After Ohana Airline Holdings (Ellison's company) sold a majority interest in Island Air in February 2016, PAF and Malama Investments each owned one-third of Island Air's shares.  *Id.*

**b.  Au Group.**

20.  The Au Group was primarily represented by Peter
Ito of the Ito Law Group, P.C., based in Colorado, and by
Christian Adams of Krek Adams LLP in Hawai'i.  Ito Decl., ECF No.
181, PageID # 3490; Adams Decl., ECF No. 180, PageID # 3482.

21.  Ito and Adams also represented the uninsured co-
defendants related to the Au Group.  Ito Decl., ECF No. 181,
PageID #s 3499-50.

**c.  Gossert.**

22.  David Farmer of Hawai'i was appointed by QBE to
represent Gossert.  Farmer Decl., ECF No. 205, PageID # 4322.

23.  Farmer also initially represented Catherine
Yannone, another defendant in the Island Air case.  *Id.*

24.  Yannone passed away in 2023, ECF No. 71, and her
estate relinquished any claims she may have had in this
interpleader action, ECF No. 73, PageID # 694.  Farmer Decl.,
ECF No. 205, PageID # 4322.

**d.  Ellison Parties.**

25.  In the underlying dispute, the Ellison Parties
initially retained Morrison & Foerster LLP in San Francisco as
well as the Hawai'i law firm of Tsugawa Lau & Muzzi LLLC ("TLM").
Marinelli Decl., ECF No. 202-1, PageID # 4287.

26.  Darryl P. Rains and Rahman Connelly from Morrison
& Foerster and Christopher J. Muzzi from TLM were the primary

lawyers for the Ellison Parties.  Rains Decl., ECF No. 186,
PageID # 3529; Connelly Decl., ECF No. 204-1, PageID # 4313;
Muzzi Decl., ECF No. 203-1, PageID # 4294.

27.  Later, the Ellison Parties also retained
Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury") when Connelly
left Morrison & Foerster to join Pillsbury's New York office.
Marinelli Decl., ECF No. 202-1, PageID # 4287; Connelly Decl.,
ECF No. 204-1, PageID # 4313.

### e.  Uchiyama.

28.  Hawaiʻi attorneys Scott Kubota, Neal Aoki, and
James Agena represented Uchiyama.  Decl. of James Y. Agena
("Agena Decl."), ECF No. 172, PageID # 3432; Decl. of Neal K.
Aoki ("Aoki Decl."), ECF No. 173, PageID # 3438; Decl. of Scott
E. Kubota ("Kubota Decl."), ECF No. 174, PageID # 3441.

### 4.  Trial.

29.  A jury trial was held before United States
District Judge Jill A. Otake in the Island Air case from
September through October 2023.  The plaintiffs were the
bankruptcy trustee and two labor unions, all represented by
Kacprowski, along with other attorneys.  *See* ECF Nos. 485, 615,
*in* Civ. No. 19-00574 JAO-RT (D. Haw.).

30.  Legal issues were decided by the jury, while
equitable claims were decided by the court.  ECF No. 282 (Order
Regarding Equitable Claims and the Use of An Advisory Jury), *in*

Civ. No. 19-00574 JAO-RT (D. Haw.); ECF No. 732 (Findings of Fact and Conclusions of Law; Order), *in* Civ. No. 19-574 JAO-RT (D. Haw.).

31. The jury found Marinelli not liable on any of the legal claims. Ex. 1145 (copy of ECF No. 627 (Special Verdict Form), *in* Civ. No. 19-00574 JAO-RT (D. Haw)). The court later found Marinelli not liable on any of the equitable claims. ECF No. 732 (Findings of Fact and Conclusions of Law; Order), *in* Civ. No. 19-00574 JAO-RT (D. Haw.).

32. The jury and the court found members of the Au Group liable on various counts. Ex. 1145; ECF No. 732 (Findings of Fact and Conclusions of Law; Order), *in* Civ. No. 19-00574 JAO-RT (D. Haw.).

33. The plaintiffs did not sue Uchiyama, but PAF, a member of the Au Group, brought a derivative claim against him for contribution. Trial Transcript Day 1 ("Tr. Day 1"), ECF No. 194, PageID #s 3675, 3678. The court determined that Uchiyama was 5 percent liable on this claim. ECF No. 732, PageID # 30284, *in* Civ. No. 16-00574 JAO-RT (D. Haw.).

34. Gossert settled with the bankruptcy trustee in August 2023, and, one month later, the agreement was approved by the bankruptcy court. Trial Decl. of David C. Farmer ("Farmer Decl."), ECF No. 205, PageID # 4336. In January 2024, after the trial, the district court granted Gossert's motion for good

11

faith settlement, thereby foreclosing the remaining cross-claims against him.  Farmer Decl., ECF No. 205, PageID # 4337; Ex. 2010 (copy of court's order).

### 5.    Claims Against the Policy.

35.   Throughout the underlying dispute, the Interpleader-Defendants collectively amassed millions of dollars in defense costs.  *See* FOF ¶ 201 (totaling the defense cost claims).

36.   They believed that, at least up to the Policy's limits, their defense costs would be reimbursed by the Policy (QBE No. QPLO192298), which provided coverage for directors, officers, and entities with respect to claims made against insureds during the period of March 2, 2017, to March 2, 2018. Ex. 2000 (copy of the Policy).

37.   Gossert and, at times, some of the other Interpleader-Defendants also sought settlements with the bankruptcy trustee that they argued should be funded by Policy proceeds.  *See* FOFs ¶¶ 74-142 (explaining the settlement negotiations and offers).

38.   Defense costs alone far exceeded the Policy limit of $6,000,000.

## 6.   Policy Terms.

39.   The Policy provides for coverage of any "Loss" incurred on account of a "Claim" first made during the Policy period.  Ex. 2000.

40.   The Policy definition of a "Claim" includes a civil proceeding evidenced by the service of a complaint or similar pleading.  *Id.*

41.   The Policy defines a "Loss" as occurring when "an Insured becomes legally obligated to pay on account of any Claim."  *Id.*

42.   "Defense Costs" refer to "that part of Loss consisting of:  reasonable costs, charges, fees (including, attorneys' fees and experts' fees)  and expenses . . . incurred in[] Investigating, defending, opposing or appealing any Claim." *Id.*

43.   Defense costs and settlements can both constitute Loss.  *Id.*

B.   **Interpleader Action.**

1.   **QBE's Motion to Interplead Policy Funds.**

44.   Facing multiple competing claims for Policy funds, QBE initiated this interpleader action in March 2022 pursuant to Federal Rule of Civil Procedure 22.[3]  *See* Ex. 7 (copy of ECF No. 1 (Complaint for Interpleader), *in* Adv. No. 22-90006 (Bankr. D. Haw.)); *see* FOF ¶ 112 (discussing how QBE was motivated, at least in part, to file this interpleader case because of Gossert's settlement efforts).

45.   The district court initially referred QBE's motion to interplead funds to the bankruptcy court.  The district court later withdrew the referral to the bankruptcy court, and the motion was instead addressed by a magistrate judge.  ECF No. 11.

a.   **Magistrate Judge's Ruling.**

46.   In November 2022, the magistrate judge denied QBE's motion, reasoning that QBE had not established that it was or could be exposed to multiple liability.  The magistrate judge read the Policy as clearly setting forth QBE's obligations and the priority of payment of proceeds.  ECF No. 32.

---

[3] Rule 22(a) of the Federal Rules of Civil Procedure allows a plaintiff to file a claim in interpleader and join as defendants those who "may expose a plaintiff to double or multiple liability."

47.   Gossert, his then-codefendant Yannone, and QBE sought review by a district judge of the magistrate judge's decision.  ECF Nos. 34, 35.

48.   Marinelli agreed with the magistrate judge's conclusion that the plain language of the Policy resolved competing claims to the funds and foreclosed any real threat of multiple liability.  *See* ECF No. 38.  Marinelli argued that the Policy clearly required funds to be paid in the order of submission to QBE for payment and claimed that his submission had priority in time.  *Id.* at PageID # 410.  Characterizing the sequence of the Interpleader-Defendants' claim submissions as clear and recognizing the likelihood that the claims already submitted would exhaust the remaining Policy funds, he argued that QBE could not reasonably fear adverse claims and was improperly using the interpleader procedure to avoid clear, contractual obligations.  *See id.* at PageID #s 410-12.

### b.   District Court's Order.

49.   Deeming QBE's motion dispositive, this district judge treated the magistrate judge's ruling as constituting findings and recommendations subject to *de novo* review.  This district judge disagreed with the magistrate judge and

ultimately granted QBE's motion in January 2023, allowing Policy funds to be interpleaded.[4]   ECF No. 48.

The court concluded that interpleader was justified because QBE's fear of multiple liability was "real and reasonable" in light of the relevant Policy language allowing for "considerable interpretation" and therefore not necessarily "foreclos[ing] all adverse claims."   *Id.* at PageID #s 479-86.

While determining that QBE's fear of multiple liability was "real and reasonable[,]" the court explained that it was not "making a summary judgment ruling as to the import of any Policy provision."   *Id.* at PageID # 479.   The court further observed that the multiple adverse claims already filed against QBE weighed in favor of allowing interpleader.   *Id.* at PageID #s 486-89.   In addition to granting QBE's motion to interplead funds, the court also enjoined the claimants from seeking all or part of the Policy funds in other actions.   *Id.* at PageID # 494.

---

[4] Marinelli appealed this court's order to the Ninth Circuit. ECF No. 54.  At his request, the Ninth Circuit has stayed his appeal.  *See* Dkt. No. 11, *in* No. 23-15319 (9th Cir.).  In the latest status report, Marinelli requested that the Ninth Circuit continue to hold the appeal in abeyance pending the issuance of this court's Post-Trial Findings of Fact and Conclusions of Law and Equity and Order.  *See* Dkt. No. 23, *in* No. 23-15319 (9th Cir.).

c.    **Deposit and Stipulated Disbursement of Policy Funds.**

50.    QBE deposited $5,513,221.51 with the court on February 3, 2023.  Ex. 1143 (copy of ECF No. 51).  That amount was what remained of the Policy limit of $6,000,000, close to half a million dollars having been paid out before funds were interpleaded.

51.    One month later, pursuant to a stipulation, the court dispensed Policy funds to David H. Pfleiger Jr. ($86,548.10) and Philip Wegescheide ($37,639.30), who were among the Interpleader-Defendants at the time.  ECF No. 61, PageID # 667.

52.    A balance of $5,389,034.11 remains in the interpleader fund.  ECF No. 61, PageID # 667.

**2.    Motions for Partial Summary Judgment.**

53.    In July 2023, the remaining Interpleader-Defendants—Gossert, Marinelli, Uchiyama, and the Au Group—filed dueling motions for partial summary judgment as to the relative priority of their claims in the distribution of the interpleaded funds.  ECF Nos. 75, 79, 81, 82.  In other words, these motions asked the court to formally rule on the import of the Policy provisions that the court had earlier concluded allowed for considerable interpretation in the context of the competing claims for Policy funds.

54.  In his motion, Gossert sought summary judgment on his claim to a "significant pro-rata share" of the Policy proceeds.  ECF No. 75, PageID # 699.  He essentially argued that he was entitled to be indemnified under the Policy in the amount of a settlement demand he had received from the bankruptcy trustee.  ECF No. 75-1, PageID #s 713-18.

55.  Uchiyama joined Gossert's motion and asked the court to "order an equitable distribution" of the Policy proceeds.  ECF No. 79, PageID # 771.

56.  On the other hand, Marinelli sought partial summary judgment to establish the priority of his claims over all others to the interpleaded funds, but, at that time, was not seeking a "specific determination" of the amount to which each claimant was entitled.  ECF No. 81, PageID #s 789, 794.

57.  Finally, Au also moved for partial summary judgment in his favor, seeking a declaration that he was owed defense costs from the interpleaded funds, that his defense costs were "reasonable" and "necessary," and that the distribution of funds should follow priority rules he set forth.  ECF No. 82, PageID #s 1118-19.

58.  After a hearing on the motions, the court issued an order rejecting all the parties' interpretations of the Policy.  ECF No. 113.

The court began by noting that "[v]ery little case law exists on the precise issue of contemporaneous payment and the priority of defense costs claims of the insured from interpleaded funds." *Id.* at PageID # 2682 (quoting *Gabarick v. Laurin Mar. (Am.) Inc.*, 635 F. Supp. 2d 499, 509 (E.D. La. 2009)). After a thorough review of the scant caselaw, the court concluded that courts generally first examine a policy to determine whether the policy prioritizes defense claims over other claims. *Id.* (citing *Gabarick*, 635 F. Supp. 2d at 509; *Reliance Nat. Ins. Co. v. Great Lakes Aviation, Ltd.*, 430 F.3d 412, 415 (9th Cir. 2005)). "When a policy does not prioritize defense costs, courts 'consider the equitable nature of distribution from the interpleader fund.'" *Id.* (quoting *Gabarick*, 635 F. Supp. 2d at 509) (citing *Liberty Mut. Ins. Co. v. Estrada*, 528 F.2d 319, 319 (9th Cir. 1975)). "To the extent that the priority of claims is not controlled by policy language or controlling law, determination of priority of claims is neither a conclusion of law nor a factual finding, but is, instead, an equitable decision." *Id.* (quoting *Gabarick*, 635 F. Supp. 2d at 509; and *Marine Indem. Ins. Co. v. Kraft Gen. Foods, Inc.*, 115 F.3d 282, 287 (5th Cir. 1997)).

In analyzing the priority of payments under the Policy's terms, this court first rejected Gossert's and Uchiyama's arguments that the settlement demands they had

19

received gave rise to indemnity rights in the Policy funds when the interpleader fund was established. This argument, this court determined, contravened the plain language of the Policy. *Id.* at PageID #s 2685-91. This court further concluded that neither Marinelli nor Au had demonstrated that the Policy prioritized particular costs over the payment of other claims to Policy proceeds.[5]  *Id.* at PageID #s 2691-705.

---

[5] The court's interpretation of the Policy appears to be consistent with QBE's interpretation of the Policy. In a December 2022 settlement proposal, QBE explained that it disagreed with the magistrate judge's conclusion that the Policy provided for defense costs to be paid before settlements or judgments. Ex. 2017 at 2. First, QBE noted that the defense costs sought by Marinelli and Au "were incurred and paid by other entities over the course of three or more years and therefore [could not] be 'advanced' under the Policy as they [were] incurred." *Id.* at 3. Second, QBE explained that the amounts sought by Marinelli and Au "are also subject to allocation because they include the costs of defending parties who are not covered under the Policy." *Id.* Third, QBE pointed out that the Policy provision dealing with defense costs "does not resolve disputes as to coverage because any advanced Defense Costs ultimately determined not to be covered under the Policy must be paid back to QBE by the receiving Insured and reinstated to the Policy's limit of liability." *Id.* Finally, QBE explained that Gossert and Yannone had

> received a demand to settle the underlying litigation brought by Island Air's bankruptcy trustee and informed QBE of that demand before Mr. Marinelli and Mr. Au provided supporting documentation in connection with their claims for Defense Costs. Mr. Au has still not submitted all supporting documentation. The Policy provides that QBE "may" pay covered amounts as they become due but does not specifically address priority as between incurred but undocumented Defense Costs and settlement demands.

*Id.*

Because the Policy terms did not "clearly establish" a priority of payments among the Interpleader-Defendants' claims to the interpleaded funds, this court concluded that it had to look to the equitable principles governing interpleader to determine how to distribute Policy funds. *Id.* at PageID #s 2705, 2709.

In their motions for partial summary judgment, no party meaningfully proposed an equitable distribution scheme. *See* ECF Nos. 75-1; 79-1; 82; 91; 102.  This court concluded that *pro rata* distributions appeared to be favored under the circumstances presented in this case.  ECF No. 113, PageID #s 2707-08 (collecting cases).

This court noted that, in fashioning the equitable distribution, it would have to consider various matters, including "whether to provide Gossert and Uchiyama shares even though they had no legal right to the proceeds arising from their settlement offers as of the date the interpleader fund was established"; "whether to alter the distribution based on Marinelli's and the Au Group's decisions to retain expensive counsel and to not regularly report their expenses to QBE"; and "whether to alter the distribution based on Marinelli's counsel's failure to provide an allocation of defense costs for Marinelli's noncovered co-defendants in the underlying litigation."  *Id.* at PageID #s 2708-09.

21

59.  At the court's request, *id.* at PageID # 2709, the parties provided supplemental briefing on the above questions and proposals for the *pro rata* distribution of Policy funds.  As the court told the parties at the pretrial conference on March 27, 2024, the court believed that this supplemental briefing would be helpful to the magistrate judge in discussing settlement possibilities with the parties.  That is, the magistrate judge might be better informed if each party stated its proposed share in light of this court's ruling on the motions for partial summary judgment.

60.  Marinelli's supplemental briefing, however, disputed the nature of the court's ruling.  He argued that it was "premature" for the court to "conclude that 'equitable principles,' rather than the terms of the Policy, ultimately 'control the distribution' of the interpleaded funds" because the court had not yet determined that "the Policy unambiguously *does not* prioritize payment of the Marinelli Claims ahead of the claims of any of the other parties—only that it does not do so *unambiguously.*"  ECF No. 115, PageID # 2724.  He contended that the "appropriate next step" was for the court to "resolve the perceived ambiguity in the Policy's language in order to conclusively determine—on a full factual record after the parties have had the opportunity to conduct discovery—whether the language of the Policy which the court found to be

22

ambiguous, *does in fact* prioritize one or more parties' claims."
*Id.* at PageID # 2725.  Marinelli filed no motion to obtain a
court ruling relating to these issues.

62. Later, Gossert filed a motion in limine to
preclude the relitigation of the interpretation of the Policy
terms.  ECF No. 134.  In other words, Gossert's motion sought to
establish that the trial would focus on equitable distribution
and not, as Marinelli's supplemental briefing suggested, on
whether the Policy established a priority or payments.

62. Marinelli did not oppose Gossert's motion.

63. At a pretrial conference on March 27, 2024, the
court sought clarity from the parties on what was to be tried.
Marinelli's counsel stated that Marinelli was "accepting" the
court's summary judgment ruling for purposes of trial and would
reserve the issues of Policy interpretation for appeal.  ECF No.
150.[6]  The court ultimately granted Gossert's motion in limine.
*Id.*  This court viewed Marinelli as abandoning any claim that
the trial should resolve any ambiguous Policy language by
examining what the parties had intended.  At trial, no evidence
was presented by Marinelli or anyone else relevant to resolving
any ambiguity in the Policy language or any prioritization of

---

[6] No party ordered an official transcript of this pretrial
conference, but the court reviewed a rough transcript from the
court reporter to confirm the court's and the parties'
statements.

claims.  Indeed, the record contains no indication that any discovery was conducted into those matters.

### 3. Bench Trial.

64. The court held a bench trial in this interpleader action from April 10 to 12, 2024.[7]

65. As established during the pretrial conference, the central issue at trial was how the remaining Policy funds should be equitably distributed.  That issue necessarily implicated the questions raised in the court's summary judgment order, including whether Gossert, who had received a settlement demand by the date the interpleader fund was established, was entitled to a share of the Policy funds covering the proposed settlement; whether the distribution should be adjusted given Marinelli's decision to retain two expensive national law firms and not regularly report his expenses to QBE; and whether the distribution should be adjusted given the failure of the Ellison Parties' counsel to separate defense costs for Marinelli from

---

[7] The trial proceeded in accordance with this court's nonjury trial procedures, pursuant to which direct examination was presented through written declarations, rather than through oral testimony in open court.  *See* Procedures for Trials Before Judge Susan Oki Mollway ¶ 15, https://www.hid.uscourts.gov/ (click on "Judge's Requirements," then on "Senior Judge Susan Oki Mollway," then on "Trial Procedures").  Under this procedure, the court ruled on objections to the declarations, then heard live cross-examination and live redirect examination.  Some of the witnesses testified by agreement via videoconference.

defense costs for related uninsured co-defendants in the underlying litigation.

Argument and evidence at trial also encompassed other issues, including the failure of Uchiyama's counsel to keep contemporaneous billing records, the relative exposure of the Interpleader-Defendants in the underlying litigation, Marinelli's alleged "blocking" of Gossert's settlement, and the bankruptcy trustee's purported targeting of Marinelli because his employer, Lawrence J. Ellison, is a billionaire.

66.   The parties presented little evidence or argument at trial regarding QBE's understanding of the controversy over interpleaded funds, QBE's interpretation of the Policy, and QBE's stance on issues such as Marinelli's decision to engage two expensive firms and his attorneys' failure to allocate their billings between insured and uninsured Ellison Parties.

67.   The adversarial process has been surprisingly unhelpful in revealing the best course of action.  With a few notable exceptions, the parties appear to have entered into a mutual disarmament pact of some kind.

This court had anticipated a vigorous debate between Marinelli and the Au Group—the two Interpleader-Defendants seeking the majority of the Policy funds, with each claiming the supremacy of its claims over all others.  But Marinelli and Au have not questioned each other's claims at all.  Instead, each

25

calls the other's claims reasonable.  *E.g.*, Au Grp. Proposed
Findings of Fact and Conclusions of Law, ECF No. 199, PageID
#s 4201-07, 4209-10; Marinelli Proposed Findings of Fact and
Conclusions of Law, ECF No. 197, PageID # 4091.  The only scrap
has revolved around Gossert's settlement.  Counsel for Marinelli
and the Ellison Parties, along with the Au Group's attorneys,
have assailed Gossert's attempt to recover Policy funds for his
settlement.  In turn, Gossert has sought to establish that the
Ellison Parties and the Au Group and its related but uninsured
co-defendants stymied his settlement efforts, which prevented
him from finalizing a settlement until after the Island Air
trial.

        At times, the parties appear to have refrained from
searching examination of would-be adversaries' claims for
reasons this court does not speculate on.  No party had any
detailed criticism of another party's billing entries,
challenging, for example, the amount of time spent on specific
tasks, the billing of any allegedly questionable item, or the
reasonableness of certain costs, such as for copying.  The
absence of a vigorous adversarial process leaves this court with
less information than it had hoped for.  The trial had a minimal
impact, leaving this court largely dependent on the documentary
evidence, almost as if no trial occurred.

IV.        POST-TRIAL FINDINGS OF FACT.

        A.   Policy Insureds.

        68.   The parties stipulated that the Interpleader-Defendants—Gossert, Marinelli, Uchiyama, and the Au Group—are insured under the Policy.  Stip. Facts, ECF No. 164, PageID # 3337.

        69.   Based on the parties' stipulations and the evidence presented at trial, the court concludes that all the Interpleader-Defendants are insureds covered under the Policy.

        70.   Throughout this interpleader case, the court and the parties have understood that Marinelli's co-defendants in the underlying litigation—the other Ellison Parties (Lawrence Investments, LLC; the Lawrence J. Ellison Revocable Trust; Ohana Airline Holdings, LLC; Carbonview Limited, LLC; and Lawrence J. Ellison)—were not covered by the Policy.  At trial, Marinelli put on no evidence to demonstrate otherwise.

        71.   Similarly, the court and the parties have understood throughout this litigation that the Au Group's related co-defendants in the underlying litigation—PaCap Management Holdings, LLC; PacifiCap Investment Management, LLC; Snowbiz Ventures, LLC; PaCap Management Solutions, LLC; PaCap Advisors, LLC; Jack Tsui; and the Jack Cheuk She Tsui Revocable Living Trust—were uninsured.  The Au Group put on no evidence to establish otherwise.

27

72.   In court filings, communications with counsel, and trial exhibits addressing settlement negotiations, QBE also repeatedly made clear that Marinelli's and the Au Group's co-defendants were not insured under the Policy.  *E.g.*, Ex. 2017 at 3, 5-6 (December 2022 settlement proposal from QBE); Ex. 1134 at 00832-33 (July 2022 letter from QBE to Rains); Ex. 116 at 0004 (July 2021 letter from QBE to Adams acknowledging that Policy coverage was triggered with respect to Au).

73.   This court concludes that neither the Au Group's co-defendants, nor the Ellison Parties, other than Marinelli himself, were insured under the Policy.

**B.   Settlements.**

74.   At various times throughout the underlying litigation, counsel for Gossert, Uchiyama, and the Ellison Parties engaged in settlement discussions.  Kacprowski Decl., ECF No. 206, PageID #s 4351-71 (detailing the bankruptcy trustee's settlement discussions in the Island Air dispute and another related adversary proceeding); Farmer Decl., ECF No. 205, PageID #s 4324-37 (detailing the settlement negotiations on behalf of Gossert, as well as mediation efforts among the parties in the Island Air dispute); Rains Decl., ECF No. 186, PageID #s 3523-24, 3541 (recounting a discussion with a QBE claims manager about the possibility of a global settlement and an unsuccessful mediation in November 2021).

75.   The Au Group did not participate in settlement efforts.  Rains Decl., ECF No. 186, PageID # 3541; Farmer Decl., ECF No. 205, PageID # 4327.

76.   In the court's ruling on the Interpleader-Defendants' summary judgment motions, the court noted that the settlement demands Gossert and Uchiyama were considering when the court issued its interpleader ruling in January 2023 did not constitute "Loss" under the Policy because, no agreement having been reached then, QBE at the time had no legal obligation entitling Gossert and Uchiyama to indemnification from Policy funds.  ECF No. 113, PageID # 2686.

77.   Of the Interpleader-Defendants who now remain in this interpleader action, only Gossert ultimately settled with the bankruptcy trustee.

78.   During the interpleader trial, Gossert essentially argued that it was equitable to grant him Policy funds to cover his settlement because the Ellison Parties had allegedly blocked his efforts to settle before the initiation of this interpleader action.  *E.g.*, Farmer Decl., ECF No. 205, PageID #s 4330-31; Gossert Proposed Findings of Fact and Conclusions of Law, ECF No. 200, PageID # 4245.  Thus, the court details here the testimony and evidence about Gossert's settlement attempts and his blocking allegations.

### 1.   Preliminary Discussions.

79.   In late 2018 and early 2019, before the First Adversary Proceeding was filed, counsel for the bankruptcy trustee, Kacprowski, engaged in preliminary settlement discussions and made a settlement demand on the Ellison Parties in late 2018 or early 2019.  Kacprowski Decl., ECF No. 206, PageID # 4353; Rains Decl., ECF No. 186, PageID # 3540.

80.   According to Kacprowski, the bankruptcy trustee offered to settle all claims against the Ellison Parties, including claims that were then pending in another related adversary proceeding[8] and claims the bankruptcy trustee was contemplating in the Island Air case, for between $2,200,000 and $2,300,000.  Kacprowski Decl., ECF No. 206, PageID # 4353. Kacprowski alleges that the Ellison Parties refused to engage in settlement discussions at this time.  *Id.*

81.   According to Rains, Marinelli's attorney, the bankruptcy trustee did not offer to settle for $2,200,000 to $2,300,000.  Rains Decl., ECF No. 186, PageID # 3540.  Rains recalled that the bankruptcy trustee demanded at least $25,000,000 from the Ellison Parties at that time, and that throughout the litigation the trustee always demanded more than $10,000,000 from them.  *Id.* at PageID #s 3540-41.

---

[8] This related proceeding is the Island Leasing case, discussed *infra* FOF ¶ 138.

82.   Later settlement discussions between Kacprowski and Rains were unproductive.   Kacprowski Decl., ECF No. 206, PageID #s 4353-55, 4357-61; Rains Decl., ECF No. 186, PageID # 3540-42.

## 2.   July 2020 Offer.

83.   In July 2020, Kacprowski contacted Farmer, Gossert and Yannone's attorney, regarding a potential settlement.   Farmer Decl., ECF No. 205, PageID # 4324; *see* Kacprowski Decl., ECF No. 206, PageID #s 4355-56.

84.   After initial conversations, Kacprowski transmitted a written settlement offer to Farmer, Ito (the Au Group's attorney), and Kubota (Uchiyama's attorney) on July 29, 2020.   Kacprowski proposed to settle the claims in the underlying dispute against Gossert, Yannone, Uchiyama, and the Au Group and its uninsured co-defendants in exchange for the Policy limits less defense costs already incurred to that point, up to $500,000.   Ex. 2013 (copy of the settlement offer); Farmer Decl., ECF No. 205, PageID # 4324; *see* Kacprowski Decl., ECF No. 206, PageID #s 4355-56.   The offer did not include Marinelli or the other Ellison Parties.   *See* Ex. 2013; Kacprowski Decl., ECF No. 206, PageID #s 4355-56.

85.   Kacprowski indicated that the bankruptcy trustee expected damages to total approximately $35,000,000.   Farmer Decl., ECF No. 205, PageID # 4325; Ex. 2013.

31

86.   The Au Group did not materially respond to the settlement proposal.  *See* Kacprowski Decl., ECF No. 206, PageID #s 4356-57.

87.   Farmer requested additional information regarding the settlement proposal, including how Kacprowski had arrived at the damages figure, and suggested that Marinelli be included in settlement discussions because he was also insured under the Policy.  Ex. 2014 (copy of Farmer's response on August 28, 2020, to Kacprowski); Farmer Decl., ECF No. 205, PageID # 4325.

88.   In response to Farmer, Kacprowski confirmed that the settlement proposal did not include Marinelli or the Ellison Parties.  Ex. 2022 (copy of Kacprowski's email of August 31, 2020, to Farmer); Kacprowski Decl., ECF No. 206, PageID # 4357; Farmer Decl., ECF No. 205, PageID # 4325.

89.   In that response, Kacprowski also indicated that the bankruptcy trustee sought to hold all the defendants jointly and severally liable for the damages.  He also wrote that, although the bankruptcy trustee "did not name Mr. Gossert and Ms. Yannone in all the fiduciary duty claims, other defendants filed cross-claims against them seeking contribution for their liability on those claims.  Those cross-claimants would be in a better position to tell you how they would allocate liability among themselves and your clients."  Ex. 2022.

90.   Based on Kacprowski's response, Farmer believed that Gossert's "exposure could well-exceed $10M."  Farmer Decl., ECF No. 205, PageID # 4325.  He thought that the settlement proposal was reasonable, and he was "optimistic" that a settlement could be reached.  *Id.* at PageID # 4326.

91.   Gossert was "very eager" to reach a settlement that would be covered by the Policy, given the significant damages the bankruptcy trustee sought.  Gossert Decl., ECF No. 207, PageID # 4378.  He noted that, without Policy coverage, "a settlement or judgment that reached the seven-figure range would financially bankrupt" him.  *Id.*

92.   However, no settlement was reached during this round of efforts.  Farmer Decl., ECF No. 205, PageID # 4326.

**3.   April-May 2021 Discussions.**

93.   In April 2021, Farmer reached out to Kacprowski to discuss a settlement by Gossert and Yannone.  Farmer Decl., ECF No. 205, PageID # 4326; Ex. 2024 (copy of Farmer's email to Kacprowski).

94.   Throughout late April and early May 2021, Farmer and Kacprowski continued to discuss settlement.  Exs. 2048, 2049 (Farmer's billing records reflecting entries for settlement conversations with Kacprowski); Farmer Decl., ECF No. 205, PageID # 4326.  Farmer recalls that he told Kacprowski that any settlement on behalf of Gossert would need to be funded by

Policy proceeds, reiterated his view that Gossert was a "small player" in the underlying dispute, and expressed the hope that a settlement would reflect that.  Farmer Decl., ECF No. 205, PageID # 4326.

95.   In early May 2021, Kacprowski conveyed a settlement proposal on behalf of the bankruptcy trustee under which Gossert and Yannone would be released from the Island Air case.  *Id.* at PageID # 4327.

96.   Farmer discussed the proposal with his QBE adjuster, but, according to Farmer, the proposal "did not gain any traction."  *Id.*

### 4.   November 2021 Mediation.

97.   In November 2021, some of the parties participated in mediation.  *Id.*; Rains Decl., ECF No. 186, PageID # 3524.

98.   The Au Group and its related but uninsured co-defendants did not participate in the mediation.  Farmer Decl., ECF No. 205, PageID # 4327; Rains Decl., ECF No. 186, PageID # 3524.

99.   No settlement was reached.  Farmer Decl., ECF No. 205, PageID # 4327; Rains Decl., ECF No. 186, PageID # 3524.

### 5.    July 2022 Offer.

100. Farmer continued to pursue settlement discussions with the bankruptcy trustee after QBE sought permission from the bankruptcy court in March 2022 to interplead funds.  Farmer Decl., ECF No. 205, PageID # 4328.

101. In June 2022, Farmer and Kacprowski once again spoke about settling the claims against Gossert.  *Id.* at PageID # 4327; Ex. 2050 (Farmer's June 2022 invoice reflecting billing for settlement conversations with Kacprowski).

102. These discussions, along with the November 2021 mediation, culminated in another written settlement proposal involving Gossert and Yannone in July 2022.  Farmer Decl., ECF No. 205, PageID # 4327; Ex. 2002 (copy of settlement proposal dated July 11, 2022).

103. Under that settlement proposal, Gossert and Yannone would have each paid $1,200,000 in return for dismissal of the claims against them.[9]  Ex. 2002.

104. The proposal left open the possibility that the payment owed to the bankruptcy trustee could be reduced by the amount of defense costs incurred by Gossert and Yannone payable from Policy funds.  *Id.*

---

[9] It appears that the trustee proposed the payment of $1,200,000 each because Kacprowski believed Gossert and Yannone were each eligible for that amount under the Policy.  Ex. 2002.

105. The settlement proposal to Gossert and Yannone was contingent on QBE's approval and funding from the Policy, as well as approval by the bankruptcy court. *Id.*

106. Following receipt of the offer, Farmer, Kacprowski, and QBE's counsel exchanged emails and other communications. Farmer Decl., ECF No. 205, PageID # 4329; Ex. 2012.

107. On July 28, 2022, Kacprowski emailed Farmer, noting that the latest settlement proposal had expired and asking whether Farmer had a response for the trustee. Ex. 2012. Kacprowski also suggested that, if the issue was getting QBE's approval for the settlement, they might pursue a fully contingent settlement that would only become effective upon QBE's agreement to fund the settlement. *Id.* He wrote that Farmer could use such a contingent settlement to argue to QBE that its refusal to fund the settlement was the only impediment to finalization. *Id.*

108. Farmer replied to Kacprowski a day later, stating: "Dead air from QBE." *Id.* Farmer "inadvertently" included Kimberly Melvin, one of QBE's attorneys, in this

reply.[10]  *See id.*

109. Melvin's inclusion in the email led to an exchange between Melvin and Kacprowski, with each insinuating that the other was to blame for the failure to reach a settlement.  *See id.*  Melvin wrote that she would be "remiss not pointing out that the [] trustee had the opportunity to participate in the interpleader but affirmatively decided not to do so and not to pursue the policy proceeds to satisfy settlement demands."  *Id.* (email from Melvin to Kacprowski dated July 29, 2022, at 1:51 a.m.).

110. Kacprowski responded that the bankruptcy trustee's participation in the interpleader action was a "completely separate issue than whether the insurer breaches it duties and acts with bad faith vis-à-vis certain individual insureds by refusing to fund settlements and instead depleting the policy by funding defense costs of other insureds with high-priced counsel."  *Id.* (email from Kacprowski to Melvin dated July 29, 2022, at 2:08 p.m.)

---

[10] Farmer testified that Melvin's inclusion was unintended. Farmer Decl., ECF No. 205, PageID # 4329.  However, in a later response in the same email chain, John Howell, another QBE attorney, alleged that Farmer had intentionally "blind-copied" Melvin on the email.  *See* Ex. 2012 (email from Howell to Tristan Andres dated August 16, 2022).  The copy of Farmer's email in the record is missing all addressee lines (to, cc, and bcc).

111. John Howell, another QBE attorney, expressed his intent to submit the email chain as evidence of competing claims for Policy funds in support of QBE's motion to deposit interpleader funds with the court. *Id.* (email from Howell to Farmer dated August 16, 2022, at 12:17 p.m.) ("[I]t is inappropriate for the trustee to represent to the court that she does not seek recovery from policy proceeds and also to continue to seek those proceeds through settlement demands against the insureds without informing the court.").

112. In July 2022, QBE filed its First Amended Motion for Leave to Deposit Interpleader Funds with the bankruptcy court. Ex. 2003.  The motion argued that a deposit of funds should be allowed in interpleader because of the conflicting claims to Policy funds that exceeded Policy limits.  QBE specifically referenced the July 2022 settlement offer to Gossert and Yannone as a competing claim under the Policy.  *Id.* at 3, 7-8.

6.   **November-December 2022**
     **Mediation and Proposal.**

113. In October 2022, the bankruptcy court transmitted this interpleader action to this district court.  ECF No. 1.

114. The Interpleader-Defendants and QBE participated in mediation in November 2022, a year after earlier mediation efforts had failed.  Farmer Decl., ECF No. 205, PageID # 4333; Rains Decl., ECF No. 186, PageID # 3524.

115. Again, the Au Group did not participate.  Rains Decl., ECF No. 186, PageID # 3524.

116. No settlement was reached, but the mediation led to a settlement proposal from QBE in December 2022.  Ex. 2017 (Howell email including settlement proposal as an attachment, dated December 28, 2022); Farmer Decl., ECF No. 205, PageID # 4333.

117. QBE proposed that the parties agree to the disbursement of $116,953.20 of Policy proceeds to then-Interpleader-Defendants Pflieger and Wegescheide to cover costs incurred before Marinelli and Au sought reimbursement of their defense costs and before the bankruptcy court had granted relief from the automatic stay imposed by Island Air's bankruptcy to permit payment under the Policy.  Ex. 2017 at 4.

118. As for Marinelli, who had sought $3,560,783.84 in defense costs, QBE noted that those costs were also incurred on

39

behalf of uninsured Ellison Parties and that Marinelli had "recognized that allocation is necessary and has proposed that QBE pay 80% of the amounts submitted." *Id.* at 5.  QBE proposed that it pay 60 percent ($2,136,295.70) "in order to achieve a settlement." *Id.*

119. Au sought $3,630,732.93 in defense costs. *Id.* QBE noted that the documents Au provided only reflected a total of $3,053,496.61 and did not include copies of the original defense invoices or backup documentation for expenses. *Id.* QBE also took issue with Au's submission of costs that predated the commencement of the First Adversary Proceeding and costs related to the Second Adversary Proceeding, which QBE noted was "never reported to QBE and does not appear to implicate Mr. Au's capacity in a role covered under the Policy." *Id.*

The sum remaining for the Au Group after QBE subtracted the amounts incurred before the First Adversary Proceeding and the amounts billed in connection with the Second Adversary Proceeding before the two proceedings were consolidated was $1,710,044.63.  *Id.* at 5-6.

QBE also sought to reduce Au's claimed defense costs because some of those amounts were incurred on behalf of related uninsured co-defendants.  *Id.* at 6.  Thus, QBE proposed that Policy funds cover 60 percent ($1,026,026.78) of Au's claimed defense costs.  *Id.*

40

120. Uchiyama sought $36,548.20 in defense costs, and Gossert and Yannone sought $11,340.  *Id.*  QBE proposed that these amounts be paid in full with Policy proceeds.  *Id.*  QBE had previously paid Uchiyama and Gossert and Yannone $486,778.49.[11]

121. The total that QBE proposed to pay was $3,318,644.98, which would have left $2,194,576.53 in Policy funds.  *Id.* at 7.  QBE proposed that this remainder be divided equally among Marinelli, Gossert, Yannone, Uchiyama, and the Au Group—$438,915.31 each—to pay "Defense Costs" or other "Loss," including settlements, as defined by the Policy.  *Id.*

122. The Interpleader-Defendants did not accept QBE's proposal.  Farmer Decl., ECF No. 205, PageID # 4334.

### 7.   **August 2023 Gossert Settlement.**

123. Farmer eventually succeeded in negotiating a settlement for Gossert in August 2023.  Farmer Decl. ECF No. 204, PageID #s 4335-36; Ex. 2007 (copy of settlement agreement).

124. The agreement included the following terms:

a.   Gossert was to pay $50,000 to the bankruptcy trustee.  Ex. 2007 at 2.

---

[11] See FOF ¶ 157 n.49 for an explanation of how the court arrived at this figure.

b.    Gossert was to pay $1,102,644.30 if he secured that amount from Policy funds by November 1, 2023. *Id.* at 2-3.

c.    Gossert was to continue to pursue his claims in this interpleader action until November 1, 2023. *Id.*

d.    After November 3, 2023, Gossert could withdraw from this interpleader action, subject to the bankruptcy trustee's discretion to require Gossert to (1) assign his interpleader claims to the trustee or (2) continue to pursue the interpleader action at the trustee's expense. *Id.* at 4.

e.    To settle this interpleader action, Gossert had to obtain the bankruptcy trustee's written consent. *Id.*

125. In September 2023, the bankruptcy court approved the settlement agreement. Ex. 2008 (bankruptcy court order).

126. Despite settling with the trustee, Gossert faced cross-claims in the underlying dispute. Farmer Decl., ECF No. 205, PageID # 4337.

127. In early 2024, after the trial in the underlying dispute, the presiding judge issued an order adopting the magistrate judge's finding that Gossert's settlement was made in

good faith pursuant to Hawai'i Revised Statutes (HRS) § 663-15.5,[12] thereby foreclosing the remaining cross-claims against him.[13]  Farmer Decl., ECF No. 205, PageID # 4337; Ex. 2010 (copy of court's order in the underlying case).

128. Gossert, who agreed to pay $50,000, now seeks $1,102,664.30 of Policy funds as settlement costs.  Gossert Proposed Findings of Fact and Conclusions of Law, ECF No. 200, PageID # 4245.

**8.   Allegations of Blocking.**

129. Farmer alleges that, throughout his efforts to reach a settlement for Gossert, the Ellison Parties and the Au Group and related uninsured co-defendants worked "to block and

---

[12] As a magistrate judge in this district has explained,

> A finding of good faith settlement [pursuant to HRS § 663-15.5] (1) discharges the settling party from liability for contribution to other joint tortfeasors, (2) reduces a plaintiff's claims against joint tortfeasors by the amount stipulated to in the release or in the amount of the consideration paid for it, whichever is greater, (3) bars other joint tortfeasors from further claims against the settling joint tortfeasor, except where there is a written indemnity agreement, and (4) results in dismissal of all crossclaims against the settling joint tortfeasor, except where there is a written indemnity agreement.

*Cruz v. Kaumana Drive Partners, LLC*, No. 19-00255 JMS-KJM, 2021 WL 5132553, at *2 (D. Haw. Oct. 15, 2021), *adopted*, No. 19-00255 JMS-KJM, 2021 WL 5122162 (D. Haw. Nov. 3, 2021).

[13] The Island Air trial dealt with both legal and equitable claims.  Legal claims went to the jury, while equitable claims were decided by the presiding judge.  The remaining cross-claims against Gossert were equitable in nature.

vehemently oppose" the funding from Policy proceeds of any settlement between Gossert and the bankruptcy trustee.  *E.g.*, Farmer Decl., ECF No. 205, PageID #s 4330-33; Tr. Day 1, ECF No. 194, PageID # 3724; Gossert Proposed Findings of Fact and Conclusions of Law, ECF No. 200, PageID # 4245.

130. For example, Farmer points to separate suits filed against QBE by Marinelli and the Au Group.  Farmer Decl., ECF No. 205, PageID #s 4331-32, 4334.

131. In the lawsuit he filed, Marinelli alleged that QBE had breached the Policy and acted in bad faith by filing this interpleader action.  According to Marinelli, payment of his defense fees was already due from QBE and had priority over other claims to Policy funds, including Gossert's pending settlement offer.  Ex. 2004 (copy of ECF No. 1 (Complaint), *in Marinelli v. QBE Specialty Ins. Co.*, Civ. No. 22-00391 SOM-KJM (D. Haw.)).

132. Marinelli's suit was stayed pending the resolution of this interpleader case by the court's order on January 27, 2023, which enjoined the Interpleader-Defendants from seeking all or part of the Policy funds in any state or federal proceeding other than this interpleader action.  ECF No. 48, PageID # 493.

133. The Au Group's lawsuit alleged that QBE had breached the Policy and acted in bad faith by filing for

44

interpleader.  The Au Group's position was that payment of the group's defense costs was already due from QBE and had priority over any other claims, including Gossert's settlement.  Ex. 2006 (copy of ECF No. 1 (Complaint), *in Au v. QBE Specialty Ins. Co.*, Civ. No. 22-00557 (D. Haw.)).

134. The Au Group and its related co-defendants dismissed their lawsuit in February 2023, shortly after this court accepted interpleaded funds.  ECF No. 9, *in Au v. QBE Specialty Ins. Co.*, Civ. No. 22-00557 SOM-KJM.

135. As further evidence of the Ellison Parties' alleged blocking of settlements, Farmer points to filings in this interpleader action in which Marinelli opposed Gossert's settlement efforts, as well as Marinelli's and the Au Group's oppositions to Gossert's motion for summary judgment, in which they reasserted the supremacy of their defense costs over all other claims to Policy funds.  Farmer Decl., ECF No. 205, PageID #s 4332-33, 4335-36; Ex. 2018 (copy of Marinelli's Opposition, ECF No. 91); Ex. 2019 (copy of the Au Group's Opposition, ECF No. 96).

136. Kacprowski, counsel for the bankruptcy trustee, believed that the Ellison Parties and the Au Group thwarted settlement negotiations in the Island Air case.  *See* Kacprowski Decl., ECF No. 206, PageID # 4350-4364.

45

137. He testified that attorneys for the Ellison Parties said they would "do everything in their power to block any settlement that did not reserve the majority of insurance proceeds for Paul Marinelli" and also that they "objected to anything but a very modest amount of the proceeds being allocated to a settlement for Mr. Gossert and Ms. Yannone." *Id.* at PageID # 4353.

138. Kacprowski's other reasons for believing that the Ellison Parties thwarted settlement negotiations require additional context:[14]

a. Before the bankruptcy trustee filed the adversary proceedings that were eventually consolidated into the Island Air case, the bankruptcy trustee had filed another adversary proceeding, Adv. No. 18-90007 (Bankr. D. Haw.), in March 2018. Kacprowski Decl., ECF No. 206, PageID #s 4346-47. The parties and this court refer to this suit as the "Island Leasing case."[15] *See id.*

b. The Island Leasing case involved Island Leasing, LLC, which is entirely owned by Ellison. *See id.*

----

[14] *See* Tr. Day 1, ECF No. 194, PageID #s 3727-28 (transcript of proceedings in which this court overruled an objection from Marinelli's attorneys to Kacprowski's testimony on the Island Leasing case, with the court noting the matter provided necessary context).

[15] The Island Leasing case is further summarized in Kacprowski's trial declaration, ECF No. 206, PageID #s 4348-52.

c.   Island Leasing, LLC, was represented by the same attorneys who represented the Ellison Parties in the Island Air litigation and who participated in this interpleader action: Darryl Rains (Morrison & Foerster) and Christopher Muzzi (TLM). *Id.* at PageID # 4349.

d.   According to Kacprowski, only $800,000 was at stake for Island Leasing, LLC (and therefore, for Ellison, the entity's ultimate owner). *Id.* at PageID # 4351. Yet the Ellison Parties allegedly aggressively litigated the case, which involved at least eight depositions, a three-day trial in the bankruptcy court with hundreds of exhibits, an appeal to the district court, and an appeal to the Ninth Circuit. *Id.* PageID # 4351. Kacprowski testified that, based on his observation of the legal work by Morrison & Foerster and TLM, he could "confidently say that the defense costs for Island Leasing were substantial." *Id.* at PageID # 4352. He also noted that the "limited settlement discussions" the bankruptcy trustee had with the Ellison Parties regarding the Island Leasing case "went nowhere." *Id.*

e.   Rains disputes that only $800,000 was at stake. Rains Decl., ECF No. 186, PageID # 3546. He said that the trustee initially valued the case at around $2,700,000, and only reduced that valuation to $800,000 when the Ellison Parties prevailed on a specific claim. *Id.*

47

139. According to Kacprowski, the Island Leasing case "played into" settlement discussions with the Ellison Parties in the Island Air dispute because the Ellison Parties "refused to discuss a separate settlement of the appeal of the Island Leasing Case, and rather insisted that all discussions include both the Island Air Case and the Island Leasing Case." Kacprowski Decl., ECF No. 206, PageID # 4351.

140. Kacprowski said that the Ellison Parties "took a similar approach" in the Island Air litigation to the approach they took in the Island Leasing case. *Id.*

141. Basically, Kacprowski and Farmer portray the Ellison Parties as engaging in scorched-earth tactics on behalf of a billionaire client—Ellison—whose ability to bankroll an expensive defense drove an overly aggressive approach in the Island Leasing case, the Island Air case, and this interpleader action.

142. As might be expected, Rains, one of the Ellison Parties' attorneys, challenges this characterization.

a.    Rains disputes Kacprowski's allegation that the Ellison Parties refused to engage in settlement discussions. Rains says that the Ellison Parties "were always the biggest proponent of settlement."  Rains Decl., ECF No. 186, PageID # 3541.  Rains explained that they "were always willing to contribute the entire insurance policy toward a settlement plus

48

additional money from the Ellison [Parties]," but that any
settlement would have required "the cooperation of the other
defendants and a financial contribution from the Au Group."  *Id.*
The Ellison Parties' "position was that, because we were a one-
third owner, and the Au Group was a two-thirds owner, their
financial contribution should be greater than that of the
Ellison [Parties]."  *Id.*

       b.   Rains also calls Kacprowski's testimony
"misleading" in its omissions.  *Id.*  In addition to the alleged
"unreasonableness" of Kacprowski's settlement demand amount
(which Rains asserts was always more than $10,000,000) Rains
notes that there were two other "large" and "unsolvable"
obstacles to settlement:  (1) achieving an allocation of the
Policy, and (2) the Au Group's refusal to participate in any
settlement discussions.  *Id.*

       c.   According to Rains, the Ellison Parties
"attempted, on many occasions, to structure a global settlement
which would include all defendants" because it would eliminate
the Policy allocation obstacle.  *Id.*  Their plan was to offer
the entirety of the remaining Policy funds (then around
$5,500,000) and then contribute additional amounts to achieve an
acceptable settlement amount.  *Id.* at PageID # 3542.  However,
Rains testified that because the Au Group would not participate,
Kacprowski "insisted that the Ellison [Parties] would have to

fund the entire settlement (on top of the insurance proceeds) and then litigate with the Au Group later over contribution and indemnity." *Id.* The Ellison Parties were "not willing" to do this. *Id.*

       d.   The other alternative, according to Rains, was for the Ellison Parties to secure a settlement with the bankruptcy trustee, apart from the other defendants. *Id.* However, Rains testified, "because there was no agreement on how much, if any, of the insurance proceeds the Ellison [Parties] could use toward a partial settlement," Kacprowski "insisted, again, that the Ellison [Parties] would need to pay the entire settlement with their own money, and later litigate with the other insured defendants over the allocation of insurance proceeds." *Id.* Rains asserts that Kacprowski "refused to accept an assignment of [] Marinelli's rights to the insurance proceeds as part of a settlement." *Id.*

       e.   Rains says that Kacprowski's assertion that the Ellison Parties "blocked" Gossert's proposed settlement is "not accurate, any more than it would be accurate to say that [] Kacprowski is 'blocking' a settlement of this [interpleader] action." *Id.* at PageID #s 3542-43.

       f.   Regarding the Policy allocation, the Ellison Parties disagreed with Kacprowski's position that the proceeds should be divided equally among the Interpleader-Defendants.

*Id.*  Rains explained that the Ellison Parties were of the opinion that Gossert, Yannone, and Uchiyama "had no exposure as a practical matter, and had only incurred a few hundred thousand dollars each in defense costs." *Id.* at PageID # 3543.  In contrast, "Marinelli (and, through him, [] Ellison) was the trustee's primary target at trial, and he had spent millions defending himself (and all the other defendants had benefitted from those efforts)." *Id.*

        g.   Rains denies that the Ellison Parties' actions blocked Gossert from settling.  *Id.*

        h.   Rains specifically disputes that he "vehemently opposed" Gossert's settlement.  *Id.* at PageID # 3544.  From his perspective, he "had a good relationship with [] Farmer," and their "conversations were always amiable." *Id.* He recalls telling Farmer, "on several occasions, that he should not make any settlement with the plaintiffs because, if he was patient, in the end [] Gossert would get out of the case for free." *Id.*  He also recalls telling Farmer that "if there ever were a global settlement, the individual defendants, including [] Gossert and [] Yannone, would simply have to release their claims to the insurance proceeds in return for a dismissal of the claims against them." *Id.*  Given the posture of the Island Air case, and the sympathetic circumstances of Gossert and Yannone, Rains testified that he "could not imagine a scenario

51

in which [] Gossert was held liable but [] Au and [] Marinelli were not." *Id.* He was certain that Kacprowski "would seek to recover the entire judgment from [the Ellison Parties], not [] Gossert." *Id.* at PageID # 3545. Rains assured Farmer that "in pursuing any contribution or indemnity claims, the Ellison [Parties] would never seek to recover any personal assets from [] Gossert over and above his rights to the insurance policy proceeds." *Id.*

i.   Rains asserts that it was the bankruptcy trustee who pursued a "scorched earth strategy and forced [the] defendants to respond unwillingly." *Id.* at PageID # 3546. Ultimately, Rains maintains that the Ellison Parties' defense costs "were the natural consequence of the litigation decisions made by [] Kacprowski." *Id.*

C.   **Defense Fees and Costs.**

143. In drafting this Order after trial, the court concluded that it would be helpful to have the parties standardize the presentation of their claims for defense costs. The court therefore directed each party to complete and file a defense cost worksheet showing total fees, expenses, and other charges sought from the interpleaded funds, along with supporting citations from the trial record. ECF No. 209. At times, the amounts sought in the defense cost worksheets

deviated from the amounts that the attorneys appeared to seek in their trial declarations.[16]

144. After the filing of completed defense cost worksheets, the court held a status conference to address several issues the parties raised in connection with the defense cost worksheets.  At that status conference, the court ordered the parties to file statements clarifying what, if any, amounts included in their defense cost worksheets related to work completed for this interpleader case.  The court indicated that, by the time of that conference, it had concluded that work in this interpleader case would not be paid out of Policy funds, because that work was not being performed to address a Loss under the Policy.  The court also asked the Au Group's counsel to file new calculations that reflected the deletion of work completed on behalf of the Au Group's related uninsured co-defendants.  ECF No. 221.

145. Unless otherwise noted, the court relies on the sums logged by the parties in their defense cost worksheets and their clarifying statements for the total amount of defense costs each party seeks from Policy funds.

---

[16] For example, compare Rains Decl., ECF No. 186, PageID #s 3430-32 (listing hours billed by 43 Morrison & Foerster professionals in the Island Air dispute), with Marinelli Def. Cost Worksheet, ECF No. 210, PageID #s 4469-71 (claiming fees for only 9 of the 43 Morrison & Foerster professionals listed in Rains's declaration).

1.   **Au Group.**

a.   **Interactions with QBE.**

146. In August 2020, Hawai'i attorney Adams tendered Au's defense to QBE.  Ex. 115 (copy of letter sent to QBE); Adams Decl., ECF No. 180, PageID # 3486.

147. In July 2021, QBE notified Adams that it had determined that coverage was triggered for Au in connection with the underlying litigation.  Ex. 116; Adams Decl., ECF No. 180, PageID # 3486.  However, QBE also noted that it was aware that Adams and Ito (the Au Group's counsel from Colorado) were representing "uninsured individuals and entities," along with Au.  Ex. 116 at 0004.  QBE requested that Adams and Ito send their hourly rate information and contact QBE "to arrive at an appropriate allocation or billing arrangement" with respect to Au's costs in defending against the underlying litigation.  *Id.*

148. In August and September 2022, Ito sent invoices to QBE for reimbursement for Au's costs and fees incurred from February 1, 2018, through July 31, 2022.  Exs. 11, 12, 13; Ito Decl., ECF No. 181, PageID # 3511.

149. As noted earlier in this order, the Au Group filed a lawsuit in December 2022 against QBE claiming breach of contract and insurance bad faith.  *See* Ex. 2006 (copy of ECF No. 1 (Complaint), *in Au v. QBE Specialty Ins. Co.*, Civ. No. 22-00557 (D. Haw.)).  The Au Group voluntarily dismissed this suit

around the time that this court granted QBE's motion to interplead funds.  ECF No. 9, *in Au v. QBE Specialty Ins. Co.*, Civ. No. 22-00557 SOM-KJM (D. Haw.).

150. Ultimately, the Au Group did not receive any distributions of Policy proceeds from QBE.  Ito Decl., ECF No. 181, PageID # 3511; Tr. Day 2, ECF No. 195, PageID # 3939 (Au Group's counsel's statement that "QBE paid none of our invoices").

151. The Au Group paid all legal fees and expenses billed by the Ito Law Group and Adams Krek within ten days.  Ito Decl., ECF No. 181, PageID # 3508; Adams Decl., ECF No. 180, PageID # 3487.

### b.    Policy Funds Sought.

152. From the interpleader funds, the Au Group, as set forth in its original worksheet (later amended, as discussed later in this order) seeks a total of $3,400,616.88 for fees, expenses, and other charges:

| Table 2. Au Group Defense Costs | |
|---|---|
| Category | Amount Sought |
| Fees | $2,614,091.40 |
| Expenses | 480,340.02 |
| Other Charges | 306,185.46 |
| Total Policy Funds Sought | 3,400,616.88 |

Au Grp. Def. Cost Worksheet, ECF No. 213, PageID # 4547.

153. The Au Group's fees of $2,614,091.40 are apportioned between the Ito Law Group and Adams Krek as follows:

| Table 3. Ito Law Group Fees | | | |
|---|---|---|---|
| Name and Title | Rate | Fees | |
| Peter Ito<br>*Partner* | $      400.00 | $   534,640.00[17] | |
| | 450.00 | 920,195.00[18] | |
| | 500.00 | 814,950.00[19] | |
| | 525.00 | 60,217.50[20] | |
| | Total Fees | 2,330,002.50 | |

*Id.* at PageID #s 4528-30.

---

[17] Au Grp. Def. Cost Worksheet, ECF No. 213, PageID # 4528 (citing Ex. 33 at 2; Ex. 34 at 3; Ex. 35 at 5; Ex. 35 at 6; Ex. 36 at 3; Ex. 36 at 5; Ex. 37 at 2; Ex. 37 at 6; Ex. 38 at 4; Ex. 38 at 6; Ex. 39 at 7; Ex. 39 at 11; Ex. 40 at 4; Ex. 40 at 8; Ex. 41 at 5; Ex. 41 at 7; Ex. 42 at 4; Ex. 42 at 6; Ex. 43 at 2; Ex. 43 at 4; Ex. 44 at 3; Ex. 44 at 5; Ex. 45 at 2; Ex. 45 at 7; Ex. 46 at 2; Ex. 46 at 5; Ex. 47 at 3; Ex. 47 at 11; Ex. 48 at 2; Ex. 48 at 8; Ex. 49 at 1; Ex. 49 at 4).

[18] *Id.* at PageID #s 4528-29 (citing Ex. 50 at 3; Ex. 50 at 7; Ex. 51 at 8; Ex. 51 at 11; Ex. 52 at 8; Ex. 52 at 9; Ex. 53 at 15; Ex. 53 at 17; Ex. 54 at 7; Ex. 55 at 13; Ex. 56 at 7; Ex. 57 at 16; Ex. 58 at 20; Ex. 59 at 11; Ex. 60 at 11; Ex. 61 at 11).

[19] *Id.* at PageID # 4529 (citing Ex. 62 at 12; Ex. 63 at 13; Ex. 64 at 15; Ex. 65 at 11; Ex. 66 at 22; Ex. 67 at 13; Ex. 68 at 17; Ex. 69 at 10; Ex. 70 at 8;Ex. 71 at 5; Ex. 72 at 5; Ex. 73 at 7).

[20] *Id.* (citing Ex. 74 at 7; Ex. 75 at 1-4).

| Table 4. Adams Krek Fees | | |
|---|---|---|
| Name and Title | Rate | Fees |
| Christian Adams<br>*Partner* | $      400.00 | $   178,203.50[21] |
| | 500.00 | 24,356.00[22] |
| | 550.00 | 4,730.00[23] |
| Cheryl Fraine<br>*Associate* | 225.00 | 3,735.00[24] |
| Rebeka Takayama<br>*Associate* | 275.00 | 10,037.50[25] |
| Kayla Benyish<br>*Paralegal* | 195.00 | 448.50[26] |
| Ashley King<br>*Paralegal* | 175.00 | 49,432.50[27] |
| | 195.00 | 11,855.90[28] |
| | 215.00 | 1,290.00[29] |
| | Total Fees | 284,088.90 |

*Id.*

---

[21] *Id.* (citing Ex. 14).

[22] *Id.* (citing Ex. 14; Ex. 88 at 2; Ex. 89 at 2; Ex. 90 at 2; Ex. 91 at 1; Ex. 92 at 2).

[23] *Id.* (citing Ex. 93 at 3).

[24] *Id.* (citing Ex. 14).

[25] *Id.* (citing Ex. 14).

[26] *Id.* at PageID # 4530 (citing Ex. 14; Ex. 93 at 3).

[27] *Id.* (citing Ex. 14).

[28] *Id.* (citing Ex. 14; Ex. 89 at 2; Ex. 90 at 2; Ex. 91 at 1).

[29] *Id.* (citing Ex. 93 at 3).

154. The Au Group seeks $480,340.02 in expenses:

| Table 5. Ito Law Group Expenses | |
|---|---|
| Category | Amount Sought |
| Airfare | $   17,503.54[30] |
| Expert | 278,687.25[31] |
| Ground Transportation | 496.77[32] |
| Legal Research Services | 13,521.93[33] |
| Lodging | 7,660.32[34] |
| Meals | 692.55[35] |
| PACER | 219.60[36] |
| Parking | 432.00[37] |
| Transcripts | 42,260.19[38] |
| Total Expenses | 361,474.15 |

*Id.* at PageID #s 4533-38.

---

[30] *Id.* at PageID # 4533 (citing Ex. 34 at 3; Ex. 35 at 5; Ex. 37 at 5; Ex. 51 at 8; Ex. 52 at 8; Ex. 55 at 13; Ex. 59 at 11).

[31] *Id.* at PageID # 4536 (citing Exs. 107, 108, 109, 110, 111, 112).

[32] *Id.* at PageID # 4533 (citing Ex. 37 at 5; Ex. 53 at 16; Ex. 57 at 16; Ex. 59 at 11).

[33] *Id.* at PageID #s 4533-34 (citing Ex. 35 at 6; Ex. 36 at 3; Ex. 37 at 5; Ex. 38 at 4; Ex. 39 at 11; Ex. 40 at 8; Ex. 41 at 5; Ex. 42 at 4; Ex. 43 at 4; Ex. 45 at 7; Ex. 46 at 5; Ex. 47 at 11; Ex. 48 at 2; Ex. 49 at 4; Ex. 50 at 7; Ex. 51 at 8; Ex. 53 at 15; Ex. 54 at 7; Ex. 55 at 13; Ex. 56 at 7; Ex. 57 at 16; Ex. 58 at 20; Ex. 59 at 11; Ex. 60 at 11; Ex. 61 at 12; Ex. 62 at 12; Ex. 63 at 13; Ex. 64 at 15; Ex. 65 at 11; Ex. 66 at 22; Ex. 67 at 13; Ex. 68 at 17; Ex. 69 at 10; Ex. 70 at 8; Ex. 71 at 5; Ex. 72 at 5; Ex. 73 at 7; Ex. 74 at 8).

[34] *Id.* at PageID # 4534 (citing Ex. 37 at 5; Ex. 38 at 6; Ex. 53 at 16; Ex. 57 at 16; Ex. 59 at 11).

[35] *Id.* (citing Ex. 53 at 16; Ex. 57 at 16; Ex. 59 at 11).

[36] *Id.* (citing Ex. 35 at 6; Ex. 36 at 3; Ex. 37 at 5).

[37] *Id.* (citing Ex. 53 at 16; Ex. 57 at 16; Ex. 59 at 11).

[38] *Id.* (citing Ex. 48 at 8; Ex. 49 at 4; Ex. 52 at 8; Ex. 53 at 16; Ex. 54 at 7; Ex. 57 at 16; Ex. 58 at 20; Ex. 59 at 11; Ex. 60 at 11; Ex. 61 at 12; Ex. 62 at 12; Ex. 63 at 13; Ex. 74 at 8).

| Table 6. Adams Krek Expenses | |
|---|---|
| Category | Amount Sought |
| Copies | $         5.24[39] |
| eDiscovery Database | 113,570.60[40] |
| Legal Research Services | 40.65[41] |
| Mail Fees | 125.71[42] |
| PACER | 82.70[43] |
| Process Servers | 274.92[44] |
| Transcripts | 4,532.71[45] |
| Telephonic Appearance Fees | 104.00[46] |
| Witness Fees | 40.00[47] |
| Electronic Media | 89.34[48] |
| Total Expenses | 118,865.87 |

*Id.*

155. In its defense cost worksheet, the Au Group also listed $306,185.46 in "other charges" for work completed before the First Adversary Proceeding was filed. *Id.* at PageID #s 4541-44.

---

[39] *Id.* at PageID # 4537 (citing Ex. 91 at 1).

[40] *Id.* (citing Ex. 14; Ex. 88 at 2; Ex. 89 at 2; Ex. 90 at 2; Ex. 91 at 1; Ex. 93 at 2).

[41] *Id.* (citing Ex. 14).

[42] *Id.* (citing Ex. 14).

[43] *Id.* (citing Ex. 14).

[44] *Id.* (citing Ex. 14).

[45] *Id.* (citing Ex. 14).

[46] *Id.* (citing Ex. 14).

[47] *Id.* (citing Ex. 14).

[48] *Id.* (citing Ex. 14).

2.    Gossert.

a.    Interactions with QBE.

156. QBE appointed Farmer as counsel for Gossert after the bankruptcy trustee sued Gossert in the Island Air case. Farmer Decl., ECF No. 205, PageID # 4324.

157. From the time that Farmer was retained and appeared as counsel for Gossert through June 2022, QBE directly paid Farmer for invoices related to Gossert's defense in the underlying litigation. *Id.* at PageID # 4338; Tr. Day 1, ECF No. 194, PageID # 3707 (establishing Farmer's receipt of payments from QBE, without recollection of amount). The court estimates that QBE paid Farmer $282,193.78.[49]

---

[49] This estimate is based on the following calculations. The Policy had a limit of $6,000,000. Wegescheide and Pfleiger received $37,639.30 and $86,548.10, respectively, from interpleaded Policy funds, leaving $5,389,034.11 of the interpleaded amount. The court subtracts the amounts paid to Wegescheide and Pfleiger and the remaining interpleaded amount from the $6,000,000 Policy limit, leaving $486,778.49. Kubota, Uchiyama's attorney, estimated that he received $204,584.71 from QBE before the Policy funds were deposited with the court. When the court subtracts the amount Kubota received ($204,584.71) from $486,778.49, the court is left with $282,193.78. In the court's original order issued on July 17, 2024, ECF No. 226, the court directed Uchiyama's and Gossert's attorneys to meet and confer regarding the court's estimate of the defense costs paid to them before QBE interpleaded Policy funds and their respective shares of the *pro rata* distribution, which is based on the total amount of Policy funds received. *See* COL ¶ 81. On July 22, 2024, counsel filed a statement noting that Uchiyama and Gossert "do not dispute the Court's representations." *See* ECF No. 228, PageID # 4846.

158. In June 2022, QBE informed Farmer that it would no longer cover Gossert's defense costs given this interpleader action.  Farmer Decl., ECF No. 205, PageID # 4338.

159. Since June 2022, Farmer has submitted invoices directly to Gossert, who has paid them out-of-pocket.  *Id.*; Gossert Decl., ECF No. 207, PageID # 4380; Tr. Day 1, ECF No. 194, PageID # 3687.

### b.   Policy Funds Sought.

160. From the interpleader funds, Gossert seeks a total of $105,903.57 for fees, expenses, and other charges:

| Table 7. Gossert Defense Costs | |
| --- | --- |
| Category | Amount Sought |
| Fees | $   105,781.43 |
| Expenses | 122.14 |
| Other Charges | 0.00 |
| Total Policy Funds Sought | 105,903.57 |

Gossert Def. Cost Worksheet, ECF No. 211, PageID #s 4493, 4497, 4506.

161. The fees of $105,781.43 reflect work done by Farmer, Alan Van Etten, Tristan Andres, and Monika Wurlitzer, with the last three individuals' amounts included in a post-trial submission pursuant to this court's direction.  The last three individuals' fees relate to litigating this interpleader action.  However, this court later clarified that fees relating to this interpleader action were not recoverable from the Policy

funds, as discussed later in this order.  This court therefore considers only Farmer's fees.

162. In fees, Gossert seeks $105,781.43, apportioned as follows:

| Table 8. Gossert Fees | | |
|---|---|---|
| Name and Title | Rate | Fees |
| David C. Farmer<br>*Attorney* | $        300.00 | $    32,261.16[50] |
| Alan Van Etten<br>*Attorney* | Not submitted | 45,201.34[51] |
| Tristan Andres<br>*Attorney* | Not submitted | 27,374.95[52] |
| Monika Wurlitzer<br>*Attorney* | Not submitted | 943.98[53] |
| | Total Fees | 105,781.43 |

*Id.* at PageID #s 4493-94.

---

[50] Gossert Def. Cost Worksheet, ECF No. 211, PageID # 4493 (citing Farmer Decl., ECF No. 205, PageID #s 4341-42; Exs. 2027-32, 2045, 2046, 2047).

[51] *Id.*

[52] *Id.*

[53] *Id.*

163. Gossert seeks $122.14 in expenses:

| Table 9. Gossert Expenses | |
|---|---|
| Category | Amount Sought |
| Copies | $       24.08[54] |
| PACER | 38.14[55] |
| Transcripts | 59.92[56] |
| Total Expenses | 122.14 |

*Id.* at PageID #s 4497-500.

164. Gossert does not seek reimbursement for any other charges.  *See id.* at PageID #s 4503-04.

### 3.   Marinelli.

#### a.   Interactions with QBE.

165. Rains testified that Marinelli tendered the underlying dispute to QBE in early 2020.  Rains Decl., ECF No. 186, PageID # 3522.

166. In May 2020, QBE acknowledged receipt of Marinelli's tender and confirmed that coverage under the Policy was triggered, subject to enumerated reservations.  Ex. 1001. In that correspondence, QBE made clear that it understood that Rains was representing Marinelli and that it would consider the retention of Morrison & Foerster once it "received additional

---

[54] Gossert Def. Cost Worksheet, ECF No. 211, PageID # 4497 (citing Ex. 2046 at 3).

[55] *Id.* (citing Ex. 2028 at 4).

information regarding hourly billing rates and staffing." *Id.* at 00035.

167. Rains testified that QBE later "consented to the joint representation" of Marinelli and "several of the other persons and entities named as defendants" in the underlying litigation by Morrison & Foerster, Pillsbury, and TLM.  Rains Decl., ECF No. 186, PageID # 3523.

168. In May 2020, Rains proposed to QBE that Marinelli temporarily defer submission of his legal bills while the parties attempted to negotiate a global settlement in the underlying litigation in order to avoid depleting the Policy funds available for a potential settlement.  *Id.*  QBE agreed to this proposal and indicated that it was reserving the right to review Marinelli's defense costs for reasonableness under the terms of the Policy.  *Id.*

169. In early 2022, after the unsuccessful November 2021 mediation, Rains notified QBE that Marinelli would be submitting his defense costs for reimbursement and advancement. *Id.* at PageID # 3524.

170. Rains testified that QBE confirmed that it would advance Marinelli's defense costs once the bankruptcy court granted relief from the automatic stay.  *Id.*; Trial Transcript Day 3 ("Tr. Day 3"), ECF No. 196, PageID # 3983.

171. Marinelli then filed a motion seeking an order lifting the automatic stay on March 28, 2022.  Rains Decl., ECF No. 186, PageID # 3524; Ex. 1002 at 00038.  The bankruptcy court granted the motion on May 31, 2022.  Rains Decl., ECF No. 186, PageID # 3524; Ex. 1002.

172. Rains thought QBE's motion to interplead funds was inconsistent with what he described as QBE's promises to him to pay defense costs.  Tr. Day 3, ECF No. 196, PageID # 3983.  In his opinion, "QBE took action [i.e. filed for interpleader] to avoid its obligation to pay [] Marinelli's impending claim."  Rains Decl., ECF No. 186, PageID # 3524.

173. During a scheduling conference with the bankruptcy court on June 3, 2022, QBE's counsel stated that "some defense costs have been advanced and other insureds are gathering their invoices, and it's the intention of QBE to continue advancing those costs until such time as it's granted a discharge."  Ex. 1003 at 48.

174. A few days later, Rains submitted to QBE on behalf of Marinelli a formal request for reimbursement and advancement of approximately $3,500,000 for defense costs incurred in the underlying litigation through April 2022.  Rains Decl., ECF No. 186, PageID # 3526.  The parties refer to this as the "First Advancement Request."  *Id.*

175. Rains testified that he spoke with QBE's counsel on June 13, 2022. *Id.* at PageID # 3527. Rains testified that, in that conversation, QBE's counsel "reaffirmed QBE's commitment to advance [] Marinelli's Defense Costs on an ongoing basis unless and until QBE received permission to interplead the Policy to the Bankruptcy Court and received a discharge of its duties under the Policy." *Id.* Rains also testified that QBE's counsel "did not express objection to the reasonableness of [] Marinelli's submitted Defense costs on this call[.]" *Id.*

176. Nevertheless, Rains received a letter from QBE on July 14, 2022, declining the reimbursement and advancement requests. *Id.*; Ex. 1134. The letter stated:

> Although Mr. Marinelli previously informed QBE that he would not seek coverage for Defense Costs under the Policy, after QBE filed the interpleader proceeding [], Mr. Marinelli has submitted $3,560,492.84 in legal fees generated by your firm, Pillsbury Winthrop Shaw and Pittman LLP and local counsel Tsugawa Lau & Muzzi LLLC. Your June 14, 2022 letter requested that 80% of such amounts be covered under the Policy.

> QBE has advanced Defense Costs in connection with this matter to the extent that the relevant Insureds received an order from the Bankruptcy Court granting relief from the automatic stay. The Court granted Mr. Marinelli's motion for relief from the automatic stay to seek coverage under the Policy on May 31, 2022. *In re Hawai'i Island Air, Inc.*, No. #17-01078 (D. Haw.), Dkt. No. 1105. QBE received supporting documentation for the invoices discussed above on July 1, 2022 and received payment instructions today, July 14, 2022.
> As discussed in QBE's Motion for Leave to Deposit Interpleader Funds, and for Discharge, Injunction, and Dismissal with Prejudice filed today in the Interpleader prior to receipt of supporting documentation from your

66

firm, QBE was informed that certain Insureds received settlement demands that, together with the legal fees submitted by Mr. Marinelli (as well as those incurred and to be submitted by other Insureds), exceed the remaining limit of liability of the Policy.  In light of the competing demands on the Policy's proceeds by various Insureds, QBE is unable to accept Mr. Marinelli's proposal to pay 80% of legal fees and costs jointly incurred on behalf of himself and non-Insured parties.  QBE notes further that **Mr. Marinelli and the non-Insured parties engaged two national law firms, in addition to local counsel, and incurred more than $3.5 million in legal fees and costs without informing QBE of the magnitude of the amounts being incurred and purporting not to request coverage for those amounts under the Policy.**

Under these circumstances, QBE is constrained to seek leave to deposit the remaining Policy proceeds into the Bankruptcy Court's registry.  As we discussed, QBE intended to continue paying covered Defense Costs, including those incurred by Mr. Marinelli, subject to the receipt of supporting documentation and agreement concerning an appropriate allocation for amounts incurred on behalf of non-Insured parties. Unfortunately, because settlement demands have been made that exceed the remaining limit of liability, QBE is unable to make further Defense Costs payments at this time.

Ex. 1134 at 00832-33 (emphasis added).

177. Rains testified that QBE was "disingenuous[]" in asserting that "prior to receipt of supporting documentation from [Rains's] firm, QBE was informed that certain Insureds received settlement demands that together with the legal fees submitted by Mr. Marinelli (as well as those incurred and to be submitted by other Insureds), exceed the remaining limit of liability of the Policy," and that "[i]n light of the competing demands on the Policy's proceeds by various Insureds," QBE was

67

"constrained to seek leave to deposit the remaining Policy proceeds into the Bankruptcy Court's registry" and "unable to make further Defense Cost payments at this time."  Rains Decl., ECF No. 186, PageID # 3528.

178. Rains took the position that QBE's "180-degree turn"—from admitting obligation to refusing to pay—amounted to bad faith.  Tr. Day 3, ECF No. 196, PageID # 3985.  During the pendency of QBE's motion to interplead funds, other counsel for Marinelli filed an action against QBE claiming breach of contract and insurance bad faith.  Ex. 2004 (copy of ECF No. 1 (Complaint), *in Marinelli v. QBE Specialty Ins. Co.*, Civ. No. 22-00391 SOM-KJM (D. Haw.)); Tr. Day 3, ECF No. 196, PageID # 3983 (Rains's acknowledgment that Marinelli had filed an action for bad faith against QBE).  Marinelli also later filed a motion for preliminary injunction, urging the court to order QBE to pay his defense costs.  ECF No. 11, *in Marinelli v. QBE Specialty Ins. Co.*, Civ. No. 22-00391 SOM-KJM (D. Haw.).

179. When this court allowed QBE to deposit interpleaded funds, the court also denied Marinelli's motion for preliminary injunction in his suit against QBE and granted QBE's motion to dismiss that case to the extent that it addressed Marinelli's claims to Policy funds.  ECF No. 35, *in Marinelli v. QBE Specialty Ins. Co.*, Civ. No. 22-00391 SOM-KJM (D. Haw.).

180. Marinelli has received no distributions of Policy funds.  Rains Decl., ECF No. 186, PageID # 3528; *see* Tr. Day 3, ECF No. 196, PageID # 3983 (stating that, after two years of assurances that defense costs would be paid, Marinelli was told that QBE would not fund Marinelli's defense costs).

181. Lawrence Investments, Marinelli's employer and one of the uninsured Ellison Parties in the Island Air dispute, advanced Marinelli's defense costs pending his receipt of Policy funds.  Marinelli Decl., ECF No. 202-1, PageID # 4288; *see* Connelly Decl., ECF No. 204-1, PageID # 4319; Muzzi Decl., ECF No. 203-1, PageID # 4307.

### b.   Policy Funds Sought.

182. From the interpleader funds, Marinelli seeks a total of $4,557,145.86 (before his proposed percentage reduction) for fees, expenses, and other charges:

| Table 10. Marinelli Defense Costs | |
|---|---|
| Category | Amount Sought |
| Fees | $4,398,705.27[57] |
| Expenses | 158,440.59 |
| Other Charges | 0.00 |
| Total Policy Funds Sought | 4,557,145.86 |

Marinelli Def. Cost Worksheet, ECF No. 210, PageID # 4488.

---

[57] This total does not account for any reduction for work completed on behalf of uninsured Ellison Parties.  Marinelli Def. Cost Worksheet, ECF No. 210, PageID # 4488.

183. Marinelli's fees of $4,398,705.27, before any proposed percentage reduction, is apportioned among Morrison & Foerster, TLM, and Pillsbury as follows:

| Table 11. Morrison & Foerster Fees | | |
|---|---|---|
| Name and Title | Rate | Fees |
| Benjamin Butterfield *Partner* | $ 975.00 | $ 6,932.25[58] |
| Rahman Connelly *Associate* | 805.00-880.00 | 763,502.40[59] |
| Karen Leung *Associate* | 510.00 | 9,776.70[60] |
| Lorenzo Marinuzzi *Partner* | 1,300.00-1,850.00 | 15,636.37[61] |
| Julian N. Radzinschi *Associate* | 880.00-975.00 | 226,379.70[62] |
| Darryl P. Rains *Senior Counsel* | 1,250.00-1,550.00 | 2,109,664.35[63] |
| Miranda K. Russell *Associate* | 650.00-765.00 | 21,079.35[64] |
| Amanda Treleaven *Associate* | 850.00 | 120,105.00[65] |
| Alvin West *Senior Paralegal* | 370.00-475.00 | 73,124.14[66] |
| | Total Fees | 3,346,200.26 |

*Id.* at PageID #s 4469-73.

---

[58] Marinelli Def. Cost Worksheet, ECF No. 210, PageID # 4469 (citing Exs. 1021-23, 1154).

[59] *Id.* (citing Exs. 1004-19, 1154).

[60] *Id.* (citing Exs. 1006, 1154).

[61] *Id.* (citing Exs. 1006-09, 1027-28, 1032, 1034-39, 1041-42, 1044, 1154).

[62] *Id.* (citing Exs. 1015-20, 1154).

[63] *Id.* (citing Exs. 1004-45, 1154).

[64] *Id.* (citing Exs. 1020-23, 1032, 1154).

[65] *Id.* (citing Exs. 1005-07, 1154).

[66] *Id.* (citing Exs. 1006, 1010-14, 1016, 1018, 1020-24, 1026-37, 1039-45, 1154).

| Table 12. TLM Fees | | |
|---|---|---|
| Name and Title | Rate | Fees |
| Christopher J. Muzzi<br>*Partner* | $ 380.00-435.00 | $ 199,888.65[67] |
| Leila M. Rothwell<br>*Senior Associate* | 300.00-335.00 | 8,638.30[68] |
| Travis Fallon<br>*Paralegal* | 225.00 | 810.00[69] |
| | Total Fees | 209,336.95 |

*Id.*

| Table 13. Pillsbury Fees | | |
|---|---|---|
| Name and Title | Rate | Fees |
| Rahman Connelly<br>*Partner* | $ 970.00-1,020.00 | $ 785,115.00[70] |
| Kwame O. Akuffo<br>*Associate* | 675.00 | 1,701.00[71] |
| Andrew V. Alfano<br>*Associate* | 890.00-980.00 | 22,504.50[72] |
| Ryan J. Foley<br>*Associate* | 710.00 | 11,776.77[73] |
| Patti Rothenberg-Montz<br>*Associate* | 875.00-1,010.00 | 22,070.79[74] |
| | Total Fees | 843,168.06 |

*Id.*

---

[67] *Id.* at PageID # 4472 (citing Exs. 1048-83).

[68] *Id.* (citing Exs. 1048, 1050-51, 1058, 1069-70, 1073-74, 1076, 1081).

[69] *Id.* (citing Ex. 1083).

[70] *Id.* at PageID # 4473 (citing Exs. 1096-116).

[71] *Id.* (citing Exs. 1101).

[72] *Id.* (citing Exs. 1102-05).

[73] *Id.* (citing Exs. 1107-08).

[74] *Id.* (citing Exs. 1106, 1115-16).

184. Regarding expenses, Marinelli seeks a total of $158,440.59, apportioned as follows:

| Table 14. Morrison & Foerster Expenses | |
|---|---|
| Category | Amount Sought |
| Copies | $    1,718.21[75] |
| eDiscovery Database | 96,838.98[76] |
| Expert Witnesses | 2,205.00[77] |
| Legal Research Services | 5,626.00[78] |
| Transcripts | 27,853.95[79] |
| Mediator Fees | 2,516.67[80] |
| Hosting of Debtor's Accounting Software for Discovery | 3,455.50[81] |
| Total Expenses | 140,214.21 |

*Id.* at PageID #s 4476-81.

---

[75] *Id.* at PageID # 4476 (citing Ex. 1018).

[76] *Id.* (citing Exs. 1005-09, 1012, 1017-45).

[77] *Id.* (citing Ex. 1044).

[78] *Id.* (citing Exs. 1006, 1015-16, 1020, 1032, 1038).

[79] *Id.* (citing Exs. 1018, 1021-22, 1025, 1028-29, 1031, 1044-45).

[80] *Id.* (citing Ex. 1027).

[81] *Id.* (citing Ex. 1010).

| Table 15. TLM Expenses | |
|---|---|
| Category | Amount Sought |
| Copies | $     647.61[82] |
| General Excise Tax | 10,225.18[83] |
| Legal Research Services | 2,544.79[84] |
| PACER | 372.20[85] |
| Process Servers | 114.00[86] |
| Transcripts | 3,891.46[87] |
| Witness Fees | 96.00[88] |
| Total Expenses | 17,891.24 |

*Id.*

| Table 16. Pillsbury Expenses | |
|---|---|
| Category | Amount Sought |
| Legal Research Services | $     335.14[89] |
| Total Expenses | 335.14 |

*Id.*

185. Marinelli does not seek reimbursement for any other charges. *See id.* at PageID #s 4484-86.

186. The failure of Marinelli's counsel to prepare bills that separated fees incurred for Marinelli from fees incurred for related uninsured co-defendants was raised in the

---

[82] *Id.* at PageID # 4478 (citing Ex. 1158).

[83] *Id.* at PageID # 4479 (citing Exs. 1048-73).

[84] *Id.* at PageID # 4478 (citing Exs. 1050, 1054, 1066, 1069-70, 1072-79, 1083).

[85] *Id.* (citing Exs. 1048-83).

[86] *Id.* (citing Ex. 1158).

[87] *Id.* (citing Ex. 1158).

[88] *Id.* (citing Ex. 1158).

[89] *Id.* at PageID # 4480 (citing Exs. 1101, 1103).

Interpleader-Defendants' pretrial motions for partial summary judgment and was at issue in the bench trial.

187. Rains and Muzzi testified that, to the extent defense costs were incurred in defending Marinelli's related uninsured co-defendants, those services benefitted Marinelli in defending against covered claims.  Rains Decl., ECF No. 186, PageID # 3536; Muzzi Decl., ECF No. 203-1, PageID # 4304.  Rains and Muzzi "do not believe that work performed that was at least in part for [] Marinelli can be segregated" between Marinelli and his related uninsured co-defendants.  Rains Decl., ECF No. 186, PageID # 3537; Muzzi Decl., ECF No. 203-1, PageID # 4305.  In other words, they maintain that the work "would have still been necessary" in defending only Marinelli from covered claims.  Rains Decl., ECF No. 186, PageID # 3537; Muzzi Decl., ECF No. 203-1, PageID # 4305.

188. While understanding the position that what benefitted, for example, Lawrence Ellison individually could also benefit Marinelli and so should be covered under the Policy, this court has some concern that Marinelli's defense may have been driven primarily by a related uninsured person or entity.  Marinelli testified that he paid no legal bill.  Marinelli Decl., ECF No. 202-1, PageID # 4288; Tr. Day 2, ECF No. 195, PageID #s 3901-04.  It is to be expected that Marinelli's employer covered legal expenses, because the claims

against Marinelli were incidental to his employment.  But there is at least the danger that the litigation strategy, even if benefitting Marinelli, was geared primarily toward what uninsureds, like Ellison himself, wanted.

This court is not saying that Marinelli's attorneys would have been anything but zealous and committed had they been representing only Marinelli.  The attorneys would presumably have represented Marinelli with the utmost vigor and highest competence no matter what.  But they might have been more amenable to early settlement had they been concerned only about Marinelli individually, not also about uninsured repeat clients. Because attorneys consider their clients' resources in devising litigation strategies, the court questions whether the fees would have soared to the level before this court if related uninsured (and wealthy) parties had not been sued along with Marinelli.

189. Rains and Muzzi estimated that, collectively, the hours worked relating only to Marinelli's related uninsured co-defendants and uncovered claims account for about 15 percent of the total fees and disbursements.  Rains Decl., ECF No. 186, PageID # 3538; Muzzi Decl., ECF No. 203-1, PageID # 4306.  They both opined that a reduction in the amount of claimed defense costs by 20 percent, in addition to the 10 percent courtesy discount already given on each invoice, would "more than fairly"

75

exclude charges that would not be valid defense costs under the Policy.  Rains Decl., ECF No. 186, PageID # 3538; Muzzi Decl., ECF No. 203-1, PageID # 4306.

190. Connelly appeared to agree with these estimates by Rains and Muzzi.  *See* Connelly Decl., ECF No. 204-1, PageID #s 4317-18.

### 4.   Uchiyama.

#### a.   Interactions with QBE.

191. In January 2020, Kubota tendered the defense of Uchiyama in the underlying litigation to QBE.  *See* Kubota Decl., ECF No. 174, PageID #s 3441-42.

192. QBE accepted the tender of Uchiyama's defense in August 2020.  *Id.* at PageID # 3442; Ex. 3002.

193. Kubota submitted billings to QBE until November 2022.  Tr. Day 1, ECF No. 194, PageID # 3669.

194. QBE paid Kubota's costs and fees through April 8, 2022.  Kubota Decl., ECF No. 174, PageID # 3442; Tr. Day 1, ECF No. 194, PageID # 3662 (acknowledging receipt by Kubota of roughly $204,584.71 from QBE).

195. Kubota received the last payment from QBE around June 2, 2022, when QBE sought to interplead funds.  Kubota Decl., ECF No. 174, PageID # 3442.

196. Kubota's understanding of his representation agreement with Uchiyama is that Uchiyama is obligated to pay

Kubota's outstanding invoices if they are not covered by QBE's interpleaded funds.  Tr. Day 1, ECF No. 194, PageID #s 3669-70.

### b.   Policy Funds Sought.

197. From the interpleaded funds, Uchiyama seeks a total of $97,173.07, apportioned as follows:

| Table 17. Uchiyama Defense Costs | |
| --- | --- |
| Category | Amount Sought |
| Fees | $   94,787.92 |
| Expenses | 2,385.15 |
| Other Charges | 0.00 |
| Total Policy Funds Sought | 97,173.07 |

Uchiyama Def. Cost Worksheet, ECF No. 216-1, PageID # 4601.

198. In fees, Uchiyama seeks $94,787.92, apportioned among his attorneys as follows:

| Table 18. Uchiyama Fees | | |
|---|---|---|
| Name and Title | Rate | Fees |
| Scott E. Kubota<br>*Attorney* | $   500.00-550.00[90] | $   88,157.03[91] |
| James Y. Agena<br>*Attorney* | 350.00[92] | 3,646.60[93] |
| Neal K. Aoki<br>*Attorney* | 500.00-550.00[94] | 2,984.29[95] |
| | Total Fees | 94,787.92 |

*Id.* at PageID # 4586.

199. Uchiyama's bills faced some challenge on the ground that counsel had not maintained contemporaneous billing records. Tr. Day 1, ECF No. 194, PageID #s 3665-66. However, at trial, Kubota said that he kept records of his work throughout each day in the form of email drafts, which he later transferred to formal billing statements. *Id.* at PageID #s 3666-67.

---

[90] Kubota Decl., ECF No. 174, PageID #s 3441-42.

[91] Uchiyama Def. Cost Worksheet, ECF No. 216-1, PageID # 4586 (citing Kubota Decl., ECF No. 174) ($84,190 in fees plus $3,967.03 in general excise tax).

[92] Agena Decl., ECF No. 172, PageID # 3433.

[93] *Id.* at PageID #s 3435-36 ($3,482.50 in fees plus $164.10 in general excise tax).

[94] Aoki Decl., ECF No. 173, PageID # 3438.

[95] *Id.* at PageID # 3439 ($2,850 in fees plus $134.29 in general excise tax).

78

200. Uchiyama also seeks $2,385.15 for transcripts.
*Id.* at PageID # 4589 (citing Ex. 3017).

**D.   Total Amount Sought from Interpleaded Funds.**

201. In sum, the Interpleader-Defendants seek a total
of $9,263,503.68 from the interpleaded funds, apportioned as
follows:

| Table 19. Total Interpleaded Policy Funds Sought | | | |
|---|---|---|---|
| Name | Defense Costs | Settlement | Total |
| Au Group | $3,400,616.88 | $      0.00 | $3,400,616.88 |
| Gossert | 105,903.57 | 1,102,664.30 | 1,208,567.87 |
| Marinelli | 4,557,145.86 | 0.00 | 4,557,145.86 |
| Uchiyama | 97,173.07 | 0.00 | 97,173.07 |
| | | Total | 9,263,503.68 |

FOFs ¶¶ 128, 152, 160, 182, 197.

202. Only $5,389,034.11 remains in the interpleader
fund.  FOF ¶ 52.

**V.     CONCLUSIONS OF LAW AND EQUITY.**

**A.   Governing Law.**

**1.   Choice of Law.**

1.   The court previously determined that Hawai'i
substantive law governed the court's analysis of whether the
Policy terms clearly established a priority of payments.  ECF
No. 113, PageID #s 2683-85.  In that order, the court concluded
that the terms of the Policy did not clearly establish a
priority of payments among the Interpleader-Defendants' claims,
so this court is guided by equitable principles in distributing
the interpleaded funds.  *Id.* at PageID # 2709.

2.   "It has long been the province of federal courts
sitting in equity to apply a body of federal common law
irrespective of state law." *Sonner v. Premier Nutrition Corp.*,
971 F.3d 834, 839 (9th Cir. 2020); *see also Guar. Trust Co. v.
York*, 326 U.S. 99, 105-06 (1945).

3.   Thus, this court applies equitable principles
derived from federal common law in determining the equitable
distribution of Policy proceeds. *See Island Title Corp. v.
Bundy*, 488 F. Supp. 2d 1084, 1095 (D. Haw. 2007) ("[A]s a
general rule, federal law rather than state law governs the
equitable power of the federal court to award attorney's fees to
the interpleader stakeholder.").

### 2.   Equitable Power in Interpleader.

4.   "Interpleader is an equitable action, the
maintenance of which is subject to the discretion of the court."
*Fed. Ins. Co. v. PixarBio Corp.*, No. 20 Civ. 4659 (GBD), 2022 WL
623735, at *4 (S.D.N.Y. Mar. 3, 2022) (internal quotations and
citations omitted); *accord Fulton v. Kaiser Steel Corp.*, 397
F.2d 580, 583 (5th Cir. 1968) ("Interpleader generally is a suit
in equity which invokes equitable principles."); *American
Airlines, Inc. v. Block*, 905 F.2d 12, 14 (2d Cir. 1990) ("[I]t
is well recognized that interpleader is an equitable remedy.").

5.   "A district court has broad powers in an interpleader action." *Rhoades v. Casey*, 196 F.3d 592, 600 (5th Cir. 1999).

6.   This equitable power "includes a district court's determination on how to disburse interpleaded funds." *PixarBio Corp.*, 2022 WL 623735, at *4; *see Vetter v. McAtee*, 850 F.3d 178, 186 (5th Cir. 2017) ("The disbursement of funds interpleaded into the registry of the court is 'equitable in nature.'"); *Bricks Unlimited, Inc. v. Agee*, 672 F.2d 1255, 1261 (5th Cir. 1982) ("In determining the order of distribution of the interpleaded funds, we sit as a court of equity, and possess the remedial flexibility of a chancellor in shaping our decree so as to do complete equity between the parties.").

7.   Under its equitable power in interpleader, a district court has discretion to deny a party's recovery from interpleaded funds or to declare priority to those proceeds. *PixarBio Corp.*, 2022 WL 623735, at *4; *Marine Indem. Ins. Co.*, 115 F.3d at 285-89.

B.   **Date Chosen for Evaluation**
      **of Claims to Interpleader Funds.**

8.   While this is an interpleader action brought
under Rule 22 of the Federal Rules of Civil Procedure, in
statutory interpleader actions, "[t]he purpose of an
interpleader action is 'to decide the validity and priority of
*existing* claims to a res.'" *Island Title Corp.*, 488 F. Supp. at
1090 (quoting *Texaco, Inc. v. Ponsoldt*, 118 F.3d 1367, 1369 (9th
Cir. 1997)).

9.   In a statutory interpleader case, a court must
determine the claims "as they existed at the time the action was
initiated." *Ponsoldt*, 118 F.3d at 1379.

10.   This court has found no governing precedent
establishing the date of initiation in the rule interpleader
context.  This court therefore looks to the statutory
interpleader precedent for guidance, but, as explained later in
this order, is conscious that a court is not necessarily
strictly bound by any particular date in addressing the claims
before it.

11.   In the statutory interpleader context, the date
an action is deemed initiated is the date on which the disputed
funds are deposited with the court.  *E.g.*, *Ponsoldt*, 118 F.3d at
1369; *Met. Life Ins. Co. v. Reynolds*, No. CV-13-01253-PHX-BSB,
2013 WL 6048808, at *3 (D. Ariz. Nov. 15, 2013); *Wells Fargo*

*Bank, N.A. v. Magellan Owners Ass'n*, No. CV-09-587-PHX-MHM, 2010
WL 46794, at *3 (D. Ariz. Jan. 4, 2010).[96]

      12.  Evaluating the claims as of the date on which QBE
deposited the Policy funds with this court is a helpful starting
point here.  Once the money was received by the court, all of
the Interpleader-Defendants knew the exact amount of Policy
funds remaining, thereby allowing them to calibrate their
positions and begin calculating their claims.

      13.  Thus, the court begins by evaluating the
Interpleader-Defendants' claims as of February 3, 2023, the date
on which QBE deposited the remaining Policy funds.  FOF ¶ 50.
In selecting that date to begin with, this court is concerned
that some end date is essential.  Otherwise, with parties
continuing to incur fees and costs, claims become ever-changing,
making calculations and assessments impossible.

---

[96] The court previously stated that the interpleader fund was
"established" on January 27, 2023, by the court's order that
granted interpleader.  ECF No. 113, PageID #s 2682-83.  At the
time, the court thought the lack of precedent on the relevant
date for evaluating claims in rule interpleader cases might help
further reduce the amounts the Interpleader-Defendants sought
from Policy funds.  However, after additional research, the
court concludes that, at least as a starting point, importing
the rule used in the statutory interpleader context (i.e.,
relying on the date funds were deposited with the court) is a
helpful organizing tool.  In any event, the difference between
January 27, 2023, and February 3, 2023, is only 7 days.

C.    **Settlements.**

14.   The court is sympathetic to the quandary Gossert faced throughout his settlement efforts. *See* FOFs ¶¶ 74-142 (discussing settlement efforts). But at least on the record before this court, this court cannot conclude that the Ellison Parties and the Au Group should be blamed for having allegedly prevented Gossert from settling. Certainly, those parties litigated the case aggressively and sought to stop or limit the depletion of Policy funds—but doing so was their prerogative. Gossert proffers no law that supports the proposition that a party's hardball tactics enable the court to fashion a benefit accruing to only his claims to the interpleaded funds.

15.   Because Gossert only had a settlement proposal— not a finalized settlement—as of February 3, 2023, the court previously concluded that he had not yet had a "Loss" for which he would have a right to indemnity from Policy funds as of that date. ECF No. 113, PageID # 2686.

16.   Because the Interpleader-Defendants' defense claims alone far exceed the remaining Policy balance and it would not be equitable to select a cutoff date favoring only Gossert's claims, the court, at least to begin with, declines to award Gossert interpleaded funds for a settlement not yet reached by February 3, 2023, when this court received the funds from QBE. Later in this order, this court relaxes its reliance

84

on that date, but even then the court does not reach the August 2023 date on which Gossert reached a settlement, much less the September 2023 date on which the bankruptcy court approved the settlement.

          **D.**   **General Excise Tax.**

       17.  General excise tax ("GET") is a privilege tax imposed on business activity in the state of Hawaiʻi.

       18.  Hawaiʻi law authorizes the counties to adopt a surcharge on GET.  The City and County of Honolulu authorizes businesses to pass on GET at a maximum rate of 4.712 percent. In Hawaiʻi state courts, it is "common practice" to include GET in the amount of a fee award.  *County of Hawaiʻi v. C & J Coupe Fam. Ltd. P'ship*, 120 Hawaiʻi 400, 409, 208 P.3d 713, 722 (2009).

       19.  Kubota, Agena, Aoki, Farmer, and the TLM professionals, all based in Hawaiʻi, added 4.712 percent GET to their fee claims.  Kubota Decl., ECF No. 174, PageID #s 3442-43; Agena Decl., ECF No. 172, PageID #s 3435-36; Aoki Decl., ECF No. 173, PageID # 3439; Farmer Decl., ECF No. 205, PageID # 4341.

       20.  Counsel for the Au Group (some of whom are Hawaiʻi attorneys) and Marinelli's Morrison & Foerster and Pillsbury attorneys did not add GET or other localities' taxes to their fee claims.

21. The attorneys who did not add GET performed their work in the underlying dispute here in Hawaiʻi and sometimes in various states across the country. This court has not been given information about tax rates applicable to these bills or about fee arrangements with clients providing for or waiving inclusion of taxes. The record suggests the Au Group and Marinelli were not charged tax, so this court does not award them any tax.

**E.   Defense Costs.**

22. The defense costs claimed by the Interpleader-Defendants are the type of charges that constitute covered "Loss" under the Policy. *See* Ex. 2000.

23.   The Interpleader-Defendants seek the following amounts in defense costs:

| Table 20. Total Defense Costs Sought[97] | | | | |
|---|---|---|---|---|
| Name | Fees | Expenses | Other Charges | Total |
| Au Group | $2,614,091.40 | $   480,340.02 | $   306,185.46 | $3,400,616.88 |
| Gossert | 105,781.43 | 122.14 | 0.00 | 105,903.57 |
| Marinelli | 4,398,705.27 | 158,440.59 | 0.00 | 4,557,145.86 |
| Uchiyama | 94,787.92 | 2,385.15 | 0.00 | 97,173.07 |
| | | | Total | 8,160,839.38 |

FOFs ¶¶ 152, 160, 182, 197.

24.   In this case, the contest over defense costs centers on attorneys' fees.

25.   Although equitable principles guide the court's analysis, the court continues to look to the terms of the Policy, which specifies that, to be reimbursed by Policy funds, defense costs must be "reasonable."  Ex. 2000.

26.   The Policy does not define "reasonable," and the parties did not attempt to establish during trial QBE's interpretation of that word or the standards, method, or analysis that QBE would or should have applied to review the

---

[97] After a status conference held on July 8, 2024, the Au Group submitted an amended defense cost worksheet, ECF No. 225-1, that reflected reductions for defense costs related to this interpleader case and work related to related uninsured co-defendants in the Island Air dispute.  The Au Group was the only Interpleader-Defendant to submit an amended worksheet.  To avoid confusion given the manner in which this court's analysis proceeds, the court cites his original worksheet here, but his defense costs are reduced in the relevant sections below to reflect the amended worksheet.

defense cost claims.  The court does find guidance helpful to this lawsuit in other cases determining reasonable attorneys' fees.

27.  In the Ninth Circuit, a court may determine reasonable attorneys' fees in two ways.  It may use the traditional lodestar analysis, in which the number of hours reasonably expended are multiplied by a reasonable hourly rate. However, when faced with a "massive" or "voluminous" request, a court may make across-the-board percentage cuts either in the number of hours claimed or in the final lodestar figure as a practical way of "trimming the fat" and determining what is reasonable.  *See E.R.K. ex rel R.K. v. Haw. Dep't of Educ.*, No. 10-00436 SOM/RT, 2023 WL 2666392, at *3-4 (Mar. 28, 2023).  When a court chooses to make a percentage cut, the court must set forth a concise and clear explanation of its reasons justifying the percentage cut, and the court's determination of fees is subject to heightened scrutiny.  *See Gonzalez v. City of Maywood*, 729 F.3d 1196, 1203 (9th Cir. 2013); *Gates v. Deukmejian*, 987 F.2d 1392, 1399-1400 (9th Cir. 1992).

28.  The defense cost claims in this case present circumstances that are not typical of fee requests—and indeed did not come before the court in typical fee request motions. Nor did the requests include the summary tables and detailed explanations required by Local Rule 54.2 for attorneys' fee

motions.  Collectively, the Interpleader-Defendants seek
reimbursement for the work of twenty-seven professionals
completed over four years in the Island Air dispute.  They
submitted thousands of pages of billings to document their
requests.  Combined, the claims total $9,263,503.68, but only
$5,389,034.11 remains in the interpleader fund.  FOFs ¶¶ 52,
201.

29.  This court applies four tranches of reductions to
the Interpleader-Defendants' *claimed* defense costs to arrive at
the amount of *reasonable* defense costs.

### 1.    Reduction No. 1:  Interpleader Fees.

30.  In the defense cost worksheets, the court
directed the parties to include fees, expenses, and other
charges incurred in the Island Air dispute and this interpleader
case from the inception of the underlying dispute until February
3, 2023.  The court asked the parties to include defense costs
incurred in both the Island Air case and this interpleader
action because the court was concerned that it might be
difficult to extricate the interpleader-related fees given the
voluminous billing records and the fact that QBE raised the
prospect of interpleader long before it actually moved to
interplead funds.  Thinking that a cut-off date was necessary to
facilitate evaluation of the parties' claims against the
interpleader fund, the court set the date that funds were paid

into the court.  The court anticipated that that early date would yield minimal overlap between costs incurred in the Island Air dispute and this interpleader action.

       31.  However, after the parties filed their defense cost worksheets, the parties requested a status conference to address the inclusion of interpleader fees in the defense cost worksheet.

       32.  At that status conference on July 8, 2024, ECF No. 221, the court clarified that, in the court's view, the fight in this interpleader case was over costs incurred in defending against claims in the Island Air dispute and any judgment that might follow, not over costs incurred in this interpleader action.  The court directed the parties to file statements explaining what, if any, amounts related to work done for this interpleader matter that had been included in their defense cost worksheets.

       33.  In those filings, the parties identified the following defense costs claimed in their worksheets as being related to this interpleader action:

       a.  Au Group:  $119,796.40 in fees.  ECF No. 225, PageID # 4684.

       b.  Gossert:  $86,606.94 in fees.  ECF No. 224, PageID # 4678.

90

c.   Marinelli:  $192,008.48 in total, of which
$135,486.00 was for work completed by Morrison & Foerster
professionals; $10,751.00 from TLM professionals, and $45,771.48
from Pillsbury professionals.  ECF No. 223, PageID #s 4627-28.

d.   Uchiyama: $47,319.35 in total ($45,190 in
fees and $2,129.35 in GET).[98]  ECF No. 222, PageID # 4622 (citing
Ex. 3016 at 0101-28).

34.  Courts have awarded attorneys' fees, to be funded
by interpleaded monies, to interpleader-plaintiffs for work
incurred in interpleader actions.  *E.g.*, *Trs. of the Dirs. Guild
of Am.-Producer Pension Benefits Plans v. Tise*, 234 F.3d 415,
426 (9th Cir. 2000); *San Rafael Compania Naviera, S.A. v. Am.
Smelting & Refin. Co.*, 327 F.2d 581, 587 (9th Cir. 1964);
*Schirmer Stevedoring Co. v. Seaboard Stevedoring Corp.,* 306 F.2d
188, 194 (9th Cir. 1962); *Metro. Life Ins. Co. v. Billini*, Civ.
S-06-02918 WBS KJM, 2007 WL 4209405, at *3 (E.D. Cal. Nov. 27,
2007); *Sun Life Assurance Co. v. Bew*, 530 F. Supp. 2d 773, 776
(E.D. Va. 2007); *Noeller v. Metro. Life Ins. Co.*, 190 F.R.D.
202, 207 (E.D. Tex. 1999).  In such situations, the Ninth

---

[98] At the status conference, Ito, representing the Au Group, said
Uchiyama's purported interpleader fees were actually incurred by
Uchiyama in defending against a claim brought by the Au Group in
the Island Air case.  In other words, Ito argued that these fees
were not related to this interpleader action.  However, having
heard Ito's description at the status conference, Uchiyama's
counsel still characterized $45,190 as interpleader fees, so the
court treats that amount as such.

Circuit has concluded that the "amount of fees to be awarded is committed to the sound discretion of the district court." *Tise*, 234 F.3d at 426.

35. However, in this case, the parties before the court are the Interpleader-Defendants, not interpleader-plaintiffs. QBE, which was discharged from this action when the court granted interpleader, was the sole Interpleader-Plaintiff.

36. The court has found no governing law on whether attorneys' fees, funded by interpleaded monies, may be awarded to an interpleader-defendant.

37. Moreover, the distinction between interpleader-plaintiffs and interpleader-defendants is significant. In awarding fees to interpleader-plaintiffs, the decisions in the *Schirmer Stevedoring* and *Tise* cases and their progeny hinge on an interpleader-plaintiff's attempt to interplead funds. For example, the *Tise* court explained that "the availability of attorneys' fees for interpleader plaintiffs recognizes that by bringing the action, the plaintiff benefits all parties 'by promoting early litigation on the ownership of the fund, thus preventing dissipation.'" *Tise*, 234 F.3d at 426 (quoting *Schirmer Stevedoring*, 306 F.2d at 193). An interpleader-plaintiff has no interest in the ultimate disposition of the fund. A fee award to an interpleader-plaintiff is therefore limited to "those fees that are incurred in filing the action

and pursuing the plan's release from liability, not in litigating the merits of the adverse claimants' positions." *Id.* *Tise* did not opine on the availability of fee awards funded by the interpleader fund for interpleader-defendants, but the reasoning of that case militates against such a conclusion.

38. As the court explained at the status conference on July 8, 2024, if counsel were fighting an insurer about whether a client was insured under a tort policy, the fees incurred in that coverage fight would not be paid from the tort policy proceeds. Fees relating to a coverage dispute might instead be recoverable under a policy provision separate from provisions on policy limits, or under a statute. By analogy here, the fees incurred in this interpleader action should not be reimbursed from interpleaded funds.

39. Accordingly, the court declines to award interpleader funds for fees related to this interpleader case. After removing those sums, the parties defense cost claims are as follows:

| Table 21. Defense Costs After Reduction No. 1 (Interpleader) | | | | |
|---|---|---|---|---|
| Name | Fees | Expenses | Other Charges | Total |
| Au Group | $2,494,295.00 | $ 480,340.02 | $ 306,185.46 | $3,280,820.48 |
| Gossert | 19,174.49 | 122.14 | 0.00 | 19,296.63 |
| Marinelli | 4,206,696.79 | 158,440.59 | 0.00 | 4,365,137.38 |
| Uchiyama | 47,468.57 | 2,385.15 | 0.00 | 49,853.72 |
| | | | Total | 7,715,108.21 |

93

## 2.    Reduction No. 2:   Hourly Rates.

40.   The Interpleader-Defendants have stipulated that hourly rates charged by Farmer, Aoki, Agena, Kubota, TLM, the Ito Law Group, and Adams Krek were reasonable.  *See* Stip. Facts, ECF No. 164, PageID # 3338.

41.   In this case, the issues surrounding the attorneys' fee requests center on the reasonableness of the hourly rates requested by attorneys and staff from Pillsbury and Morrison & Foerster, who were retained by the Ellison Parties.

42.   The court looks to the prevailing rates in this district for guidance as to the reasonableness of the hourly rates requested in this action.  The court emphasizes the distinction between "what one might charge and collect from a client and the prevailing rates awarded by a court."  *Onishi v. Redline Recovery Servs., LLC*, Civ. No. 10-00259 DAE-KSC, 2010 WL 5128723, at *2 n.1 (D. Haw. Nov. 12, 2010), *adopted*, 2010 WL 5128720 (D. Haw. Dec. 9, 2010).  In other words, while the court acknowledges that a party has a right to choose its own counsel and pay that counsel's rate, the court "is guided by the hourly rates generally awarded in this district, not the amounts charged to clients, nor rates that appear to be outliers."  *Au v. Funding Grp., Inc.*, 933 F. Supp. 2d 1264, 1275 (D. Haw. 2013).

43.   Recent cases in this district adjudicating attorneys' fee motions guide this court's analysis.   However, this court also emphasizes that the amounts deemed reasonable in this *interpleader action* may have no bearing on the reasonableness of requests in *attorneys' fee motions*.   Unlike attorneys' fee motions, in which the amount a client can pay might not factor into the analysis, here, the court must recognize the finite sum remaining in the interpleader fund and how much the parties' claims exceed the available funds.

### a.   Senior-Level Attorneys.

44.   Senior-level attorneys in this case charged the following hourly rates:

| Table 22. Hourly Rates of Senior-Level Attorneys | | |
|---|---|---|
| Name | Experience[99] | Rate |
| Lorenzo Marinuzzi | 27 years[100] | $    1,300.00-1,850.00 |
| Darryl P. Rains | 41 years[101] | 1,250.00-1,550.00 |
| Benjamin Butterfield | 9 years[102] | 975.00 |
| Rahman Connelly | 9 years[103] | 970.00-1,020.00 |
| Christopher J. Muzzi | 26 years[104] | 380.00-435.00 |
| Peter Ito | 32 years[105] | 400.00-525.00 |
| Christian Adams | 19 years[106] | 400.00-550.00 |
| David C. Farmer | 38 years[107] | 300.00 |
| Scott E. Kubota | 39 years[108] | 500.00-550.00 |
| James Y. Agena | 40 years[109] | 350.00 |
| Neal K. Aoki | 37 years[110] | 500.00-550.00 |

FOFs ¶¶ 153, 162, 183, 198.

---

[99] The court measures experience from the time of the attorney's licensure to February 3, 2023.

[100] Ex. 1149.

[101] *Id.*

[102] *Id.*

[103] Connelly Decl., ECF No. 204-1, PageID # 4313.

[104] Marinelli did not submit information as to the years of experience Muzzi has, but the court takes judicial notice of the Hawaiʻi State Bar Association's directory listing Muzzi as having been licensed in this state since 1997.

[105] Ito Decl., ECF No. 181, PageID # 3490.

[106] Adams Decl., ECF No. 180, PageID # 3482.

[107] Gossert did not submit information as to the years of experience Farmer has, but the court takes judicial notice of the Hawaiʻi State Bar Association's directory listing Farmer as having been licensed in this state since 1985.

[108] Kubota Decl., ECF No. 174, PageID # 3441.

[109] Agena Decl., ECF No. 172, PageID # 3432.

[110] Aoki Decl., ECF No. 173, PageID # 3438.

45.   The first four attorneys listed in the chart above, as well as Peter Ito, are out-of-district attorneys.   The other attorneys are based in Hawai'i.

46.   At the high end, this district has previously deemed $500 per hour to be reasonable for attorneys with over 40 years of experience.  *See Booth v. Wong*, No. 10-00680 DKW-RLP, 2015 WL 4663994, at *3 (D. Haw. July 17, 2015), *adopted*, 2015 WL 4676343 (D. Haw. Aug. 5, 2015) (finding reasonable a $500 hourly rate for Paul Alston, who had more than 40 years of experience, and a $300 hourly rate for an attorney with 20 years of experience); *Sunday's Child, LLC v. Irongate Azrep BW LLC*, No. 13-00502 DKW-RLP, 2014 WL 2451560, at *2-3 (D. Haw. May 30, 2014) (finding reasonable a $500 hourly rate for Terence O'Toole, who had over 40 years of experience); *but see Au*, 933 F. Supp. 2d at 1274 (finding $395 per hour was a reasonable hourly rate for Paul Alston, who had over 40 years of experience at the time of the court's ruling).  Of course, a court may also consider the nature of a case, the need for the particular experienced or specialized attorney, and related factors, not just years of experience.

47.   In recent years, this court has also reduced the hourly rate of a "Partner-in-Charge" with 34 years of experience from $500 to $425.  *Scalia v. Saakvitne*, No. 18-00155 SOM-WRP, 2020 WL 4193118, at *12 (D. Haw. July 21, 2020).

48.   For a "principal" attorney with 28 years of experience, this court determined that $400 per hour was reasonable.  *Reyes v. Tanaka*, No. 17-00143 JAO-KJM, 2020 WL 2857493, at *2 (D. Haw. June 2, 2020).

49.   For an attorney with 17 years of experience, this court has concluded that $250 was reasonable.  *ME2 Prods., Inc. v Pumaras*, No. 17-00078 SOM/RLP, 2017 WL 4707015, at *7 (D. Haw. Oct. 19, 2017).

50.   Here, the rates requested by the Pillsbury and Morrison & Foerster attorneys (Butterfield, Marinuzzi, Rains, and Connelly) are more than two-to-three times the high-end rates deemed reasonable for local counsel with over 40 years of experience, as well as two-to-three times the rates of all other senior-level attorneys in this case.

### b.   Associates.

51.  Associates seek the following rates:

| Table 23. Hourly Rates of Associates | | |
|---|---|---|
| Name | Experience | Rate |
| Cheryl Fraine | 10 years[111] | $    225.00 |
| Rebeka Takayama | 20 years[112] | 275.00 |
| Julian N. Radzinschi | 9 years[113] | 880.00-975.00 |
| Amanda Treleaven | 14 years[114] | 850.00 |
| Rahman Connelly | 7 years[115] | 805.00-880.00 |
| Miranda K. Russell | 2 years[116] | 650.00-765.00 |
| Karen Leung | 5 years[117] | 510.00 |
| Leila M. Rothwell | 22 years[118] | 300.00-335.00 |
| Kwame O. Akuffo | 6 years[119] | 675.00 |
| Andrew V. Alfano | 7 years[120] | 890.00-980.00 |
| Ryan J. Foley | Not submitted | 710.00 |
| Patti Rothenberg-Montz | 5 years[121] | 875.00-1,010.00 |

FOFs ¶¶ 153, 183.

---

[111] The Au Group did not submit information as to the years of experience Fraine has, but the court takes judicial notice of the Hawaiʻi State Bar Association's directory listing Fraine as having been licensed in this state since 2013.

[112] Similarly, the court takes judicial notice that Takayama has been licensed in this state since 2003.

[113] Ex. 1149.

[114] *Id.*

[115] Connelly was licensed in 2014.  Connelly Decl., ECF No. 204-1, PageID # 4313.  He worked at Morrison & Foerster as an associate until he joined Pillsbury.  *Id.*  He joined Pillsbury in January 2021.  Marinelli Decl., ECF No. 202-1, PageID # 4287.

[116] Ex. 1149.

[117] *Id.*

[118] Muzzi Decl., ECF No. 203-1, PageID # 4300.

[119] Ex. 1151.

[120] *Id.*

[121] *Id.*

52.  This district has previously awarded hourly rates
of $300 for an attorney with 18 years of experience, $225 with
11 years, and $200 with 5 to 10 years.  *Mueller v. Haw. Dep't of
Pub. Safety*, No. 17-00571 HG-WRP, 2022 WL 1207322, at *4 (D.
Haw. Apr. 7, 2022), *adopted*, 2022 WL 1204931 (D. Haw. Apr. 22,
2022); *see also Adams v. Pac. iWorks, LLC*, No. 20-00341 DKW-RT,
2021 WL 685190, at *8 (D. Haw. Feb. 1, 2021), *adopted*, 2021 WL
683887 (D. Haw. Feb. 22, 2021) (finding that an hourly rate of
$200, reduced from $350, was appropriate for an attorney with 5
years of experience); *Eckerle v. Deutsche Bank Nat. Tr.*, No. 10-
00474 SOM-BMK, 2012 WL 896266, at *3 (D. Haw. Feb. 21, 2012),
*adopted*, 2012 WL 896258 (D. Haw. Mar. 14, 2012) (approving the
requested $210 hourly rate for an associate with 5 years of
experience).

53.  Again, in this case, the rates requested by
associate attorneys from Pillsbury and Morrison & Foerster
(Radzinschi, Treleaven, Connelly, Russell, Leung, Akuffo,
Alfano, Foley, and Rothenberg-Montz) are two-to-four times the
rates deemed reasonable in this district for associates with
more years of experience than the out-of-district associates in
this case, as well as two-to-four times the rates requested by
local attorneys in this case with commensurate experience.

### c.    Paralegals.

54.    Paralegals in this action seek the following rates:

| Table 24. Hourly Rates of Paralegals | | |
|---|---|---|
| Name | Experience | Rate |
| Kayla Benyish | Not submitted | $     195.00 |
| Ashley King | Not submitted | 195.00-215.00 |
| Alvin West | 31 years[122] | 370.00-475.00 |
| Travis Fallon | 6 years[123] | 225.00 |

FOFs ¶¶ 153, 183.

55.    This district has previously concluded that $105 was a reasonable rate for a paralegal with 30 years of experience and $85 per hour was a reasonable rate for a paralegal with 8 years of experience.  *Balboa v. Haw. Care & Cleaning, Inc.*, No. 14-00009 ACK-RLP, 2015 WL 4418304, at *3 (D. Haw. June 23, 2015), *adopted*, 2015 WL 4418712 (D. Haw. July 17, 2015).

56.    The rate of the paralegal (West) from Morrison & Foerster is more than three-to-four times the rate deemed reasonable in this district and nearly double the rates of other paralegals in this action.  The court does recognize that West is a senior paralegal with significant experience who worked

---

[122] Ex. 1149.

[123] Muzzi Decl., ECF No. 203-1, PageID # 4300.  Fallon appears to be an attorney licensed in the District of Columbia who provided paralegal services for TLM in this action.  *See id.*

closely with Rains throughout the Island Air dispute.  Rains
Decl., ECF No. 186, PageID #s 3530, 3532.

**d.    Reasonable Hourly Rates.**

57.   The Interpleader-Defendants stipulated that
hourly rates charged by Farmer, Aoki, Agena, Kubota, TLM, the
Ito Law Group, Adams Krek were reasonable.  *See* Stip. Facts, ECF
No. 164, PageID # 3338.

58.   The court reiterates that Marinelli and the
Ellison Parties have a right to choose their attorneys and pay
their attorneys' hourly rates, however expensive those rates may
be.  The court is by no means suggesting how forthcoming or
pending motions for attorneys' fees in the underlying litigation
should be resolved.  This court acknowledges that high hourly
rates are sometimes justified given an attorney's relationship
with a client, the breadth of experience and resources available
to clients of larger national firms, and the positive outcome
obtained.  Marinelli and the Ellison Parties prevailed entirely
in the Island Air dispute.  Rains has significant experience and
specialization in corporate litigation, and in representing
companies and their officers and directors.  Rains Decl., ECF
No. 186, PageID # 3528.  Indeed, Farmer even recalled stating,
in an "effusive" moment, that Rains was "putting on a clinic for
local counsel."  Tr. Day 1, ECF No. 194, PageID # 3720.

102

59.  Still, this court must recognize that Marinelli is not alone in claiming finite Policy funds.  The attorneys' fees sought by Marinelli equate to 82 percent of the remaining sum.[124]  It would not be equitable for this court to award so much of that sum to one party.

60.  Moreover, to be reimbursed, the Policy requires that defense costs be reasonable.  Ex. 2000.  QBE made clear to Marinelli and the Ellison Parties that their retention of expensive national firms posed an issue for their defense cost reimbursement.[125]  For example, as discussed in FOF ¶ 176, in declining Marinelli's defense cost reimbursement request at the outset of this interpleader action, QBE noted in a letter to Rains that Marinelli and the Ellison Parties had "engaged two national law firms, in addition to local counsel, and incurred more than $3.5 million in legal fees and costs without informing QBE of the magnitude of the amounts being incurred and

---

[124] Marinelli seeks $4,398,705.27 in attorneys' fees.  FOF ¶ 183. There is $5,389,034.11 remaining in the interpleader fund. FOF ¶ 52.  To find the percentage of Marinelli's fees (x) relative to the remaining funds (y), the court divides x by y and then multiplies by 100:  ($4,398,705.27 ÷ $5,389,034.11) x 100 = 82 percent.

[125] The parties did not actively litigate QBE's position on the Ellison Parties' retention of two expensive national law firms, even though the court identified this as a possible issue for trial in its decision on the summary judgment motions.  ECF No. 113, PageID # 2708.

purporting not to request coverage for those amounts under the Policy." Ex. 1134 at 00832-33.

61.   Pursuant to the court's broad discretion to equitably award attorneys' fees in interpleader actions, the court reduces the requested fee awards of the Pillsbury and Morrison & Foerster professionals—Butterfield, Marinuzzi, Rains, Connelly, Radzinschi, Treleaven, Russell, Leung, Akuffo, Alfano, Foley, Rothenberg-Montz, and West—by half.  Reducing the fee award by half has the same effect as reducing each professionals' hourly rate by half.  After this halving, and accounting for Reduction No. 1 (Interpleader Fees), the reasonable fees sought by Marinelli on behalf of the professionals from Pillsbury and Morrison & Foerster total $2,202,641.37, apportioned as follows:

Case 1:22-cv-00450-SOM-KJM   Document 230   Filed 07/26/24   Page 110 of 125   PageID.4960

| Table 25. Reasonable Rates for Morrison & Foerster Professionals | | | | |
|---|---|---|---|---|
| Name[126] | Requested Rates | Requested Fees | Reasonable Rates | Reasonable Fees |
| Butterfield | $ 975.00 | $ 6,932.25 | $ 487.00 | $ 3,466.12 |
| Marinuzzi[127] | 1,300.00-1,850.00 | 13,123.87 | 650.00-925.00 | 6,561.94 |
| Rains[128] | 1,250.00-1,550.00 | 1,976,690.85 | 625.00-775.00 | 988,345.43 |
| Connelly | 805.00-880.00 | 763,502.40 | 402.50-440.00 | 381,751.20 |
| Leung | 510.00 | 9,776.70 | 255.00 | 4,888.35 |
| Radzinschi | 880.00-975.00 | 226,379.70 | 440.00-487.50 | 113,189.85 |
| Russell | 650.00-765.00 | 21,079.35 | 325.00-382.50 | 10,539.66 |
| Treleaven | 850.00 | 120,105.00 | 425.00 | 60,052.50 |
| West | 370.00-475.00 | 73,124.14 | 185.00-237.50 | 36,562.07 |
| Requested Total | | 3,210,714.26 | Reasonable Sub-Total | 1,605,357.13 |

---

[126] For citations supporting the requested hourly rates and total fees sought by each professional in this Table and Table 25, see the Tables in FOF ¶ 183.

[127] Marinelli seeks $15,636.37 for Marinuzzi's fees. FOF ¶ 183. The "Requested Fees" listed in this Table for Marinuzzi reflect the deduction of $2,512.50 for interpleader-related work, *see* ECF No. 223-1, PageID # 4639, which was removed in Reduction No. 1.

[128] Marinelli seeks $2,109,664.35 for Rains's fees. FOF ¶ 183. The "Requested Fees" listed in this Table for Rains account for the deduction of $132,973.50 related to interpleader work, *see* ECF No. 223-1, PageID #s 4630-55, which was removed in Reduction No. 1.

| Table 26. Reasonable Rates for Pillsbury Professionals | | | | |
|---|---|---|---|---|
| Name | Requested Rates | Requested Fees | Reasonable Rates | Reasonable Fees |
| Connelly[129] | $ 970.00-1,020.00 | $ 739,343.52 | $ 485.00-510.00 | $ 369,671.76 |
| Akuffo | 675.00 | 1,701.00 | 337.50 | 850.50 |
| Alfano | 890.00-980.00 | 22,504.50 | 445.00-490.00 | 11,252.25 |
| Foley | 710.00 | 11,776.77 | 355.00 | 5,888.38 |
| Rothenberg-Montz | 875.00-1,010.00 | 22,070.79 | 437.50-505.00 | 11,035.40 |
| | Requested Total | 797,396.58 | Reasonable Sub-Total | 398,698.29 |

62.  Even after being cut in half, the rates of the Pillsbury and Morrison & Foerster professionals remain higher than those awarded to the other professionals in this case and those generally awarded in this district to attorneys with commensurate—and in many cases, more—experience.  But halving the rates brings those rates more in line with Hawaiʻi rates, and applying an across the board 50 percent reduction avoids the need to scour the voluminous time records to make individual adjustments to rates that varied over time.  Given the finite Policy funds, the other Interpleader-Defendants' competing claims, the Policy's requirement that rates be reasonable, and QBE's apparent hesitation with regard to the Ellison Parties' retention of two national law firms in addition to local

[129] Marinelli seeks $785,115.00 for fees Connelly billed at Pillsbury.  FOF ¶ 183.  The "Requested Fees" listed in this Table for Connelly account for the deduction of $45,771.48 related to interpleader work, see ECF No. 223-1, PageID #s 4669-72, which was removed in Reduction No. 1.

counsel, this court concludes that cutting the Pillsbury and Morrison & Foerster professionals' rates in half is equitable. In so stating, this court is not stating that out-of-district attorneys should invariably assume their rates will be cut.  Nor should Hawaiʻi attorneys assume that this court will invariably adopt hourly rates equivalent to those awarded here to out-of-district attorneys.  This case went to trial in an interpleader context, and this decision is being rendered in that unusual circumstance.

63.  After the hourly rates of the Pillsbury and Morrison & Foerster professionals are cut in by half, the parties' defense cost claims are as follows:

| Table 27. Defense Costs After Reduction No. 2 (Hourly Rates) | | | | |
|---|---|---|---|---|
| Name | Fees | Expenses | Other Charges | Total |
| Au Group | $2,494,295.00 | $   480,340.02 | $   306,185.46 | $3,280,820.48 |
| Gossert | 19,174.49 | 122.14 | 0.00 | 19,296.63 |
| Marinelli | 2,202,641.37 | 158,440.59 | 0.00 | 2,361,081.96 |
| Uchiyama | 47,468.57 | 2,385.15 | 0.00 | 49,853.72 |
| | | | Total | 5,711,052.79 |

### 3.   Reduction No. 3:   Uninsured Co-Defendants.

64.  In the underlying dispute, counsel for Marinelli and the Au Group represented other parties who were not Policy insureds.  FOFs ¶¶ 12, 16-17, 70-73.

65.  Counsel for Marinelli and the other Ellison Parties testified that a 20 percent reduction in defense costs would "more than fairly" exclude items that would not be valid

107

defense costs under the Policy because those items represented work on behalf of Marinelli's related uninsured co-defendants. Connelly Decl., ECF No. 204-1, PageID #s 4317-18; Muzzi Decl., ECF No. 203-1, PageID # 4306; Rains Decl., ECF No. 186, PageID # 3538.  After reviewing the billings, the court concludes that a 20 percent reduction is appropriate and fair (not "more than fair").  In so concluding, this court also factors in its concern about the effect of counsel's joint representation of uninsured co-defendants related to Marinelli.  It is unthinkable that a client's resources would be totally ignored in devising a strategy in a case such as the underlying dispute, and Marinelli, as Ellison's employee, would not have had Ellison's resources.  Marinelli paid no legal bills at all, but his attorneys were fully paid by Lawrence Investments (not by QBE). *E.g.*, Marinelli Decl., ECF No. 202-1, PageID # 4288; Tr. Day 2, ECF No. 195, PageID # 3857.

    66.  The Au Group identified $68,123.50 in fees and $6,177.69 in costs related to uninsured co-defendants.[130]  ECF No. 225, PageID # 4685.

---

[130] At a post-trial status conference held on July 8, 2024, the court gave the Au Group's attorneys the option of either proposing a percentage reduction to their defense costs to account for work completed on behalf of the uninsured co-defendants, as Marinelli's counsel did, or, given Ito's meticulous billing records, identifying to the court the exact amount of defense costs incurred on behalf of the uninsured co-defendants.

67.  After reducing Marinelli's and the Au Group's defense costs accordingly, the parties' defense cost claims are as follows:

| Name | Fees | Expenses | Other Charges | Total |
|---|---|---|---|---|
| Table 28. Defense Costs After Reduction No. 3 (Uninsureds) | | | | |
| Au Group | $2,426,171.50 | $   474,162.33 | $   306,185.46 | $3,206,519.29 |
| Gossert | 19,174.49 | 122.14 | 0.00 | 19,296.63 |
| Marinelli | 1,762,113.10 | 126,752.47 | 0.00 | 1,888,865.57 |
| Uchiyama | 47,468.57 | 2,385.15 | 0.00 | 49,853.72 |
| | | | Total | 5,164,535.21 |

### 4.   Reduction No. 4:  Rule 2004 Subpoenas.

68.  The Au Group also included $306,185.46 in "other charges" in its defense costs worksheet for work related to Rule 2004 Subpoenas issued prior to the filing of the First Adversary Proceeding.  Au Grp. Def. Cost Worksheet, ECF No. 213, PageID #s 4541-44.

69.  At the status conference held on July 8, 2024, the other parties indicated that they had not included defense costs related to the Rule 2004 subpoenas in their claims against the interpleader fund.

70.  The court declines to award defense costs to the Au Group for work related to the Rule 2004 subpoenas.

71.  After reducing the Au Group's award, and accounting for all four tranches of reductions, the court deems the following defense costs reasonable:

| Table 29. Reasonable Defense Cost Claims up to February 3, 2023 | | | | |
|---|---|---|---|---|
| Name | Fees | Expenses | Other Charges | Total |
| Au Group | $2,426,171.50 | $   474,162.33 | $      0.00 | $2,900,333.83 |
| Gossert | 19,174.49 | 122.14 | 0.00 | 19,296.63 |
| Marinelli | 1,762,113.10 | 126,752.47 | 0.00 | 1,888,865.57 |
| Uchiyama | 47,468.57 | 2,385.15 | 0.00 | 49,853.72 |
| | | | Total | **4,858,349.75** |

        **F.**    ***Pro Rata* Distribution.**

       72.  The principal amount held by this court ($5,389,034.11) covers more than the Interpleader-Defendants' reasonable defense costs claims ($4,858,349.75) up to February 3, 2023.

       73.  This means that, after accounting for all reasonable defense cost claims, this court has $530,684.36 remaining in the interpleader fund.  That there is this excess over what this court has determined were reasonable amounts comes as a surprise.  This court, and presumably the parties, did not anticipate any such excess.

       74.  Having deposited all remaining Policy funds, QBE appears to have intended all of those funds to be distributed by this court to insureds.  Even though the court has calculated reasonable fees and costs through February 3, 2023, as totaling less than QBE deposited with the court, disbursement of any excess is entirely equitable.  After all, the parties continued to incur fees and costs even after funds were deposited with the court, possibly at a faster rate than before February 3, 2023,

as discovery in the underlying dispute proceeded and then jury
and equitable issues were litigated in that underlying dispute.

75. Courts favor *pro rata* distributions under the
circumstances presented here. *See Burchfield v. Bevans*, 242
F.2d 239, 242 (10th Cir. 1957) ("Whenever several persons are
all entitled to participate in a common fund, or are all
creditors of a common debtor, equity will award a distribution
of the fund, or a satisfaction of the claims, in accordance with
the maxim, Equality is equity; in other words, if the fund is
not sufficient to discharge all claims upon it in full, or if
the debtor is insolvent, equity will incline to regard all the
demands as standing upon equal footing and will decree a pro
rata distribution or payment."); *see also Fed. Ins. Co. v.
Areias*, 680 F.2d 962, 965 (3d Cir. 1982); *Hebel v. Ebersole*, 543
F.2d 14, 18 (7th Cir. 1976); *Ruddle v. Moore*, 411 F.2d 718, 719
(D.C. Cir. 1969); *Hudson Ins. Co. v. Klamath Superior Motor Co.,
Inc.*, No. 1:17-CV-00984-CL, 2018 WL 734669, at *2 (D. Or. Feb.
6, 2018); *Chi. Ins. Co. v. Abstract Title Guar. Co., Inc.*, No.
1:03-CV-00590-JDT-TA, 2004 WL 2750258, at *3 (S.D. Ind. Oct. 12,
2004); *Fid. Bank v. Commonwealth Marine & Gen. Assurance Co.*,
581 F. Supp. 999, 1019 (E.D. Pa. 1984); *State Farm Mut. Auto.
Ins. Co. v. Hamilton*, 326 F. Supp. 931, 936-38 (D.S.C. 1971);
*Gakiya v. Hallmark Props., Inc.*, 68 Haw. 550, 554, 722 P.2d 460,
463 (1986); *Territory v. Mellor*, 33 Haw. 523, 525 (1935);

*Sheehan v. Liberty Mut. Fire. Ins. Co.*, 258 So. 2d 719, 723-24
(Ala. 1972); *Ariz. Pub. Serv. Co. v. Lamb*, 327 P.2d 998, 1001
(Ariz. 1958).

76.   "*Pro rata* means 'proportionately according to an
exactly calculable factor (such as share or liability).'"
*Hudson Ins. Co.*, 2018 WL 734669, at *3 (quoting Webster's New
Collegiate Dictionary 944 (1985)).

77.   Courts have created various equitable proration
schemes.  For example, when designing a *pro rata* distribution of
a fund that covered only 37.72 percent of the total amount
sought by all claimants, the federal district court in Oregon
determined that each claimant was entitled to 37.72 cents on the
dollar of the amount the claimant sought.  *Id.* at *3; *see also*
*Hamilton*, 326 F. Supp. at 937-38; *Sheehan*, 258 So. 2d at 724
(both cases concluding that claimants were entitled to the
proportion of the fund that the amount of their individual
claims bore to the total amount of all claims).

78.   The court is very much aware that Gossert ended
up entering into a settlement agreement that obligated him to
pay $50,000 from his personal account.  That settlement,
however, was agreed to so long after February 3, 2023, that this
court thinks the excess of $530,684.36 would have been exhausted
before then had QBE not deposited the funds with the court.  In
saying that, this court looks at the rate at which fees and

costs were incurred before funds were interpleaded.  This court therefore considers only the parties' fees and costs in allocating any excess above reasonable amounts incurred up to February 3, 2023.

79.  Relying on its calculation of the total of $4,858,349.75 as the reasonable fees and costs awardable, and then adding back in the amounts paid to Gossert and Uchiyama before funds were deposited with this court, the court has calculated the percentage share associated with each Interpleader-Defendant.  The court has applied that percentage to the excess amount of $530,684.36.

80.  This court recognizes that this pro data distribution of the excess is not the only way to handle the excess.  The court could, for example, simply divide the excess into fourths and award each party its quarter.  Alternatively, the court could reopen the evidence and invite further evidence on the fees and costs insured after February 3, 2023, up to some new designated date.  But the court expects that litigation over what that new date should be and the reasonableness of the fees and costs up to that date would be exceedingly expensive.

Quite apart from the interests of judicial economy, the costs to the parties, coupled with the risk of a result worse than that proposed here by this court, might make additional trial proceedings not only ineffective from a cost

perspective but possibly substantively ill-advised.  The bench trial that this court conducted turned out to yield less help to the court than anticipated, and further trial proceedings might be similar.  Operating within equitable principles, this court thinks the distribution set forth here qualifies as an equitable pro rata distribution of the excess of $530,684.36.

81.  The court apportions the remaining $530,684.36 among the parties in accordance with the share of the Policy limit of $6,000,000 that each party's reasonable fees and costs occupies.  This court takes into account the sums paid to Kubota ($204,584.71) and Farmer ($282,193.78) before the deposit of any Policy funds with the court.[131]

---

[131] See FOF ¶ 157 n.49 for calculations of the amounts Kubota and Farmer were paid.  QBE appears to have deemed these sums "reasonable" because QBE paid them out to Kubota and Farmer.  No party has challenged those payments.

a.   First, the court calculates for each of the Interpleader-Defendants the total reasonable defense costs awarded by this court and paid by QBE before it deposited funds with the court:

| Table 30. Total Reasonable Defense Costs | | | |
|---|---|---|---|
| Name | Defense Costs Awarded in this Order | Defense Costs Paid Prior to Fund Deposit | Total Reasonable Defense Costs |
| Au Group | $2,900,333.83 | $       0.00 | $2,900,333.83 |
| Gossert | 19,296.63 | 282,193.78 | 301,490.41 |
| Marinelli | 1,888,865.57 | 0.00 | 1,888,865.57 |
| Uchiyama | 49,853.72 | 204,584.71 | 254,438.43 |
| | | Total | 5,345,128.24 |

b.   Next, the court divides the individual shares of each Interpleader-Defendant by the total reasonable defense costs addressed in this order.  The court treats the result as the percentage of total reasonable defense costs occupied by each Interpleader-Defendant:

| Table 31. Remainder Percentage Calculation | |
|---|---|
| Name | Formula |
| Au Group | $2,900,333.83 ÷ $5,345,128.24 = 54.26 percent |
| Gossert | 301,490.41 ÷  5,345,128.24 =  5.64 percent |
| Marinelli | 1,888,865.57 ÷  5,345,128.24 = 35.34 percent |
| Uchiyama | 254,438.43 ÷  5,345,128.24 =  4.76 percent |

c.   Finally, the court multiples the remainder ($530,684.36) by each Interpleader-Defendant's percentage to calculate how much of the excess $530,684.36 each Interpleader-Defendant is entitled to:

| Table 32. Remainder Allocation | |
|---|---|
| Name | Formula |
| Au Group | 54.26 percent x $530,684.36 = $287,956.01 |
| Gossert | 5.64 percent x  530,684.36 =  29,933.10 |
| Marinelli | 35.34 percent x  530,684.36 =  187,533.65 |
| Uchiyama | 4.76 percent x  530,684.36 =  25,261.60 |

Thus, the Au Group's reasonable defense costs constitute 54.26 percent of the total reasonable defense costs, so the Au Group is entitled to an additional $287,956.01, which is 54.26 percent of the remaining $530,684.36.

Gossert's reasonable defense costs represent 5.64 percent of the total reasonable defense costs, so he is entitled to an additional $29,933.10, which is 5.64 percent of the remaining $530,684.36.

Marinelli's reasonable defense costs equal 35.34 percent of the total reasonable defense costs, so he is entitled to an additional $187,533.65, which is 35.34 percent of the remaining $530,684.36.

Uchiyama's reasonable defense costs total 4.76 percent of the total reasonable defense costs, so he is entitled to an additional $25,261.60, which is 4.76 percent of the remaining $530,684.36.

82.   In total, the interpleader fund shall be dispersed as follows:

| Table 33. Interpleader Fund Disbursement | | | |
|---|---|---|---|
| Name | Reasonable Defense Costs | Allocation of Remainder | Total Award |
| Au Group | $2,900,333.83 | $   287,956.01 | **$3,188,289.84** |
| Gossert | 19,296.63 | 29,933.10 | **49,229.73** |
| Marinelli | 1,888,865.57 | 187,533.65 | **2,076,399.22** |
| Uchiyama | 49,853.72 | 25,261.60 | **75,115.32** |

|  | Total Disbursement | 5,389,034.11 |
|---|---|---|
|  | Remaining Funds | 0.00 |

## VI.        COURT REGISTRY INVESTMENT SYSTEM.

83.   The funds paid into this court were deposited by this court in a national judiciary account called the Court Registry Investment System, or CRIS.   That account earns interest.   This court recently inquired about the amount of interest that has accrued and was told that the amount as of a few days ago was $227,800.79.   Of course, the final amount will presumably be greater, as interest will continue to accrue until disbursement.

84.   The accrued interest will be divided among the Interpleader-Defendants based on the amount of their reasonable defense costs paid out of the interpleaded funds.

117

85.  The court divides the amount of defense costs awarded in this action by the remaining interpleader funds ($5,389,034.11) to calculate the percentage of the accrued interest that each Interpleader-Defendant is entitled to:

| Table 34. Interest Percentage Calculation | |
|---|---|
| Name | Formula |
| Au Group | $3,188,289.84 ÷ $5,389,034.11 = 59.16 percent |
| Gossert | 49,229.73 ÷ 5,389,034.11 = 0.91 percent |
| Marinelli | 2,076,399.22 ÷ 5,389,034.11 = 38.53 percent |
| Uchiyama | 75,115.32 ÷ 5,389,034.11 = 1.39 percent |

Thus, the Au Group is entitled to 59.16 percent of the accrued interest; Gossert to 0.91 percent; Marinelli to 38.53 percent; and Uchiyama to 1.39 percent.

VII.      CONCLUSION AND ORDER.

        The court allocates the funds interpleaded into court
as follows:

        a.    To the Au Group:  $3,188,289.84of the principal
plus 59.16 percent of accrued interest.

        b.    To Gossert:  $49,229.73 of the principal plus
0.91 percent of accrued interest.

        c.    To Marinelli:  $2,076,399.22 of the principal
plus 38.53 percent of accrued interest.

        d.    To Uchiyama:  $75,115.32 of the principal plus
1.39 percent of accrued interest.

        The Clerk is DIRECTED to enter judgment as noted above
and to close this file.

        In its original order issued on July 17, 2024, ECF No.
226, the court directed the parties to confer about whether the
court should disburse funds upon entry of judgment or should
continue to hold funds if any appeal is taken.  The parties have
informed the court of their agreement that "once the judgment is
final and non-appealable, the funds may be distributed."  ECF
No. 227, PageID # 4841.  If there is an appeal, the parties ask
the court to continue to hold the funds.  *Id.*

        Thus, if after 30 days from the issuance of this
order, no appeal has been taken, the Clerk of Court is DIRECTED
to contact CRIS to disburse the funds pursuant to the allocation

119

described above in this Conclusion and Order.  On the other hand, if an appeal is filed, the Clerk of Court is DIRECTED to continue to hold the funds pending the resolution of the appeal and any remand from the appellate court.

Additionally, if this Order is appealed, Marinelli has informed the court that *Marinelli v. QBE Specialty Insurance Co.*, Civ. No. 22-00391 (D. Haw.), should proceed.  *Id.* at PageID # 4841.  In that event, he expects to request a stay pending the resolution of the appeal of this Order.  If this Order is not appealed, Marinelli has indicated that his suit against QBE should be dismissed.  *Id.*

IT IS SO ORDERED.

DATED:  Honolulu, Hawaiʻi, July 26, 2024.



/s/ Susan Oki Mollway
Susan Oki Mollway
United States District Judge


*QBE Specialty Insurance Co. v. David Uchiyama et al.*, Civ. No. 22-00450 SOM-KJM; AMENDED POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW AND EQUITY; ORDER.